ELDRIDGE HAWKINS, LLC, Attorney at Law
60 Evergreen Place, Suite 510
East Orange, NJ 07018
Phone (973) 676 5070 Fax (973) 676 7356
hwklaw@aol.com
Attorney Id: 214731967

CECILE D. PORTILLA, ATTORNEY AT LAW LLC
7 Glenwood Avenue, Suite 400
East Orange, NJ 07017
Phone (973) 419 2325 Fax (973) 669 3268
Attorney Id :021212005
Portillalaw@gmail.com

| | |
|---|---|
| **IN THE MATTER OF CECILE DELROSE PORTILLA, ESQUIRE AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY**<br><br>**(0121212005)** | **SUPREME COURT OF NEW JERSEY**<br>**M-974-September Term 2025**<br>**0920260**<br><br>**BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE** |

## PRELIMINARY STATEMENT

This Court must decline to impose reciprocal discipline because the underlying state temporary suspension is structurally invalid and constitutionally infirm. The Office of Attorney Ethics ("OAE") failed to satisfy its baseline burden of demonstrating that Respondent poses any "substantial threat of serious harm" to clients or the public. Instead, the state disciplinary machinery was weaponized to execute an unlawful campaign of

retaliation against protected First Amendment whistleblowing, while violating Title II of the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12102(1)(C), by targeting Respondent under a prohibited, pretextual "regarded as" disability framework.

To circumvent these federal statutory and constitutional boundaries, the OAE engaged in a calculated **"TRIAL BY AMBUSH"** before the state tribunal. Specifically, on June 18, 2026—a full year after the initial June 10, 2025 referral—the OAE weaponized a final disciplinary reply brief to introduce brand-new, fabricated, and patently false accusations for the absolute first time. The OAE falsely asserted that Respondent authored "pleadings" "clients" omitting legal merits in favor of discussing the Federal Bureau of Investigation ("FBI").

This sudden, eleventh-hour pivot was a calculated maneuver designed to mislead the state tribunal, mask the OAE's failure to meet the strict legal thresholds for an emergency medical suspension, and evade the stringent restrictions of the ADA. Because state procedures strictly bar sur-replies, Respondent was entirely deprived of procedural safeguards defend her protected livelihood against these serious, brand-new accusations. The OAE deliberately exploited this manufactured, one-sided record to secure Respondent's rapid-fire temporary suspension on July 9, 2026.

Furthermore, this ambush caps a historical pattern of information concealment. Prior to the investigative interview on August 11, 2025, Respondent was completely denied an inspection of the case file. When counsel requested discovery on August 7, 2025, the OAE explicitly refused, telling counsel to guess what documents formed the basis of the

prosecution. Forcing an attorney to defend her license without basic administrative discovery subverts the bedrock principles of due process. Because the underlying state proceedings were fundamentally infected by a want of due process, an absolute infirmity of proof, and objective bad-faith retaliation, the imposition of reciprocal discipline by this Court would constitute a grave injustice.

## STATEMENT OF FACTS (WITH CERTIFICATION SUPPORT)

### I. Plaintiff's Whistleblower Status and Resulting Technical Interferences

Plaintiff Cecile D. Portilla, Esq., who is also a Registered Nurse (RN), is a documented whistleblower against her former employer and against a U.S. Special Agent. She blew the whistle in her executive capacity as Director of Clinical Services at a healthcare facility, against her employer and subsequently reporting the Special Agent to the federal government for a severe neglect of duty. By virtue of these actions, she is entitled to robust whistleblower protections recognized under the **42 U.S.C. § 12203(a), 31 U.S.C. § 3730(h) and** New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 *et seq.*

During a February 2014 Department of Justice (DOJ) interview concerning her reports, the Special Agent exhibited open hostility toward Plaintiff as a whistleblower. Before permitting her to depart, he demanded a comprehensive list of all her phone numbers—despite a single contact number being objectively sufficient. Immediately following this encounter, Plaintiff's landline and all three of her personal cell phones were subjected to severe, unprecedented technical interferences, forcing her to abandon her

mobile devices and resort exclusively to pay phones or borrowed lines to protect her communications. (Cert. of Portilla[1])

## II. The Emergence of eCourts Interface Interferences and Document Manipulation

Plaintiff subsequently observed severe, systemic interferences infiltrating the New Jersey judiciary's electronic filing platform (eCourts). Portilla initially brought these electronic anomalies to the attention of her family and her co-counsel, Eldridge Hawkins, Esq., both of whom verified the observations. As the interface defects escalated, Plaintiff formally put court staff on notice in 2022. The electronic system began generating severe digital "blind spots" and obscured documents, resulting in multiple Superior Court judges falsely accusing Attorney Hawkins—whom Plaintiff was actively assisting—of failing to file critical, mandatory documents that had already been successfully submitted.

These systemic software anomalies led directly to a wave of unjust case dismissals and a flurry of emergency appeals. The technical interference persisted at both the Appellate Division and the Supreme Court levels. Between 2022 and 2024, Plaintiff filed multiple formal communications with the Appellate Division advising management that court documents were actively rotating sideways and developing rogue, unauthorized hyperlinks within the system interface. Critically, these institutional communications focused strictly on technical remediation and contained no reference to her FBI whistleblower disclosures. Because neither the Appellate Division nor the Supreme Court accepts documents that are digitally distorted or hyperlinked, clerk staff repeatedly rejected the submissions. Despite these ongoing platform failures, every single

[1] Certification of Cecile D. Portilla, Esquire date August 10, 2026

request by Plaintiff to bypass the broken interface and submit emergency paper filings was flatly denied.

**III. The Severe Structural Failures and Document Obscuration *Faulknor.***

The devastating legal consequences of these electronic platform defects culminated in the matter of *Faulknor v. County of Hudson, et al.* On March 30, 2021, Attorney Hawkins successfully uploaded six separate, timely, and complete Notices of Tort Claim, (NOCs) alongside the critical curriculum vitae (CV) of Dr. Faulknor, to the Hudson County eCourts platform in direct opposition to a defense Motion for Summary Judgment. **(Ra710-11, Ra695-709)** The official electronic case jacket demonstrates that between 2018 and 2021, variations and submissions of these identical NOC had been uploaded to the court system a total of thirty-seven (37) separate times, firmly embedding them within the trial court record.

Despite the physical and electronic existence of these thirty-seven successful filings, the trial court entered an Order on June 3, 2021, granting Summary Judgment to Defendants and dismissing multiple counts of the Complaint. In its written opinion, the court stated: *"There was no notice of claim filed as required by N.J.S.A. 59:8-8... for this reason, any tort claims, however plead in the complaint, are dismissed."* **(Cert. of Cecile D. Portilla, Ra688-689).** Based entirely upon this catastrophic interface failure-however caused or engineered—the court stripped Dr. Faulknor of her foundational claims. Furthermore, the eCourts platform failed to display Dr. Faulknor's critical CV, which directly refuted the defense's summary judgment allegation that she had concealed a former employer. Due to this digital omission, the trial court explicitly noted in its opinion: *"She cannot recall whether she submitted her CV which she claims contains her full work*

*history."* **(Ra687).** Because these vital documents had been properly transmitted with valid electronic receipts, Plaintiff and Attorney Hawkins were forced to conclude that the trial court was either deliberately ignoring the record or that the record was being intentionally undermined to benefit the County. Based on the evidence available at that time, Attorney Hawkins filed a Motion to Recuse Judge D'Elia alongside a Motion for Reconsideration.

**IV. Docket Retroactivity, Visual Corruption, and the Failure of State Administrative Relief**

The structural failure of the eCourts platform to display critical entries further manifested when the core Order of Dismissal itself completely failed to appear on the public electronic portal. For nearly two weeks following the June 3, 2021 ruling, no summary judgment order was visible to Plaintiff's counsel. On June 14, 2021, Plaintiff's counsel was required to contact the court directly to request a copy of the ruling via alternative channels to preserve the timeline for reconsideration. **(Ra751)**

When the Order finally appeared on the electronic portal, it was dated June 3, 2021, confirming that the court's own decrees resided within a systemic electronic blind spot. The structural corruption of the online docket remains permanently visible on the platform. For example, a key copy of the Advanced Practice Nurse (APN) Act—submitted to demonstrate why Dr. Faulknor could not execute certain paperwork presented by nursing staff—is permanently displayed on the eCourts interface inverted upside down. The digital filing system corrupted and inverted the orientation of the submission, rendering it visually illegible to reviewers, obstructing Dr. Faulknor's fundamental right to petition the court. **(Ra728).** Seeking to alert the judiciary to these overlooked documents, Atty Hawkins filed

a Motion for Reconsideration on July 1, 2021, and re-uploaded the exact same six NOCs.**(Ra738-50).** Due to the ongoing system-wide electronic "blind spots" and eCourts processing failures, these items remained entirely obscured on the electronic docket and were never reviewed on their substantive merits. To escape what appeared to be a corrupted and heavily biased judicial environment, Atty Hawkins moved to transfer venue. He filed a motion directed to the Assign. Judge requesting a change of venue, and demanding that all of Judge D'Elia's rulings be vacated in the interest of justice. **(Ra728, Ra757-58)** The Assignment Judge denied the motion, echoing Judge D'Elia's characterization that counsel was simply dissatisfied with an adverse decision. The Assignment Judge likewise failed to inspect the eCourts interface or review the NOCs and CV that the system had obscured.

**V. The Extraordinary January 31, 2025 Administrative Cyber-Anomaly**

On January 31, 2025, an extraordinary technical anomaly occurred on the Supreme Court's electronic platform: unauthorized third parties bypassed standard security protocols to upload[2] the denied recusal order and a denied reconsideration order signed by Judge D'Elia completely outside of the formal appendices. After Portilla denied uploading these documents and exposed the security breach, the Supreme Court Clerk officially marked these rogue entries on the case jacket as **"submitted in error."(Ra297, Ra298)**

---

[2] As a professional writer, Plaintiff Portilla is acutely aware of the precise meaning and application of language. There is a distinct, legally recognized difference between establishing conclusive "proof of unauthorized access" and articulating a "perception" regarding the identities of those responsible. While Portilla properly relied on substantial circumstantial evidence—derived from her documented whistleblowing history and subsequent threats—she proactively sought the assistance of the Essex County Prosecutor's Office (ECPO) to secure definitive forensic verification. Investigator Chopra's certification reveals a fundamental misunderstanding of the term "perception." Chopra baseline insults Plaintiff by asserting she cannot distinguish what constitutes direct evidence, while simultaneously disregarding a bedrock tenet of litigation: legal practitioners routinely rely on circumstantial evidence when direct evidence is unavailable. (See Exhibit B to ECF No. 87).

## VI. The Escalation of Systemic Electronic Failures and Forced Physical Remediation in Trenton

From April to May 30, 2025, the historical profound professional frustration generated by the **historic** friction between Eldridge Hawkins, Esq., and the Hudson County judiciary—stemming directly from Judge D'Elia's **incorrect** assertion that the six critical Notices of Tort Claim and Faulknor's CV were never filed remained a severe, un-remedied injury. Plaintiff was recently forced to reexamine those exact six old Notices of Claim from Hudson County after the two surreptitiously uploaded two August 6, 2021 denied Orders of Judge D'Elia to the **Supreme Court platform** on January 31, 2025 by the third parties. **(Ra297, Ra298)**

Plaintiff had no legal or statutory duty to file the appellate briefs or original petitions on behalf of litigants Lopez and Faulknor; she had done so entirely at her firm's own expense to ***prevent a total miscarriage of justice.*** None of these documents mention FBI.(See Cert. of Portilla) The precise filing subsequently referred by the NJ Supreme Court to the OAE was a motion to vacate and reconsider the Lopez dismissed petition, brought explicitly pursuant to **New Jersey Court Rule 4:50-1(c)** for fraud upon the court, and **Rule 4:50-1(f)** for extraordinary circumstances. Plaintiff also moved to hold the *Faulknor* petition in abeyance, with the objective that once the third-party upload was forensically investigated, equity would dictate returning the matter to the trial court for a full hearing under **Rule 1:13-1**. (Cert. of Portilla, **Ra644, Ra646**)

The shocking sight of these two rogue electronic entries related to the previous friction and anger in Hudson County prompted Plaintiff to file the **Rule 4:50-1(c) and (f)** application to vacate Lopez's denied petition, exposing the state's tolerance of rogue hyperlinks, rotating pages, and systemic electronic blind spots that prevented judges from viewing properly filed documents. Critically, neither the *Lopez* nor *Faulknor* original Supreme Court petitions, nor their respective appellate briefs, made any reference to the FBI. There was nothing to

reconsider as neither Lopez' Appeal nor his petition were heard on the merits. Plaintiff's Rule 4:50 filings alleged a constructive fraud upon the court under Rule 4:50-1 based entirely on deliberate indifference to severe electronic filing disruptions that started in the Appellate Division that actively followed both Lopez's and Faulknor's matters into the Supreme Court. When these electronic filing failures occurred, Plaintiff did not merely write letters. She personally executed multiple emergency trips to Trenton to secure physical remediation, meeting directly with Paige Ennis and former Appellate Clerk Saul Hernandez. Mr. Hernandez explicitly acknowledged the gravity and nature of the technical interference by advising her that she should have told him about her whistle blower status. **(Cert. of Portilla).**

The electronic environment surrounding the *Lopez* Supreme Court filing was even more severely degraded than *Faulknor*. Mandatory processing fields required to submit the *Lopez* petition electronically were completely invisible on the user interface, forcing Plaintiff to make emergency physical trips to Trenton to determine how to execute the filing. On 10/17/24, Plaintiff sent a formal letter advising the Supreme Court Case Manager in Lopez that vital electronic options were blocked, requiring her to upload Supreme Court documents under "miscellaneous" headers. Plaintiff traveled to Trenton with hard copies of screen shots and documents, hand-delivering them to staff member Paige Ennis. On 2/19/25, Paige Ennis noted the *Faulknor* docket sheet, confirming she had physically transferred hard copies directly to the Supreme Court case manager. **(Ra679; Cert. of Portilla)**

**VII. The OAE's Mischaracterization of Collateral Filings and Protected Therapy History**

To manufacture a pretextual narrative of psychiatric instability, Investigator Chopra weaponized a collateral, non-damages civil complaint filed by Plaintiff against the Essex County Prosecutor's Office (ECPO). The ECPO had initially promised to perform a forensic examination of Plaintiff's devices following severe cyber-intrusions, but subsequently refused to cooperate or return her physical hardware once she disclosed that the suspected cyber-intruder was an active U.S. Special Agent. Attached to that conversion complaint was a 2022 Notice of Claim documenting the historical harassment she endured prior to surrendering her devices. This attachment was included for a narrow, purely procedural and administrative purpose: to satisfy the mandatory six-year statute of limitations for conversion actions pursuant to **N.J.S.A. 2A:14-1**.

Plaintiff did not seek a single dollar of emotional distress damages in her lawsuit against the ECPO**.** Investigator Chopra deliberately ignored the structural legal context of this pleading, omitted the material fact that no emotional damages were sought, and twisted a standard statute-of-limitations preservation layout into a false narrative of psychological instability. Years prior, Plaintiff and her husband—both licensed healthcare professionals—briefly sought therapy to cope with the profound stress of acute retaliation and external cyberstalking that immediately followed her federal whistleblower activities. This harassment was heavily documented and real, involving verified home invasions, vehicle break-ins, wiretapping, strangers intercepting landline calls, physical mail theft, stalking, and repeated emergency calls to law enforcement. Plaintiff intermittently followed up with

Dr. Ejiofor for prayer and worship over time because of their mutual religious background.

on June 18, 2026—a full year after the initial June 10, 2025 referral—the OAE weaponized a final disciplinary reply brief to introduce brand-new, fabricated, and patently false accusations for the absolute first time. The OAE falsely asserted that Respondent authored "client pleadings" omitting legal merits in favor of discussing the Federal Bureau of Investigation ("FBI"). **(Ra001-24; Ra003, Ra017, Ra19)**

The 11th hour new allegations also followed a historical pattern of information concealment by the OAE. Prior to the investigative interview on August 11, 2025, Plaintiff was completely denied an inspection of the case file. Upon Eldridge Hawkins requesting discovery on August 7, 2025, Gitter stated:

> ***"The documents are the same as those available to Ms. Portilla on eCourts. You are free to compare Ms. Portilla's eCourts records to her originals without the Office of Attorney Ethics printing hundreds of pages." (Ra036).***

1. **Refusal to Clarify Charges:** Following the August 14, 2025 interview, Plaintiff's counsel, Eldridge Hawkins, sent an email to Ms. Gitter and Chopra stating:

> ***"Respectfully, I know what I know. I respectfully request all correspondences submitted to the two of you pertaining to the purpose and subject matter of the investigation. It is necessary so that I may have substantive due process for my client. I do not know what we are defending officially" (Ra036).***

Ms. Gitter and Mr. Chopra failed to provide this baseline information. Gitter's 12/02/25 Petition against Plaintiff was supported by Chopra's 11/26/25 certification and no Brief. On 8/18/25 Gitter clarified that Plaintiff was being investigated for "Paranoia." **(Ra037).** Hawkins opposed on the States failure to comply with **N.J.S.A. 30:4-27.1, et seq.** Attorney Nagel Rice opposed the petition on the OAE's failure to meet the ADA Gateway

factors *US. Const. Amend. I* grounds as well as the fourth and fourteenth Amendments**. I(Ra225, Ra227, Ra229 (Ra225).** Ultimately, the underlying record contains only Respondent's protected communications- notices of whistleblower status, requests for accommodation, disclosures of unabated eCourts cyber anomalies and Grievances. Significantly, no "pleading" whatsoever exists on behalf of any client in any court that mentions the FBI or omits any substantive merits. The OAE deliberately mischaracterized Respondent's administrative certifications and accommodation letters as "pleadings" to punish her for making statutory requests, resulting in the Clerk's July 9, 2026, interim suspension order. On [Insert Date of Federal OSC], this Court entered its Order to Show Cause why reciprocal discipline should not be imposed. This response follows.

## II. STANDARD OF REVIEW GOVERNING FEDERAL RECIPROCAL DISCIPLINE

The imposition of reciprocal discipline in a federal district court is governed strictly by federal law, not state procedural rules. While state court disciplinary findings are entitled to high respect, they are not conclusively binding upon the federal judiciary. The United States Supreme Court in the seminal case of ***Selling v. Radford*, 243 U.S. 46 (1917)** established that a federal court must independently evaluate the underlying state record.

Under the *Selling* doctrine, a federal court will impose reciprocal discipline **unless** the respondent lawyer demonstrates from the face of the record that the state proceeding was plagued by one or more of the following constitutional or structural defects:

1. **Want of Due Process:** That the state procedure was so lacking in notice or an opportunity to be heard as to constitute a deprivation of due process;

2. **Infirmity of Proof:** That there was such an infirmity of proof establishing the misconduct as to give rise to a clear conviction that the federal court could not, consistent with its duty, accept the state's conclusion; or

3. **Grave Injustice:** That the imposition of the same discipline by the federal court would result in a grave injustice. *Selling*, 243 U.S. at 51.

This standard is codified within the Local Civil Rules of the United States District Court for the District of New Jersey. Local Civil Rule 104.1(e)(3) explicitly mandates that reciprocal discipline shall be imposed *unless* the attorney shows that upon the face of the record it clearly appears that due process was violated, proof was lacking, or a grave injustice would result. The burden is on the respondent to establish these exceptions by clear and convincing evidence. As demonstrated below, Respondent satisfies all three prongs of the *Selling* exception, requiring this Court to dissolve the Order to Show Cause.

## IV. LEGAL ARGUMENT

### POINT ONE

**RECIPROCAL DISCIPLINE CANNOT BE IMPOSED UNDER *SELLING V. RADFORD* BECAUSE THE STATE PROCEEDING SUFFERS FROM A TOTAL INFIRMITY OF PROOF AND UNCONSTITUTIONAL BIAS RETALIATING AGAINST A WHISTLEBLOWER; THE OAE STRIPPED THE TERM "DISCIPLINE" OF ANY UNIFIED OR REASONABLE DEFINITION BY WEAPONIZING ADMINISTRATIVE REGULATORY INFRASTRUCTURE CONTRARY TO *CONSUMERS UNION* AND ACTING IN BLATANT BAD FAITH UNDER THE *YOUNGER* EXCEPTION.**

### I. The State Order Suffers from a Total Infirmity of Proof and Due Process Violations Under *Selling v. Radford*

Under the governing standard established in *Selling v. Radford*, 243 U.S. 46 (1917), a federal court must not mechanically or blindly impose reciprocal discipline if the state court record reveals:

1. A lack of notice or opportunity to be heard violating due process;
2. An **infirmity of proof** as to the underlying misconduct; or
3. A **grave reason** indicating that reciprocal discipline would conflict with the court's duty to right a wrong.

The Third Circuit strictly enforces these structural limitations. Under *In re Ruffalo*, 390 U.S. 544 (1968) and *In re Surrick*, 338 F.3d 224 (3d Cir. 2003), attorney disciplinary proceedings are quasi-criminal. They cannot be used as an elastic, undefined dragnet to strip an attorney of her livelihood for demanding statutory protections. In this case, the record exhibits a **total infirmity of proof**. There is no client complaint, no financial mismanagement, no professional malpractice, and no clinical finding of incapacity. Instead, the Office of Attorney Ethics (OAE) manufactured an emergent suspension by pathologizing standard civil practice. Plaintiff's underlying submission was a precise procedural motion under **New Jersey Court Rule 4:50-1** for fraud upon the court in the *Faulknor Lopez* matter.

Treating a strict procedural motion and a request for paper-filing accommodations under the **Americans with Disabilities Act (ADA)** as affirmative proof of "impaired judgment" is an unconstitutional distortion of law. "Discipline" cannot mean compelling the surrender of private medical records simply because a practitioner blows the whistle on infrastructure defects. The state platform suffered from severe system-generated anomalies—including document rotation within appendix hyperlinks and blind spots that obstructed judicial review. To punish an attorney for identifying these platform errors creates a structural due process defect that bars reciprocal discipline under *Selling*.

## II. The OAE Abandoned Its Adjudicatory Charter and Operated as a Lawless Administrative Aggressor Under *Consumers Union*

Federal intervention is mandated because the state disciplinary apparatus is operating completely outside its constitutional boundaries. In *Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719 (1980), the U.S. Supreme Court drew a sharp, dispositive distinction between a judicial branch's **adjudicatory** enforcement functions and its **administrative or legislative** regulatory roles.

When the OAE converted an inquiry into eCourts software glitches and cyber-intrusions into a retaliatory weapon demanding psychiatric records, it **divested itself of its adjudicatory authority**. It ceased enforcing standard ethics rules and instead began executing an unwritten, unconstitutional administrative policy designed to suppress whistleblower disclosures.

This structural defect creates an irreconcilable conflict of interest rendering the state forum completely futile. The Supreme Court of New Jersey—the very administrative entity responsible for operating and maintaining the compromised eCourts architecture—is the body that referred Plaintiff to the OAE. Because the state judiciary is itself the alleged perpetrator of the Title II ADA violations and First Amendment retaliation, it cannot sit as an impartial arbiter of its own system failures. Under *Consumers Union*, when a state judicial body abandons its adjudicatory framework to engage in administrative warfare, the federal court is required to exercise its jurisdiction to preserve constitutional boundaries.

## III. The State Action Displays Pathetic Bad Faith and Harassment, Satisfying the Absolute Exception to *Younger* Abstention

While federal courts generally abstain from interfering with ongoing state attorney disciplinary proceedings under *Younger v. Harris*, 401 U.S. 37 (1971), the Supreme Court carved out an absolute exception where the state proceeding is motivated by **bad faith, a desire to harass, or other extraordinary circumstances**. *Id.* at 54; *see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) (applying *Younger* to New Jersey ethics proceedings but preserving the bad-faith exception).

The OAE's conduct provides the "smoking gun" evidence necessary to trigger the *Younger* bad-faith exception:

1. **Requests for Accommodation to Paper file:** The OAE relied on plaintiff's requests for accommodation to paper file documents and her law suit against the Essex County Prosecutor' Office for Conversion of her computes, allegation of denial of equal protection and related claims as proof of incapacity
2. **Evidence Spoliation:** The OAE actively manipulated system documents to conceal system-generated proof of cyber-intrusions and flatly refused to interview key witnesses who witnessed the electronic platform interference.

3. **Retaliatory Overreach:** The OAE explicitly relied on an investigator's diagnostic overreach, rubber-stamped by Gitter, which treated protected civil rights litigation as a psychiatric symptom.

4. ***Danger to self and Others:*** The OAE suspended plaintiff without showing that plaintiff was danger to others.

5. **No valid constitutional quorum of Justices:** The Supreme Court of New Jersey entered the temporary suspension order without a valid constitutional quorum of Justices. Furthermore, the underlying order was not personally executed by the Justices; rather, it was issued via a boilerplate administrative stamp of a single Justice and signed mechanically by the Clerk of the Supreme Court. **(Ra002-003)**

"Discipline" cannot mean demanding an attorney's medical files because she filed a lawsuit against an arm of the state government (EPCO) that unlawfully withheld her forensically seized computers for six years after she disclosed a federal agent hack. This disciplinary action was brought in bad faith to punish speech protected by the **First Amendment**, stripped Plaintiff of her protections under the **Americans with Disabilities Act Amendments Act (ADAAA)**, and directly retaliated against her for disclosures covered by the **False Claims Act, 31 U.S.C. § 3730(h)**. Because the state forum is structurally incapable of impartially resolving these federal constitutional and statutory claims, this Court must reject reciprocal discipline.

## POINT TWO
## THE UNDERLYING STATE SUSPENSION REPRESENTS A WANT OF DUE PROCESS UNDER *SELLING* BECAUSE THE OAE SECURED IT THROUGH AN INCURABLE "TRIAL BY AMBUSH" WITHIN AN UNANSWERABLE REPLY BRIEF

The first prong of the *Selling* doctrine mandates that a federal court reject reciprocal discipline if the underlying state procedure deprived the attorney of fundamental due process. *Selling*, 243 U.S. at 51. It is a bedrock principle of federal and state jurisprudence that a moving party is strictly prohibited from using a reply brief to expand its core arguments, introduce entirely new claims, or fundamentally remodel its factual theory. *Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001). Raising an issue for the first time in a reply brief is highly improper because it deprives the opposing party of a fair opportunity to respond, resulting in an unconstitutional "trial by ambush."

Here, the OAE secured the emergency temporary suspension through an incurable procedural violation that completely subverted the truth-seeking process. On June 18, 2026—a full year after the initial June 10, 2025 referral—Ethics Counsel filed a final disciplinary reply brief. Within that unanswerable filing, the OAE introduced an entirely novel, unproven, and patently false structural claim: that Respondent drafted client briefs completely omitting underlying legal merits to focus exclusively on the FBI **(Ra004-24)**

Because no sur-reply is permitted as a matter of right under New Jersey Court Rule 1:6-5, the OAE's tactical introduction of novel accusations at the absolute final stage of briefing eviscerated the core components of due process: adequate notice and a meaningful opportunity to be heard. U.S. Const. amend. XIV. Where a protected property interest is at stake—such as an attorney's law license and livelihood—ambushing a practitioner with verifiably false allegations within an unanswerable brief creates an incurable want of due process.

Furthermore, this "omitted merits" theory fails as a matter of law and represents a deliberate distortion of civil procedure. Ethics Counsel's reply brief falsely accuses Respondent of failing to argue the merits in client "pleadings." Under New Jersey Court Rule 4:5-1(a), the term "pleading" is strictly limited to complaints, answers, counterclaims, cross-claims, and third-party applications, explicitly dictating that "[n]o other pleading is allowed." It is an elementary principle of practice that motions and briefs are *not* pleadings. *In re Estate of Rogers*, 15 N.J. Super. 189, 199 (App. Div. 1951). Pleadings are generally not filed in the Supreme Court, and the OAE's initial referral letter exclusively cited Supreme Court *motions* (Exhibit Y).

By denying Respondent access to the case file, refusing to turn over basic administrative discovery, and forcing her to guess which documents formed the basis of the prosecution, the OAE completely subverted the administrative justice system. Because the resulting July 9, 2026

suspension order rests entirely upon an unconstitutional procedural ambush and a legally illiterate application of pleading rules, it represents a fatal want of due process under *Selling* that this Court cannot accept.

## POINT THREE

## THERE IS A FATAL INFIRMITY OF PROOF UNDER *SELLING* BECAUSE A RULE 4:50-1 MOTION IS AN EQUITABLE, NON-MERITS VEHICLE CARRYING NO LAWFUL REQUIREMENT TO ARGUE THE UNDERLYING MERITS

The second prong of the *Selling* standard requires a federal court to decline reciprocal discipline when the state record demonstrates a total "infirmity of proof." *Selling*, 243 U.S. at 51.

On June 10, 2025, plaintiff received a letter advising that the motions she filed in the Supreme Court regarding the Faulknor Lopez matter had been referred to the Office of Attorney Ethics (OAE). The first submission was a Rule 4:50-1 motion based on fraud upon the court, which had caused the unjust dismissal of the Lopez petition. The second was a motion to hold the Lopez matter in abeyance pending a State investigation into an unlawful document upload. This upload involved two historical orders from Hudson County that had caused significant friction between attorney Hawkins and Hudson County judges. Plaintiff had requested accommodations to file paper submissions on behalf of both parties, as severe electronic interference in the Appellate Division had persisted into their Supreme Court filings.The OAE's suspension petition relies on a flagrant misstatement of foundational civil practice. Specifically, the OAE raises a false, bad-faith claim that plaintiff filed pleadings in the Supreme Court and Essex County that failed to address the merits, arguing instead about the FBI. This assertion is a falsehood manufactured to mislead the tribunal into believing the plaintiff's judgment is impaired. Similarly, Chopra's allegation that plaintiff conceded she lacked evidence is entirely false. It is designed to mislead the tribunal into concluding that plaintiff's "judgment may be impaired," despite the fact that plaintiff has

consistently presented evidence of overlooked documents on the State's electronic platform that led to unjust dismissals and subsequent appeals.

The claim that the Lopez Rule 4:50-1 motion failed to argue the merits demonstrates a total infirmity of proof; it pathologizes strict adherence to court procedures, ignoring the reality that a Rule 4:50-1 motion is a precise procedural vehicle rather than an attempt to secure an improper "second bite at the apple."

As a matter of law, a motion filed under Rule 4:50-1 targets procedural defects, inequities, and misconduct that compromise a proceeding's integrity—it explicitly does *not* seek a determination on the underlying merits of the claims. The New Jersey Supreme Court has explicitly held that a Rule 4:50-1 motion "does not permit a second bite of the apple" to re-litigate the substantive merits. *DEG, LLC v. Township of Fairfield*, 198 N.J. 242, 261 (2009). The entire purpose of the rule is to "afford relief from unjust judgments," guided strictly by equitable principles. *Hous. Auth. of Morristown v. Little*, 135 N.J. 274, 283 (1994). When reviewing a Rule 4:50-1 application, "the matter is limited to the vacatur... not the underlying merits." *State v. One 2004 Infiniti G35* (App. Div. 2024).

Respondent's applications—brought under Rule 4:50-1(c) for fraud upon the court and Rule 4:50-1(f) for extraordinary circumstances—addressed severe electronic filing interferences on eCourts witnessed and formally certified by co-counsel Eldridge Hawkins, Esq., and Adam Portilla (Exhibits E, F). Because neither the Appellate Court nor the Supreme Court ever reached the underlying merits of the *Lopez* matter due to eCourts platform glitches (however caused or engineered) , it was a procedural impossibility to demand a merits-based argument within a narrow motion to vacate those administrative dismissals. Moreover, apart from the Rule 4:50-1 motion

the Lopez, Faulknor and Upchurch the documents that Chopra attached to his certification are clearly identified as requests for accommodations.

To characterize an attorney's strict compliance with procedural motion rules as a substantive "concession" of unfitness or a lack of proof constitutes an absurdity. Because there is a total absence of competent proof that Respondent omitted any mandatory legal arguments, the state's primary factual justification is entirely devoid of evidentiary support, demonstrating a fatal infirmity of proof.

## POINT FOUR
## THE OAE'S SHIFTING JUSTIFICATIONS EXPOSE A PRETEXTUAL FRAUD ON THE TRIBUNAL DESIGNED TO EVADE THE MANDATES OF THE AMERICANS WITH DISABILITIES ACT.

Under the doctrine of judicial estoppel and established federal pretext principles, litigants cannot play "fast and loose" with the judiciary by asserting entirely contradictory theories to suit the changing tides of litigation. *Ali v. Rutgers*, 166 N.J. 280, 287-88 (2001). When an entity's expressed rationale shifts over time or introduces an entirely new theory late in the proceedings, it serves as powerful circumstantial evidence of bad faith, pretext, and fabrication. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 284 (3d Cir. 2001); *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The underlying record reveals that neither Investigator Chopra nor Ethics Counsel accused plaintiff of omitting merits arguments in their initial demands or threats of suspension (Ra The OAE's sole original stated basis for demanding a forced medical examination was a claim of "paranoia" and "delusions" targeting the content of Respondent's protected speech **(Ra027)**

However, once Attorney Jay Rice, LLC on Plaintiff, established that the OAE's perception of mental illness triggered the strict statutory mandates of the Americans with Disabilities Act, 42 U.S.C. § 12112(d)(4)(A), and the stringent federal gateway factors articulated in *Conroy v. New*

*York State Dep't of Correctional Services*, 333 F.3d 88 (2d Cir. 2003)—which strictly forbid forced medical exams absent a showing of objective evidence that a condition actively interferes with job functions—the OAE executed an abrupt about-face. (**Ra225; Ra004-Ra024)**

To evade the ADA's statutory restrictions, Ethics Counsel manufactured the separate, non-medical, procedural "omitted merits" argument within its June 18, 2026 reply brief. (**Ra004-Ra024, Ra003, Ra017, Ra19)**

This eleventh-hour transformation of the OAE's core narrative is a textbook "belated justification" that exposes the entire state disciplinary action as a pretextual fraud upon the court. Litigants, particularly institutional disciplinary prosecutors, operate under a heightened obligation of absolute candor toward the tribunal under RPC 3.3. Intentionally mislabeling a factual certification or an ADA accommodation request as a "pleading" to invent an ethical violation violates RPC 8.4(c) and strips the state suspension of all legal and moral legitimacy.

## POINT FIVE

## THE RECORD DEMONSTRATES A FATAL INFIRMITY OF PROOF AND A GRAVE INJUSTICE, DEFEATING BOTH RECIPROCAL DISCIPLINE AND YOUNGER DEFERENCE.

### I. An Arbitrary State Record Constitutes an "Infirmity of Proof" and a "Grave Injustice"

Under Selling An administrative determination must be rejected when it fails to follow the law, ignores relevant data, or relies on findings unsupported by substantial, competent evidence. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 4*63 U.S. 29, 43 (1983); In *re Application of Virtua-West Jersey Hosp. Voorhees*, 194 N.J. 413, 422 (2008). Under *Selling v. Radford*, 243 U.S. 46, 51 (1917), a federal court must decline reciprocal discipline when the state record reveals either an "infirmity of proof" or a "grave injustice." As detailed

above, Ms. Gitter's reliance on Investigator Chopra’s uncredentialed clinical pathologizing provides an entirely defective foundation for an emergency suspension.

Under well-established law, there is a strict public policy distinction between engaging in a localized course of therapy to navigate the direct stress of external harassment, and possessing a chronic pathological condition affecting fitness. *In re Paul Williams*, 443 N.J. Super. 532, 536 (App. Div. 2016); Kinsella v. Kinsella, 150 N.J. 276, 330 (1997). Chief Justice Stuart Rabner’s formal September 19, 2023 Notice to the Bar explicitly prohibits the regulatory process from acting as a deterrent to pursuing mental health care or pathologizing legal professionals who seek situational counseling. The OAE's weaponization of a private, concluded family therapy history—necessitated years ago by documented home invasions, wiretapping, and vehicle break-ins directly defies this public policy.

> The state cannot utilize a remote history of seeking psychological or medical assistance as a blanket tool to devalue an individual's professional capabilities. *In re Hennessey v. Coastal Eagle Point Oil Co.*, 129 N.J. 81, 96 (1992). An administrative record that intentionally blinds itself to overwhelming technical and medical evidence, and instead substitutes uncredentialed lay speculation, establishes a complete infirmity of proof under Selling.

## II. The OAE's Bad Faith, Harassment, and Irregular Procedures Defeat Younger Abstention Deference Arbitrary, capricious, and retaliatory agency actions serve as a recognized exception to federal Younger abstention.

While *Younger v. Harris,* 401 U.S. 37 (1971) and *Middlesex County Ethics Committee v. Garden State Bar Ass'n*, 457 U.S. 423 (1982) generally require federal courts to abstain from interfering with ongoing state attorney disciplinary proceedings, abstention is wholly inapplicable where the state action is executed in bad faith, for purposes of harassment, or

without a legitimate, independent regulatory anchor. *Kugler v. Helfant,* 421 U.S. 117, 124–25 (1975). When an agency acts arbitrarily, capriciously, and in bad faith—such as deploying a known defective, uncredentialed investigation to strip a professional of her livelihood—the "extraordinary circumstances" exception to Younger is triggered, completely neutralizing comity.

The Third Circuit has heavily reinforced this standard, clarifying that a federal court must deny Younger deference where the state administrative process is executed in an erratic, discriminatory, bad-faith, or highly irregular manner. See *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989) (abstention inappropriate where state proceeding is brought in bad faith or as an instrument of retaliation); *Sullivan v. City of Pittsburgh*, 811 F.2d 171, 179 (3d Cir. 1987) (federal intervention mandatory where state machinery is deployed with an improper animus or through egregious procedural irregularities). Where state disciplinary procedures are intentionally applied to chill paramount federal rights, mask technological access failures, or discourage protected First Amendment whistleblower speech, the state pipeline is structurally inadequate, its findings are legally void, and comity is soundly defeated. *Grandco Corp. v.* ***Rochford*****, 536 F.2d 197, 203 (3d Cir. 1976).**

## POINT SIX
## THE OAE'S RECORD IS LEGALLY INCOMPETENT UNDER F.R.E. 702 AND RELIES ON INADMISSIBLE HEARSAY

The state investigative record is legally incompetent because it relies entirely on an amateur medical narrative authored by a lay investigator. Under Federal Rule of Evidence 702 and N.J.R.E. 702, a witness cannot offer a specialized clinical opinion unless they possess precise diagnostic training. *In re Accutane Litig.*, 234 N.J. 340, 349 (2018). An investigator's testimony must be

restricted strictly to raw factual observations and cannot venture into expert clinical pathologizing. *State v. McLean*, 205 N.J. 438, 459 (2011). Investigator Chopra possesses zero medical licensing or psychiatric credentials. His characterization of Respondent's documented reports of cyber-intrusions as "EXTREME PERSECUTORY BELIEFS" constitutes gross diagnostic overreach. **(Ra041 ¶54).** This is a technical term of art found in the DSM-5-TR to pathologize severe clinical conditions. A lay investigator cannot bypass F.R.E. 702 by dressing up personal skepticism in clinical terminology. Furthermore, the investigation violates DSM-5 compliance protocols, which mandate the utilization of multi-source informant data and collateral witnesses when issues of cognitive capacity are implicated.

Investigator Chopra failed to interview credentialed eyewitnesses who executed statements confirming these exact eCourts technical anomalies, including Mario Portilla, Adam Portilla, Eldridge Hawkins, Esq., Ronald Morrison, Latoya Borum, and Dr. Ejiofor. **(Cert. of Portilla[3] Ra166, Ra171, Ra162, Ra156, Ra197, Ra198)** Systematically isolating Respondent and suppressing exculpatory evidence violates basic administrative fairness. *State v. Peterkin,* 226 N.J. Super. 25, 43-45 (App. Div. 1988); *Townsend v. Pierre*, 221 N.J. 36 (2015). Worse still, the certification is an inadmissible repository of multi-layered hearsay under F.R.E. 801 and 802. It packs the record with unverified out-of-court assertions, including a highly offensive, false, and defamatory double-hearsay statement alleging historical recommendations for treatment (**Ra041-Chopra Cert. ¶ 45**). The word "merely" is an editorialized insertion designed to prejudice the tribunal. This groundless assertion lacks a dual statutory exception under F.R.E. 805, rendering it entirely devoid of evidentiary value. Courts must safeguard files from serving as reservoirs of unverified libelous statements. *Hammock v. Hoffmann-La Roche, Inc.*, 142 N.J. 356, 380 (1995).

[3] Certification of Cecile D. Portilla August 14, 2026

The state cannot bootstrap unauthenticated lay hearsay to manufacture a "psychiatric history" or establish a baseline of unfitness.

Investigator Chopra places undue weight upon a letter I sent to President Donald Trump, demonstrating a fundamental misunderstanding of standard advocacy and my professional background. Throughout my career, I have worked closely alongside Eldridge Hawkins, Esq., a former New Jersey Legislator, whom I frequently observed petitioning government representatives to address systemic grievances. Through my interactions with Mr. Hawkins, his son (the former Mayor of Orange), and the late Senator Walter Kavanaugh, I became entirely comfortable communicating with elected officials to express serious public concerns.

My civic advocacy is extensive: I have petitioned the New Jersey Legislature to amend the New Jersey Workers' Compensation Act, and I have communicated with former Governor Murphy and Senator Cory Booker regarding critical infrastructure issues. Investigator Chopra cannot arbitrarily infer mental incompetence from my lawful exercise of the right to petition the government, a right expressly protected under Article I, Paragraph 18 of the New Jersey Constitution. In fact, Eldridge Hawkins, Esq. was fully aware of my letter to President Trump; we had previously discussed that, given the President's strict stance on crime, he would be rightfully concerned by the unauthorized hacking of the State's eCourts platform.

## POINT SEVEN
## IMPOSING RECIPROCAL DISCIPLINE WOULD CONSTITUTE A GRAVE INJUSTICE UNDER *SELLING* BECAUSE THE STATE PROSECUTION WAS BROUGHT IN OBJECTIVE BAD FAITH TO RETALIATE AGAINST PROTECTED STATUTORY WHISTLEBLOWING.

The third prong of the *Selling* doctrine dictates that a federal court must decline reciprocal discipline if the imposition of identical sanctions would result in a "grave injustice." *Selling*, 243 U.S. at 51. Imposing discipline based on a state record born out of targeted institutional retaliation

and bad faith is the definition of a grave injustice. Federal courts have long recognized that state proceedings lose all legitimate enforcement interests when they are brought in bad faith, act as an instrument of retaliation, or are used to harass a practitioner. *Mitchum v. Foster*, 407 U.S. 225, 230-31 (1972).

The undisputed evidence of bad-faith retaliatory animus is embedded directly within the investigator's certification. The OAE explicitly attached and weaponized Respondent’s protected, underlying requests for federal disability accommodations as affirmative evidence of "unfitness to practice law." Specifically, the investigator targeted Respondent's formal requests to paper-file and hand-deliver documents—necessitated by eCourts platform disruptions—in *Upchurch v. City of Orange* and *Faulknor v. Hudson County*.

Subverting explicit statutory requests for reasonable accommodations into a disciplinary blunt instrument violates the express anti-retaliation provisions of the ADAAA, 42 U.S.C. § 12203(a). Because Respondent's parallel whistleblowing protected disabled adults and minority children from systemic healthcare and Medicare fraud, her speech is actively shielded by the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and the New Jersey Conscientious Employee Protection Act (CEPA). Under *Tartaglia v. UBS PaineWebber, Inc.*, 197 N.J. 81 (2008), the Rules of Professional Conduct constitute a clear mandate of public policy under CEPA, placing a dual statutory and ethical mandate upon an attorney to blow the whistle on ongoing fraud.

Furthermore, under the Continuing Violation Doctrine, Respondent's paperwork accommodation requests cannot be sliced into independent, isolated fractions; they represent an inseparable, multi-year continuation of the protected, reasonable procedural baseline she

established in 2022 to counter platform interferences and fulfill her obligations as an officer of the court. *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 448 (2003).

Compounding this injustice, the structural framework of the state prosecution is fatally conflicted. The State of New Jersey and the Essex County Prosecutor's Office ("ECPO") share the exact same legal counsel. The state cannot neutrally discipline Respondent while simultaneously acting as defense counsel for the very county agency that unlawfully converted Respondent's physical computer hardware, ignored property return requests for nearly a decade, and actively suppressed evidence of cyber-intrusions after Respondent disclosed that the suspected intruder was an active U.S. Special Agent. Weaponizing the disciplinary machinery to suppress an attorney's individual rights to recover converted property under 42 U.S.C. § 1983 represents an egregious misuse of state power that renders federal reciprocal discipline a profound injustice.

## POINT EIGHT

## THE UNDERLYING EMERGENCY SUSPENSION REPRESENTS A GRAVE INJUSTICE BECAUSE IT DIRECTLY VIOLATES THE FIRST AMENDMENT AND CONSTITUTES UNLAWFUL "REGARDED AS" DISABILITY DISCRIMINATION UNDER THE ADAAA.

### I. First Amendment: Retaliation for Protected Whistleblowing Speech

It is an established tenet of federal constitutional law that attorneys do not surrender their First Amendment rights at the courthouse door. A legal practitioner's speech addressing judicial integrity, structural governmental defects, and systemic technical vulnerabilities within public electronic court filing infrastructure occupies the highest rung of protected speech. *Pickering v. Board of Ed.*, 391 U.S. 563, 573 (1968); *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971). Disciplinary actions driven by a retaliatory animus designed to penalize, chill, or silence an attorney for exposing state-administered

administrative failures violate the United States Constitution and render any resulting sanction a grave injustice under Selling.

The underlying state suspension petition is an unconstitutional content- and viewpoint-based retaliatory counter-strike. Plaintiff engaged in protected whistleblowing by: (1) reporting operational "blind spots" and severe structural access interferences on the eCourts platform; (2) accusing state actors of deliberate indifference for failing to abate these system-wide errors; and (3) requesting mandatory reasonable accommodations to protect her clients' constitutional due process rights. (**Cert. of Portilla)** Respondent maintains an unblemished disciplinary record with zero client complaints or judicial grievances over her career. Multiple credentialed eyewitnesses executed formal statements confirming they witnessed the exact eCourts technical anomalies Respondent reported. The OAE cannot weaponize emergency disciplinary authority to purge a practitioner from the bar simply for exposing verified technological defects in public administrative software.

**II. Title II of the ADAAA: Unlawful Medical Inquiries and "Regarded As" Disability Discrimination**

Title II of the Americans with Disabilities Act Amendments Act ("ADAAA") strictly prohibits public and licensing entities from engaging in discrimination, harassment, or adverse licensing actions based upon an individual's actual or perceived disability. 42 U.S.C. § 12132; *Medical Soc. of New Jersey v. Jacobs*, 1993 WL 413016 (D.N.J. Oct. 5, 1993).

**A. Absolute Bar Against Intrusive Medical Inquiries:**

Public licensing boards are entities bound by the ADA and are strictly barred from initiating invasive medical inquiries or constructing a pathologized "psychiatric history" unless they possess current, objective evidence that a professional's condition actively interferes with their capability to perform essential job functions. *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003). Emergency medical suspensions require clear and convincing evidence of a direct, immediate, and high-probability threat to the public.

The underlying state record is totally devoid of such proof. The OAE presented zero client complaints, zero missed deadlines, and zero acts of professional misconduct. Furthermore, the OAE lacked any objective, contemporaneous clinical evidence showing a danger to clients, the public, or the judiciary, completely failing the federal gateway standards articulated in *Conroy*.

**B. Unlawful "Regarded As" Discrimination via Non-Medical Litigation Files:**

By dredging up an old, non-medical conversion lawsuit file to label Respondent with a chronic "psychiatric history," Investigator Chopra engaged in explicit, illegal "regarded as" disability discrimination. 42 U.S.C. § 12102(1)(C). Under the ADAAA, a state regulatory agency violates federal law when it takes an adverse professional action based on the *perception* of a mental impairment or an artificially inflated medical narrative, regardless of whether a true medical disability actually exists. *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987).

Investigator Chopra's reliance on a 2022 Notice of Claim ("NOC") attached to Plaintiff's protected complaint against the ECPO from an unrelated property conversion lawsuit **(Ra614)** against the Essex County Prosecutor's Office violates federal law:

- **No Evidentiary Competence:** A non-damage-seeking NOC attached to a historical property conversion lawsuit concerning a stolen laptop does not constitute objective psychiatric evidence.
- **Narrow Procedural Context:** The document was attached solely to satisfy the mandatory statutory notification timeline under N.J.S.A. 2A:14-1.
- **No Medical Claim:** Plaintiff sought zero dollars in emotional distress damages from the ECPO showing that there were no problems in that area.

Stripping a standard statute-of-limitations Notice of Claim of its legal context to manufacture a false narrative of chronic psychological instability is the archetype of "regarded as" discrimination. The OAE cannot substitute an illiterate reading of property pleadings for competent, current clinical proof. The July 9, 2026 Order is legally void and must be vacated.

## POINT NINE
## INVESTIGATOR CHOPRA'S UNLAWFUL BAN ON RECORDING THE ADMINISTRATIVE INTERVIEW VIOLATES PROCEDURAL DUE PROCESS AND PROTECTED TRUTH-TELLING MECHANISMS.

The state record is independently deficient under *Selling* because Investigator Chopra's explicit prohibition against recording the OAE interview compounds the procedural bad faith of this investigation, using an artificial evidentiary gag to mask systemic mischaracterizations. Administrative investigations must strictly adhere to fundamental concepts of procedural due process and fair play. *Barlyn v. Dow*, 436 N.J. Super. 161, 172 (App. Div. 2014). Forcing a respondent into a high-stakes, career-threatening mental health inquiry while simultaneously banning a standard, non-disruptive audio recording is a calculated tactic designed to ensure that the OAE's unverified interpretations remain entirely unchecked.

Under the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A 2A:156A-4, an individual has an absolute statutory right to record their own active interactions. Furthermore, courts recognize that audio recordings during compulsory examinations touching upon psychological or cognitive health are permissible. *B.D. v. Carley*, 307 N.J. Super. 259, 262 (App. Div. 1998).

When a party is subjected to an adversarial or compulsory examination regarding clinical stability, they possess a presumptive right to unobtrusively audio or video record the proceeding due to the obvious risk of mischaracterization by adversarial actors who can easily twist standard behavioral responses or structural objections into indicators of psychiatric instability. *DiFiore v. Pezic*, 254 N.J. 134, 153 (2023). The *DiFiore* Court established that recording serves as an objective, neutral truth-teller that prevents vulnerable litigants from being subjected to one-sided, weaponized summaries. By enforcing an unlawful ban on recording, the investigator completely subverted these protections, rendering the interview and the resulting report procedurally deficient and a clear violation of due process.

## POINT TEN

## THE STATE ORDER REPRESENTS A WANT OF DUE PROCESS AND INFIRMITY OF PROOF UNDER *SELLING* BECAUSE IT WAS EXECUTED UNILATERALLY BY AN UNCONSTITUTIONALLY DELEGATED ADMINISTRATIVE OFFICIAL ACTING WITHOUT A JUDICIAL QUORUM OR SUBSTANTIVE PROOF OF PUBLIC HARM.

### I. The OAE Failed to Establish the Mandatory Regulatory Threshold of a Substantial Threat of Public Harm

Under the second prong of ***Selling v. Radford*, 243 U.S. 46, 51 (1917)**, a federal court must decline reciprocal discipline where a state record exhibits a total infirmity of proof. Under New Jersey Court Rule 1:20-11(a), an emergency temporary suspension requires a rigorous showing that the practitioner poses a "substantial threat of serious harm" to clients or the public. The

underlying state record is entirely devoid of this required proof. There exist zero client complaints, zero allegations of substantive professional misconduct, and zero independent findings of professional incapacity. The OAE's record rests exclusively on protected whistleblowing speech and accommodation requests. Pathologizing protected First Amendment petitioning activity to meet an emergency regulatory threshold constitutes a total infirmity of proof, invalidating the suspension.

## II. The Lack of a Judicial Quorum and Unconstitutional Administrative Delegation Violates Due Process

The New Jersey Constitution vests attorney disciplinary power exclusively within the full collective body of the Supreme Court. N.J. Const. art. VI, § 2, ¶ 3. Here, the state record reveals a fatal structural defect under *Selling*: the New Jersey Supreme Court never met as a collective body, never cast a quorum vote, and never issued an authentic judicial decree suspending Respondent's license. Instead, the coercive production directives were signed unilaterally by a non-judge administrative official (Chief Ethics Counsel Timothy Ellis), and the final suspension order was executed via a boilerplate signature stamp by the Clerk of the Court.

A supreme court cannot delegate its core, non-delegable judicial voting authority to subordinate bureaucrats. Under the doctrine of unconstitutional delegation of power, when an administrative agency permits sub-personnel to issue coercive directives and relies on after-the-fact clerical rubber-stamping, the proceeding loses its judicial character. *New Orleans Public Service, Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 361 (1989). Because an attorney’s license is a constitutionally protected property right, depriving Respondent of her livelihood without a formal, subjective vote by a constitutional quorum violates procedural due process under 42 U.S.C. § 1983 and defeats reciprocal enforcement.

**III. The Structural Conflict and Ultra Vires Nature of the Administrative Mandates Preclude Younger Deference**

Under ***Supreme Court of Virginia v. Consumers Union of the United States, Inc.*, 446 U.S. 719, 731–36 (1980)**, regulatory branches operate in distinct legislative, administrative, and adjudicative roles; prosecutorial and investigative mandates do not carry judicial character. Chief Ethics Counsel Timothy Ellis acts as an administrative prosecutor, not a detached judicial officer. *Younger* abstention is strictly confined to ongoing state proceedings that are genuinely adjudicative and judicial. *NOPSI*, 491 U.S. at 361; *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 238 (1984).

The Third Circuit recognizes that prosecutorial and investigative functions within a state disciplinary apparatus are legally separate from a court's core judicial functions. *Centifanti v. Nix*, 865 F.2d 1422, 1428 (3d Cir. 1989). Because this sweeping medical records production mandate was issued unilaterally by an administrative official acting without prior judicial oversight, a balancing of privileges, or a valid behavioral nexus, the directive is *ultra vires*. An executive official cannot overstep explicit statutory boundaries to execute coercive mandates. *Pennsylvania v. DeJoy*, 491 F. Supp. 3d 46, 54 (E.D. Pa. 2020); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996). Forcing a whistleblower to choose between her livelihood and her right to privacy via a non-judicial administrative decree represents a severe structural defect, stripping the state proceeding of any protective foundation under *Younger* or *Selling*.

**V. CONCLUSION**

For the foregoing reasons, Respondent respectfully requests that this Honorable Court exercise its inherent equitable powers and its plenary authority to reject the imposition of

reciprocal discipline, vacate any federal interim restrictions, dissolve the current Order to Show Cause, strike the legally incompetent Certification of Investigator Rajesh Chopra, and permit Respondent to continue the uninterrupted practice of law before the Bar of this Federal District Court.

Respectfully submitted,

/s/ Cecile D. Portilla
CECILE D. PORTILLA, ESQ.
Dated: August 14, 2026