ELDRIDGE HAWKINS, LLC
Attorney at Law
60 Evergreen Place, Suite 510
East Orange, NJ 07018
Attorney ID No. 214731967
(973) 676-5070 Fax: (973) 676-7356
hwklaw@aol.com

| | |
|---|---|
| **IN THE MATTER OF CECILE DELROSE PORTILLA, ESQUIRE AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY**<br><br>**(0121212005)** | **SUPREME COURT OF NEW JERSEY**<br>**M-974-September Term 2025**<br>**0920260**<br><br>**CERTIFICATION IN SUPPORT OF OTSC** |

I, **Cecile D. Portilla**, of full age, being of sound mind and with full knowledge of the penalties associated with false swearing, hereby certify as follows:

1. This certification is in support of my Order to show cause why a reciprocal discipline should not be imposed.

2. Plaintiff was suspended on July 9, 2026. **(Ra001, Ra002)**

3. Ethics Attorney Alexandra Gitter's Reply Brief with Brand New 11th hour allegation amounting to a trial by ambush prevents reciprocal discipline due to denial of due process and extreme bad faith. **(Ra007**-a true copy of Ms. Gitter's

June 18, 2026 reply Brief, Ms. Gitter's Motion for leave to file a Reply Brief- **Ra004**)

4. The contents of Ms. Gitter's Reply Brief to which we could not respond has false allegations violating the Rules of Professional Conduct. **(Ra004-24)**
5. Her June 11, 2026 Reply Brief falsely accuses Plaintiff of failing to argue the merits in client "pleadings" and instead vent about the FBI.
6. Ms. Gitter had clarified in her August 18, 2025 email that I was being investigated for paranoia. **(Ra034)**
7. **The Contradiction**: Attached as **Ra027** is a true and correct copy of the June 10, 2025 letter with HIPAA forms from the OAE in which Ms. Gitter advised that I was being investigated for "Motions" that I submitted to the Supreme Court on behalf of **Lopez and Faulknor** in the Supreme Court. **(Ra027-true copy).**
8. On August 6, 2025, prior to the Ethics interview, Attorney Hawkins emailed Alexanda Gitter a request for discovery, asking for copies of the Faulknor and Lopez Motion documents to determine if Respondent Authored them. **(Ra034-a true copy**)
9. On August 7, 2025 an email was sent from Ms. Gitter to Hawkins advising him that the discovery documents that we requested are the same as those available to Ms. Portilla on eCourts and to ***feel free*** to compare them to Ms. Portilla's

Originals documents without the OAE printing hundreds of pages. (**Ra035- a true copy** )

10. On August 14, 2025 Eldridge Hawkins again sent an email to Ms. Gitter requesting discovery and specifically advising her that he needed discovery so that "I *may have substantive due process"* and that he did not know what "we are defending officially." (**Ra036-a true copy)**

11. On August 18, 2025 an email was received from Gitter to Hawkins advising him that Respondent is being Investigated for Paranoia. (**Ra037)**

12. Ms. Gitter's new allegations page 3, 10,11 of her June 18, 2026 Reply Brief that I filed "pleadings" on behalf of clients in the Supreme Court in which I failed to argue the "merits" of my clients and discussed FBI are false. **(Ra009, Ra016, Ra017)**

13. Ms. Gitter's Reply Brief allegation that I filed "pleadings" in the Essex County Court in which I failed to argue the "merits" of my client's case is false. **(Ra009).**

14. The documents in Essex County in the *Upchurch* case to which Ms. Gitter refers are: (i) a request for accommodation to paper file documents due to interferences on eCourts that affected her Summary Judgment Motion; (ii) a Motion for accommodation to paper file documents on eCourts due to witnessed unlawful interferences on eCourts. (**Ra570, Ra576**)

15. The second Essex County document to which Ms. Gitter refers is my personal Complaint against the Essex County Prosecutor's Office for Conversion/Theft

of my computers. **(Ra614).** The Essex County Prosecutor's Office (ECOP) agreed to perform a forensic examination on my computers related to cyber intrusions that began after my whistle blowing. **(Ra614)** Upon making the ECPO aware that the suspected cyber intrusion was a US Special Agent, ECPO refused to perform the examination and kept my computers for six years upon which time I sued for conversion/Theft, denial of public accommodation and denial of Equal protection. (**Ra614**). By the time the law suit concluded 10 years had passed. The Essex County Judge who presided over the matter Opined that Portilla is a lawyer and could have gotten her computers back?

16. The documents filed in the Lopez case to which Ms. Gitter and Mr. Chopra refer are my request for accommodation to paper file documents on behalf of Lopez due to witnessed interferences on eCourts and my personal law suit against the ECPO for conversion and denial of equal protection with an old NOC that was attached solely to show that the six years SOL was satisfied. **(See attachments to Chopra's certification dated 11/26/2025)**

17. The motion filed in the Supreme Court on Lopez's behalf was a Rule 4:50-1 motion grieving about fraud upon the Court because the Supreme Court dismissed Lopez Petition without hearing it on the merits after his documents were subjected to severe interference on eCourts **(Ra259, Ra380, Ra393, Ra266-true copies).**

18. I also argued that the State was reckless in allowing the interferences of which I had complained since year 2022 on both his and Faulknor's behalf**. (Ra380, Ra393-true copies)**

19. The Faulknor documents to which Ms. Gitter refers is request and motion to hold Faulknor's Petition in Abeyance until the cyber intrusion into the Supreme Court was investigated and request for accommodation**. (Ra644, Ra646).**

20. As shown absolutely NO pleadings on behalf of any "client" are involved.

## <u>Gitter's Failure to provide Discovery</u>

21. Prior to the investigative interview on August 11, 2025, Plaintiff was completely denied an inspection of the case file. Upon Eldridge Hawkins requesting discovery on August 7, 2025, Gitter stated:

> ***"The documents are the same as those available to Ms. Portilla on eCourts. You are free to compare Ms. Portilla's eCourts records to her originals without the Office of Attorney Ethics printing hundreds of pages." (Ra036).***

22. **Refusal to Clarify Charges:** Following the August 14, 2025 interview, Plaintiff's counsel, Eldridge Hawkins, sent an email to Ms. Gitter and Chopra stating:

> ***"Respectfully, I know what I know. I respectfully request all correspondences submitted to the two of you pertaining to the purpose and subject matter of the investigation. It is necessary so that I may have substantive due process for my client. I do not know what we are defending officially" (Ra036).***

23. Ms. Gitter and Mr. Chopra failed to provide this baseline information. Gitter's 12/02/25 Petition against Plaintiff was supported by Chopra's 11/26/25 certification

and no Brief. On 8/18/25 Gitter clarified that Plaintiff was being investigated for "Paranoia." **(Ra037).**

**Whistleblower History and My Entitlement to WhistleBlower Protection/Accommodation Under the ADA, CEPA**

24. I am the former director of Clinical services of a Health Care Agency and a Whistle Blower plaintiff with multiple layers of protections under the ADAAA and the anti-retaliation provision of the False Claims Act 31 U.S.C. § 3730(h).

25. In 2013, I blew the Whistle against my former Employ (Maxim Health Care services for billing fraud and patient neglect. **(Ra776)**

26. Maxim has a history of billing fraud, despite an integrity agreement with the Federal Government that continued in 2013 upon my employment. **(Ra798)**

**27.** I acted to protect disabled children/adults related to Medicare fraud and patient neglect followed by a verbal and written complaint against the Federal Agent who neglected them and now against the State. **(Ra772, Ra775, Ra776, Ra777)**

**28.** Shortly after that encounter at the DOJ, my home landline and all three of my cell phones began experiencing severe, unprecedented interference causing me to abandon them and began using pay phones and borrowing phones from others and my computers became useless for business purposes. **(See Ra805, Ra162, Ra791)**

**29.** Soon after I left the DOJ interview in February of 2014 regarding the Maxim investigation, I became aware that I was being followed.

**30.** My mail was now being tampered. Envelopes would arrive ripped open. Packages would arrive open. My trust account envelopes were arriving in resealable envelopes and my green certified mail receipt were no longer being returned.

**31.** My family and I came under cyber assault, stalking and harassment. This involved verified home invasions, vehicle break-ins, wiretapping, strangers intercepting landline calls, physical mail theft, stalking, and repeated emergency calls to law enforcement. **(See example Ra762)**

32. My husband and I who are both medical professionals attended therapy and were discharged.

33. These acts of cyber intrusion and surveillance were too technologically advanced to be the work of ordinary novices. The perpetrators possessed the capability to create custom pop-up alerts to inform me they were actively watching me, and they successfully breached my home and vehicles without any signs of forced entry.

34. This level of sophistication, occurring in the immediate aftermath of my whistleblowing activities, provides a strong circumstantial basis to conclude that the intruder possesses specialized federal skills and is acting in retaliation.

35. Despite the overwhelming circumstantial evidence, I have often used the word perceived "to qualify the word Special Agent or FBI" or based my conclusion on information and belief as I am aware that I do not have the forensic evidence to link any specific Agent to the Crimes." **(See Ra579 ¶7**[1])

36. My valid experiences and responses are grounded in fact, not the "paranoia" that OAE Investigator Chopra attempts to portray to the Court. I am not the only witness to these actions; my husband experienced them alongside me**.(Ra162, Ra791)**

37. Prior to the onset of these targeted acts, neither of us had any need for therapy. Investigator Chopra's attempt to label our responsible, good-faith pursuit of mental health support as an adverse "psychiatric history" is wholly inappropriate and a mischaracterization of our circumstances.

38. I reasonably believe that the systemic technical anomalies, apparent "blind spots," and direct interference with the New Jersey eCourts platform—which have effectively prevented judges from viewing my filings—are the retaliatory acts of the aforementioned U.S. Special Agent and individuals acting in concert with him.

39. I first alerted the Court to this issue in 2022, upon realizing that the perpetrators had targeted the State's electronic filing infrastructure. These unauthorized interferences are occurring directly within the eCourts platform itself. **(Ra334,Ra350, Ra357,Ra259)**

40. This interference is corroborated by the formal certifications of my son and Attorney Hawkins, both of whom personally witnessed these digital anomalies. Notably, the Office of Attorney Ethics (OAE) investigator completely failed to interview either of these crucial witnesses. **(Ra198, Ra695)**

---

[1] **Use of the word "perceive"- since no forensic evidence exists**

**41.** Investigator Chopra went so far as to disregard the medical certification of Dr. Ejiofor, APN, which unequivocally affirmed my mental competency**. (Ra170)**

42. I did NOT seek therapy related to the acts on eCourts. I went to therapy before I was aware of the acts on eCourts. **(See Ra162, Ra170)**

43. Chopra and Gitter misled us as to the nature of the interview and did not tell us that they were using an expired Notice of Claim attached to my law suit against the ECPO against me. **(See Ra035)**

44. Chopra's certification is replete with falsehoods and has little do with any present information that was actually obtained from me.

45. As a whistleblower, I legally exercised my right to request reasonable accommodations. My actions are fully protected under the Americans with Disabilities Act (ADA), the Conscientious Employee Protection Act (CEPA), and the anti-retaliation provisions of the False Claims Act.

**46.** Shockingly, the primary exhibits being used to support my suspension are my protected requests for accommodation in the *Upchurch*, *Faulknor*, and *Lopez* matters. These requests sought permission to file via paper to ensure my clients were not denied their fundamental right of access to the courts**. (See Ra570, Ra576, Ra578, Ra667, Ra646)**

47. Ms. Gitter, in her Reply Brief, now falsely labels my February 2025 and April 2025 requests for accommodation in the *Upchurch* matter as "pleadings" that lacked arguments on the merits**. (Ra009, Ra017, Ra019).**

48. To the contrary, these were distinct requests for administrative accommodation under the ADA, submitted immediately after I discovered that the summary judgment appendices on the eCourts platform had been altered and no longer displayed the file names I had originally assigned to them**. (Ra570, Ra576, Ra 578).**

49. These protected requests for accommodation—alongside similar filings in the *Faulknor* and *Lopez* matters seeking paper-filing alternatives to ensure my clients were not denied their fundamental right of access to the courts—are the very exhibits now being improperly weaponized to support my suspension

50. The only attachments to Investigator Chopra's certification apart from transcripts that we absolutely disavow, were my request for accommodation in *Upchurch*, my request for accommodation in Lopez and Faulknor and to hold *Faulknor* in abeyance, my law suit against Essex County that has an 2022 Notice of Tort Claim (NOC) and my grievance.

51. The NOC was originally attached to my lawsuit against the Essex County Prosecutor's Office (ECPO) for conversion of my two computers and denial of equal protection. It was included in that lawsuit solely to demonstrate satisfaction of the

statute of limitations for conversion. Although the NOC detailed the historical hardships I endured due to the ECPO's failure to investigate the crimes against me, I did not seek damages for emotional distress. My lawsuit against the ECPO was strictly limited to the conversion of my property and the denial of equal protection based on their refusal to perform a forensic examination while operating as a place of public accommodation**.(Ra614, Ra640**)

52. In approximately 2016, Captain Sanabria of the ECPO offered to assist me by performing a forensic examination on my computers after I reported the cyber intrusions. At the time, the Cyber Crime Unit was located at 7 Glenwood Avenue in East Orange, the same building as my law office. Detective Heather Cassidy contacted me and advised me to bring my computers in, explicitly stating the assistance was being extended as a professional courtesy. **(See Ra807, Ra801, Ra811)**

53. However, immediately after I disclosed that the suspected cyber intruder was a U.S. Special Agent, the Cyber Crime Unit ceased all communication with me. They refused to return my computers despite my numerous phone calls, text messages, and in-person visits to obtain either the forensic results or the return of my property.

54. For six years, my inquiries were entirely ignored. Consequently, I filed suit for conversion, denial of public accommodation, denial of equal protection, and related claims. . **(See Ra807, Ra801, Ra811)**

55. Without my knowledge or authorization, Investigator Chopra accessed my civil lawsuit against the ECPO and extracted the historical NOC to attach it to his certification against me.

56. My February 2025 and April 2025 certifications, requests for accommodation, and motions for judicial notice in *Upchurch* were weaponized and attached to Chopra’s certification. My constitutionally protected complaint against the Essex County Prosecutor’s Office is being improperly used against me, despite the clear statutory protections afforded to me under the ADA (42 U.S.C. § 12112(d)(4)(A)), the ADAAA, the Conscientious Employee Protection Act (CEPA), and the whistleblower protection provisions of the False Claims Act (31 U.S.C. § 3730(h)).

## Witness Observations and Experiences

**57.** Mario Portilla corroborated the extensive assault upon my computers that started after my interview at the DOJ's office in 2014. **(Ra191, Ra162)**

**58.** Witness Ronald Morrison certified as to the assault upon his livelihood and his property tights he started delivering my mail to prevent theft and tampering. **(Ra166)**

59. Morrison detailed how he went to car dealership to purchase a vehicle and was identified as deceased citizen in the credit reporting g system barring his ability to purchase his vehicle. **(Ra166)**

60. Ronald Morrisin explained how he was suddenly required to have a back ground check done within 10 months of the last one that he was told that he failed causing him to be immediately terminated from his Uber kid that he had go 20 years. Despite failing that background check he was able to pass the same check for LYFT, TWIC abs his weapons renewal. **(Ra166)**

61. Chopra was told about Morrison at the OAE interview. He said that he would reach out to Morrison but did not. Morrison went in person to the offices of the OAE in Ewing to give his address and phone number for proper contact but Neither Chopra nor Gitter contacted him. **(Ra166)**

62. Latoya Borum presented facts in her certification that mirrors the types of harassment that I endured in the past. **(Ra171)**

63. Attorney Hawkins explained that he saw the acts of interferences on ecourts that disputes my being paranoid regarding my observations. **(Ra156)**

64. Richard Douglas certified as to the remote access to my computers in the early years. The report was provided to the ECPO who failed to assist me. (**Ra197)**

65. Adam Portilla described his direct observation on ecourts that mirrors my co center related to the facts that the acts were happening directly on ecourts. **(Ra198)**

66. Dr. Ejiofor also became a witness after his office equipment and medical records were hacked and changed**. (Ra170)**

## Lopez Denied Petition and Prior Appellate Issues

67. Attached as Ra259 is a true and correct copy of a Certification in the Appellate Division in support of a motion requesting relief dated August 15, 2024 expressing concerns to the Appellate Case manager that the documents in Lopez's Appendix were **rotating sideways and upside dow**n on eCourts and developing hyperlinks and requesting a remedy of filing certain documents outside of the Appendix. **(Ra259).** The FBI was not mentioned.

68. On August 29, 2024, the Appellate Court denied the requested relief of being able to file the documents that were rotating on their own volition on eCourts outside of the Appendices to prevent rejection. **(Ra264- a true copy)**

69. Neither the Appellate Division nor the Supreme Court accept documents that are rotated 360 degrees, 90 degrees, 45 degrees or otherwise inside the Appendices or with active hyperlinks.

70. Attached as **Ra231** is a true and correct copy of the Petition that was filed on October 17, 2024 on behalf of Angel Lopez in the Supreme Court. **(Ra231- a true copy).** It does not mention FBI.

71. Attached as Ra258 is a true and correct copy of the Order denying the Lopez Petition signed January 28, 2025 and filed January 31 2025**. (Ra258)**

72. As shown, I had issues filing the Lopez Petition and updated my concerns to the Supreme Court case manager. (**Ra666**)

73. As shown by the attached February 19, 2025 email from Paige Ennis (Appellate Court Staff), I hand delivered documents in Trenton to her related to difficulties that I encountered with the Lopez filing. Mandatory filing fields were simply missing causing me to travel to Trenton to meet with Paige Ennis and determine how a would execute the filing of his petition (**See Ra679- a true copy)**

74. Attached as Ra681 is a true copy of an Email dated February 20, 2025 communication from me to Paige Ennis related to Lopez's documents. **(Ra681)**

75. On September 17, 2024, following significant systemic interference within the Appellate Division, the Lopez appeal was dismissed without a hearing on the merits. **(See Ra231).** This dismissal occurred after the Court and the case manager provided conflicting deadlines for the Respondent. (**Ra265- a true copy).** As argued in the Lopez Petition, the Appellate Court set one deadline, while the case manager issued a longer one. **(See Ra231).** The Respondent relied on the case manager's extended deadline, but the case was dismissed before that date arrived. (**(See Ra231)**

**76.** Consequently, the Respondent filed a petition arguing that it is fundamentally unfair to expect an attorney to guess which of two conflicting official deadlines to follow**. (Ra231)**

**77.**On April 21, 2025, I filed a Certification in the Supreme Court in support of a request for **accommodation to paper f**ile documents in Lopez case. (**Ra666, Ra667)**

**The Faulknor Supreme Court Petition and Problems that started in the Appellate Division**

78. Attached as Ra268 is a true and correct copy of the Petition that was filed in the Supreme Court on behalf of Dr, Faulknor on January 16, 2025. **(Ra268).** It does not mention the FBI.

**79.**Attached as **Ra300** is a true and correct copy of the amended Petition of Dr. Faulknor that was filed in the Supreme Court on June 6, 2025. **(Ra300).** It does not mention FBI.

**80.**Faulknor's problems in the Appellate Division actually followed her into the Supreme Court**. (Ra334, Ra360)**

**81.**On September 30, 2022 I filed a motion requesting leave to paper file documents on behalf of Faulknor in the Appellate Division due to **documents turning sideways and upside down on the electronic platform. (Ra334, Ra350)**

**82.** From 2022 – 2024, I filed a Motion brief and Certifications/letters requesting **accommodation** to paper file Faulknor's documents in the Appellate Division reveal that the Appellate documents of Dr. Faulknor, Anthony Sutton and Angel Lopez had the same systemic interferences however caused or engineered in the Appellate Division as explained below.

**83.** On 4/29/25, I filed a  motion for accommodation to be allowed to paper file documents in Faulknor

**84.** Because Faulknor, Lopez and Anthony Sutton all suffered from these bizarre anomalies in the Appellate Division  I attached Faulknor's Appellate documents in which I had expressed concerns as well as Anthon Sutton's to the Lopez Rule 4:50-1 (c ) (f) motion brief  to vacate the dismissal that I had filed in the Supreme Court. **(Ra356, Ra442, Ra444, Ra462, Ra478, Ra502)**

**85.** The phone number that is attached to the eCourt web site for reporting issues actually went into "CALL FAILURE" when Eldridge Hawkins and I sat down and tried calling to express concerns regarding problems that are occurring <u>directly</u> on eCourts**. (See Ra683-communication to Hon Judge Gardner)**

**<u>Upchurch v City of Orange</u>**

86. On February 19, 2025, I timely filed a brief in opposition to Summary Judgment in support of Client Upchurch. **(Ra563)** The brief did not mention FBI.

87. The motion was supported by 8 parts of an Appendix. **(Ra563)**

88. I specifically i*dentified the page range of the documents* in each Appendix part as I had done in the ones that were filed on July 10, 2024. **(See Ra569)**

89. Respondent later became aware that the Appendices noted on ecourts did not have the page ranges as I had given  indicating that they were tampered.

**90.** Seeking to protect my client, I requested that the Court take judicial Notice of Eight Appendices that she had previously filed on July 10,  2024 in a previous cross motion for Summary Judgment and **requested accommodation. (Ra570)**

91. The request for accommodation did not require a Merits argument.

92. Due to the persistent interferences and blind spots on eCourt, Respondent concluded that the Judge did not see the brief nor her Couter Statement of Material facts that she had filed on behalf of Respondent. She was forced to file an interlocutory appeal asking for a good faith change in laws to protect Whistleblowers against law enforcement including FBI

**Judicial Blind Spots & Forced Appeals:**

93. There are apparent, severe electronic "blind spots" however caused or engineered-manifesting across the New Jersey Court system. These defects

prevent presiding Judges from viewing properly submitted documents, leading the court to erroneously accuse Attorney Hawkins of non-filing. Consequently, valid cases are being summarily dismissed, forcing us to file appeals that are subsequently subjected to even greater electronic interference.

94. **Technical Anomalies:** These platform-direct anomalies include, but are not limited to, the obscuring of mandatory filing fields, the unauthorized rotation of document pages sideways and upside down, the spontaneous creation of faulty hyperlinks and removal of our names for receipt of Court notifications.

**95. The Faulknor Precedent:** The devastating legal consequences of these electronic platform defects culminated in the matter of *Faulknor v. County of Hudson, et al.* On March 30, 2021, Attorney Hawkins successfully uploaded six separate, timely, and complete Notices of Tort Claim, alongside the critical curriculum vitae (CV) of Dr. Faulknor with Faulknor's 2014 cover letter to the County, to the eCourts platform in direct opposition to a defense Motion for Summary Judgment. (See **Ra695-702, Ra710-711)**

**Historical Filing Record and Circumstantial Proofs of Interference**

96. The official electronic case jacket of *Faulknor v. County of Hudson, et al.* demonstrates that between 2018 and 2021, variations and submissions of these identical Notices of Claim (NOC) had been successfully uploaded to the court

system a total of thirty-seven (37) separate times, firmly embedding them within the trial court record.

97. **Erroneous Summary Judgment:** Despite the physical and electronic existence of these thirty-seven successful filings, including six NOCs filed in support of our Cross Motion for Summary Judgment, the trial court entered an Order on June 3, 2021, granting Summary Judgment to Defendants and dismissing multiple counts of the Complaint. In its written opinion, the court erroneously stated: *"There was no notice of claim filed as required by N.J.S.A. 59:8-8... for this reason, any tort claims, however plead in the complaint, are dismissed."* **(Ra688)**

98. **Catastrophic Interface Failure:** Based entirely upon this catastrophic interface failure-however caused or engineered-the Court stripped Dr. Faulknor of her foundational legal claims. Furthermore, the eCourts platform failed to display Dr. Faulknor's critical CV, which directly refuted the defense's summary judgment allegation that she had concealed a former employer. Due to this digital omission, the trial court explicitly and incorrectly noted in its opinion: *"She cannot recall whether she submitted her CV which she claims contains her full work history."* ***(Ra687)***

99. **Justified Motions for Recusal & Reconsideration:** Because these vital documents had been properly transmitted with valid electronic receipts,

Attorney Hawkins was forced to conclude that the trial court was either deliberately ignoring the record or that the digital record was being intentionally undermined to benefit the County. Based on the evidence available at that time, Attorney Hawkins filed a Motion to Recuse Judge D’Elia alongside a Motion for Reconsideration to protect the integrity of the proceedings.

100. **The 2021 Order Granting Summary Judgement in Faulknor could Not be Seen by Hawkins:** The structural failure of the eCourts platform to display critical entries further manifested when the core Order of Dismissal itself in *Faulknor* completely failed to appear on the public electronic portal. For nearly two weeks following the June 3, 2021 ruling, no summary judgment order was visible to Faulknor’s counsel. On June 14, 2021, Eldridge Hawkins was forced to contact the court directly to request a copy of the ruling via alternative channels simply to preserve the statutory timeline for reconsideration. **(Ra751).** When the Order finally appeared on the electronic portal, it was dated June 3, 2021, confirming that the court's own decrees resided within a systemic electronic blind spot.

101. **Visible Structural Corruption:** The structural corruption of the online docket remains permanently visible on the eCourts platform. For example, a vital copy of the Advanced Practice Nurse (APN) Act-submitted to demonstrate exactly why Dr. Faulknor could not legally execute certain paperwork presented

by nursing staff-is permanently displayed on the eCourts interface inverted upside down. (**Ra728).** The digital filing system-however caused or engineered-corrupted and inverted the orientation of this critical submission, rendering it visually illegible to a reviewing jurist and actively obstructing Plaintiff's fundamental constitutional right to petition the court.

102. **Denied Motion to Change Venue:** To escape what appeared to be a corrupted and heavily biased judicial environment, Attorney Hawkins moved to transfer venue. **(Ra755).** Attorney Hawkins filed a motion directed to the Assignment Judge requesting a change of venue and demanding that all of Judge D'Elia's rulings be vacated in the interest of justice. **(Ra758)** The Assignment Judge denied the motion, echoing Judge D'Elia's characterization that Hawkins was simply dissatisfied with an adverse decision. The Assignment Judge on reconsideration likewise failed to inspect the eCourts interface or review the Notices of Claim and CV that the platform had obscured. **(See Ra738-750, Ra710-711)**

103. **Unauthorized Third-Party Security Breach:** On January 31, 2025, an extraordinary technical anomaly occurred on Supreme Court eCourts platform: unauthorized third parties successfully bypassed standard administrative security protocols to upload the denied recusal order and a denied

reconsideration order signed by Judge D'Elia completely outside of the formal appendices. **(Ra297, Ra297)**

104. **Correction of the Supreme Court Record:** After Plaintiff denied uploading these documents and exposed this severe security breach, the Supreme Court Clerk officially marked these rogue entries on the electronic case jacket as "submitted in error." **(Ra297, Ra298)**

105. **Investigator Alteration of Evidence:** Compounding these platform breaches, the Office of Attorney Ethics (OAE) investigator explicitly presented entirely different, unauthorized versions of these two rogue Orders to the OAE, rather than presenting the authentic electronic versions filed on January 31, 2025, that the Supreme Court Clerk had officially marked as "**submitted in error"** on the public case jacket. **(Ra752, Ra754)**

106. **Basis for Rule 4:50-1 Application:** The shocking sight of these two rogue electronic entries-related directly to the 2021 previous friction and judicial hostility in Hudson County-prompted me to file the Rule 4:50-1(c) and (f) application to vacate Lopez's denied petition**. (Ra350)** This application implicitly exposed the state's tolerance of rogue hyperlinks, rotating pages, and systemic electronic blind spots that continuously prevented judges from viewing properly filed documents.

107. **The Lopez and Faulknor Original Petition were already properly argued on their merits.** I felt certain that Lopez Petition was improperly dismissed due to the unabated interferences that started on the Appellate Division.

108. **Absence of My Theory Regarding who is at fault:** Critically, neither the *Lopez* nor *Faulknor* original Supreme Court petitions, nor their respective appellate briefs, made any reference whatsoever to those persons that I perceived were causing the interferences**. (Ra231; Ra268, Ra300)**

109. **Allegations of Constructive Fraud:** My Rule 4:50 filing after the *Lopez* Petition was dismissed, alleged a constructive fraud upon the court under Rule 4:50-1, caused by the interferences and the State's deliberate indifference to the severe electronic filing disruptions in the Appellate Division that actively followed both the Lopez and Faulknor matters into the Supreme Court. **(Ra380)**

110. **Emergency Physical Remediation Trips:** When these electronic filing failures occurred, I did not merely write letters; I personally executed multiple emergency trips to Trenton to secure physical remediation, meeting directly with Court Staff Member Paige Ennis. **(Ra679)**

111. **Communication with the Appellate Clerk:** Former Appellate Clerk Saul Hernandez subsequently advised me that I should have explicitly informed him

of my historical whistleblower status during those filing disruptions. He seemed to grasp the magnitude of the situation.

112. **Severely Degraded Electronic Environment:** The electronic environment surrounding the *Lopez* Supreme Court filing was even more severely degraded than in *Faulknor*. Mandatory processing fields required to submit the *Lopez* petition electronically were completely invisible on the user interface, forcing me to make emergency physical trips to Trenton to determine how to execute the filings.

113. **Formal Written Notice of Blocked Options:** On October 17, 2024, I sent a formal letter advising the Supreme Court Case Manager in Lopez advising that vital electronic options were blocked, requiring me to upload Supreme Court documents under "miscellaneous" headers. **(Ra266))**

114. **Hand-Delivery of Documents to Trenton:** I traveled directly to Trenton with hard copies of documents, hand-delivering them to staff member Paige Ennis to bypass the compromised digital platform. **(Ra679, Ra681)**

115. **Official Docket Confirmation:** On February 19, 2025, Paige Ennis noted the *Faulknor* docket sheet, officially confirming she had physically transferred these hand delivered documents directly to the Supreme Court case manager. **(Ra679)**

116. **Unremedied Injury & Judicial Friction:** By May 30, 2025, the profound professional frustration generated by the friction that had erupted in 2021 between Eldridge Hawkins, Esq., and the Hudson County judiciary-stemming directly from Judge D'Elia's incorrect assertions that the six critical Notices of Tort Claim were never filed-remained a severe, un-remedied injury and was still raw.

117. **Discovery of Surreptitious Uploads:** Prior to drafting the Rule 4:50-1 motion that was ultimately sent to the Office of Attorney Ethics (OAE), I was recently forced to reexamine those exact six Notices of Claim after discovering that the unattached 2021 order denying Judge D'Elia's recusal and an order denying reconsideration had been surreptitiously uploaded to the Appellate Division platform by unauthorized third parties on January 31, 2025.

118. **Pro Bono Protection of Litigants:** I had no legal or statutory duty to file the appellate briefs or original petitions on behalf of litigants *Lopez* and *Faulknor*; I had done so entirely at my firm's own expense to prevent a *total miscarriage of justice.* None of these documents mentioned my specific theories as to who I perceived was actively causing the electronic interferences.

119. **Procedural Action to Address Injustice**: Following the unjust dismissal of the Lopez Petition, I filed a procedural motion pursuant to Rule 4:50-1 to explicitly argue the injustice denying both Lopez and Faulknor lawful access to

the courts. *But for* the technical failures on eCourts (however caused or engineered), Lopez's matter would not have been dismissed by the Appellate Division. Furthermore, had it not been for the apparent "blind spots" on the Hudson County electronic platform, all counts of Dr. Faulknor's Complaint would not have been dismissed by the trial court.

120. **Disclosure of Whistleblower Status for Context:** In the documents requesting accommodation, I explained my whistleblower status so that the Court could understand my background and why I believed these specific interferences were occurring on eCourts. **(Ra570-578)**

121. **OAE Referral by the Supreme Court:** That equitable remedy did not occur. Instead, the Supreme Court itself referred to the Office of Attorney Ethics (OAE) my Rule 4:50-1 motion on behalf of Lopez and Faulknor, alongside the Certification to hold Faulknor's matter in abeyance. **(Ra027, Ra37)**

122. I argued under Rule 4:50-1(c) and (f) that relief was warranted due to fraud upon the court and the extraordinary circumstances presented by the State's persistent failure to act, despite my consistently making these severe platform concerns known. **(Ra380**).That motion was not a "second bite at the apple," but rather protected speech on behalf of Faulknor and Lopez.

**123. Availability of Corroborating Records:** The letters, certifications, and a motion brief detailing these platform-direct eCourts defects remain fully

accessible and preserved under the Appellate dockets of *Faulknor v. Hudson County*, *Lopez v. The Palisades, et al.*, and *Anthony Sutton v. Beth Israel.*

124. **Basis of the OAE Demand:** As a direct result of my grievance and accommodation requests I was placed under investigation. There has been no showing that I am a danger.

125. **I did not refuse to comply with the OAE, I asserted my right sunder the ADA and the first Amendment, Fourth and fourteenth Amendment to the Constitution. (Ra225, Ra227, Ra229)**

126. **Nagel Rice advised the OAE that it was required to comply with the ADA.** (Ra225)

127. **There were no Pleadings attached to Investigator Chopra's certification on which Gitter relied to support her Petition to first compel the psychiatric exam and turnover of medical records.**

128. **Failure to Investigate Material Witnesses:** Despite the presence of direct witnesses to these electronic interferences, the OAE sought a psychological or psychiatric determination to explain away my factual observations rather than interviewing those witnesses. To date, the OAE has failed to interview a single material witness, including Eldridge Hawkins, Esq., whose cases are overwhelmingly and disproportionately subjected to these egregious technical interferences on the eCourts platform.

129. Attached is a true and correct copy of Certification filed by **Mario Portilla** that corroborates that I was being harassed during the early years after my whistle blowing.

130. Attached is a true and correct copy of Certification prepared by **Eldridge Hawkin**s, Esquire who witnessed the unauthorized acts against out documents filed on eCourts,

131. Note that Eldride Hawkins expressly states in his certification that someone that he perceived to an FBI agent actually came into his office mimicking my concerns**. (Ra157)**

132. While not mentioned in the certification, Eldridge Hawkins had advised me soon after that encounter that the individual who came into his offices pretending to need a lawyer wanted him to know that the FBI can do just about anything and get away with it.

133. There is no question that I and my family became a ***victims of crimes*** related to my whistle blowing against the United States Special Agent.

134. On June 28, 2025, Dr. Udoka Ejiofor wrote a report regarding my mental competence that was sent to the OAE. Chopra rejected it**. (Ra170)**

**135.** Dr. Ejiofor himself became a victim of crimes after he wrote the report on my behalf**. (Ra152)**

136. The eyewitnesses that Chopra refused to interview, also witnessed-and in several instances personally shared-experiences such as unauthorized hyperlink creation after upload, removal of counsel names from case jackets, manual docket manipulation, systemic blindness preventing judges and lawyers from viewing filings, documents rotating sideways and upside down on eCourts causing rejection by the Appellate Division. Hawkins witnessed documents given false numeric designation in the ACMS that cause them to appear as if filed after adversaries, documents not entered into the ACMS. Morrison witnessed false matter injected into documents on government sites, and unauthorized alterations to background data collected by government personnel.

137. These events were not isolated or speculative; they were repeated, documented, and experienced by multiple persons. The testimony of witnesses would have directly disproven Chopra's defamatory psychiatric characterization and would have established that the anomalies I reported were grounded in verifiable system failures, not in any mental impairment.

138. **Assertion of Federal Constitutional Rights:** In response to these actions, I have explicitly asserted my federal rights under the Americans with Disabilities Act (ADA) and the First , fourth and fourteenth Amendment to the United States Constitution.

139. **The same Special Agent who was assigned to the first Maxim Fraud Charges was reassigned to the matter that I reported to the OIG in 2013.**

140. Upon the Special Agent being reassigned to investigate Maxim, he acted as if he had no interest in the Investigation. I was very concerned because my name was attached to documents that I did not sign that would allow the owners of Maxim to defraud the government.

141. I reasonably believed that Agent Fayer was the one assigned to oversee Maxim pursuant to the 2011 integrity agreement. His nonchalant attitude, his behavior on the phone, and the delay in reaching out to me led me to conclude that he neglected his responsibility.

142. I had read a news article wherein it was stated that there was no interest in the first Maxim investigation by the DOJ and that it was the Maxim patient and his lawyer who pushed the 2009 allegations forward after which the DOJ became involved.

143. Due to the Special Agent's his behavior, I sincerely believed that he had no interest in getting involved a second time. I felt that had he and others properly supervised Maxim, it would not have continued the billing fraud when I became employed in 2013. I did not work in the billing department.

144. I received alerts on my phone and computer pops ups advising me about private acts conducted in my bedroom, my bathroom and my kitchen.

145. Without attaching all the police reports from repeated calls to the police, police report incident #14045086 dated December 11, 2014, attached here, references other police reports, and expressly states in part "the Portillas then provided that several odd occurrences have happened to them and their residence" **(Ra762)** "Mrs. Portilla believes that she and her family have been targeted for her actions in uncovering a health Insurance Fraud through her private practice. Ms. Portilla provided she believes that the investigator from the Office of the Inspector General in charge of the case, only identified as Gene Fayer" (no further information provided) is responsible**. (Ra762)**

146. The **"**no further information provided" injected in the police report is false as the police were told a lot that night.

147. Police report #14045086 was related to a text message that I received on 11/01/2014 asking whether I wanted the Power Dry Emergency Water removal Company to remove water from my home.

148. I had ignored the text message as a spam.

149. Four days later I went down to my finished basement (formerly a doctor's Office prior to the house being sold to us) where I had not been in days and saw that the entire basement was flooded, warranting that all the carpeting be removed.

150. The attached Police report #14045086 contradicts paragraph 41 (d) of Chopra's report wherein her certifies that the Power Dry incident occurred 2006 to 2016. Those dates documented by Mr. Chopra shift the focus from the US Special Agent who I met in February 2014. *By documenting 2006,* Chopra gives the impression that the Power Dry incident occurred even before I met the Special Agent.

151. Chopra omitted a critical fact from his Certification: I explicitly told him that I no longer felt safe using my own phones after discovering they were compromised. To protect myself, I resorted to using public payphones or borrowing phones from random businesses, like gas stations. The reality of my surveillance became crystal clear one day when I pulled into a gas station I had never visited before. Before I could even step out of my car or utter a word, a gas station employee walked directly toward me, smiling held out a device, and said, "Here is the phone."

152. Chopra states in his Certification "*During her interview with the OAE on August 11, 2025, Respondent confirmed her belief that her IP address is located in Virginia, which she perceives to be confirmation of the mainframe hookup. Such discovery occurred after her son observed "Comcast guys coming out of a PSE&G van to make change out of my house without our consent, without our knowledge*" **(Chopra's Certification ¶ 50)**

153. Chopra omitted the critical fact that ***I told him*** that my cybersecurity company, upon finding no localized evidence of an intrusion, instructed me to look up my IP address, which a Google search revealed was routed through Virginia.

154. I went to the Comcast store to inquire into the reason why my IP address was routed through Virginia and was told that it should not be so. I am aware that the FBI has a head office in Virginia.

155. Chopra states in his certification "*She claims that she is being harassed by the FBI, West Orange Police Department (WOPD) and other people*" **(Ra041- Chopra's Certification ¶ 9)**. This is a false statement.

156. I never accused the West Orange Police of Harassment. I stated that it took me many years until 2025 to realize that the West Orange Police were a part of the crimes (meaning covering up for perceived FBI Agents). I explained that over the years that the West Orange Police wrote reports that were false and did not reflect my true words.

157. I explained to Chopra that in 2025, upon going fishing with my husband in Jersey City, I was approached by an individual who came up to us and asked me how was the fishing. Upon looking into his face, I recognized him as an individual who the West police had brought into my home in the early years.

He was the only one wearing plain clothes when he came into with my home with the police that day.

158. I have always maintained that my harasser is a perceived US Special Agen/FBI and those perceived assisting him. NO other people.

159. Chopra stated that I "believe[d] the WOPD brought an FBI agent ***disguised*** as a police officer to Respondent's house when she called WOPD" **(Ra041-Chopra's Certification ¶ 38)**

160. I never used the word "disguised." If he was the only one wearing plain clothes, then he was not disguised.

161. Chopra also stated "Responded added she brought her cell phone to the WOPD upon noticing her emergency contact was set to "prison" which she interpreted as a threat that she is going to prison." (**Ra041-Chopra's Certification ¶ 39)** I never advised Chopra that *I* ***interpreted*** **the rigging of my phone to add prison as my emergency contact as a threat th**at I was going to prison. I was angry and felt violated because I did not give my consent to anyone to add an emergency contact to my phone.

162. **Confidential Family therapy:** Due to the outrageous acts of harassment, my husband and I attended therapy. We were both discharged years ago. Chopra describes my therapy as "Psychiatric History."

163. Chopra's certification contains outrageous defamatory statements, including: *"Respondent indicated Ejiofor advised she should merely rest when Respondent's husband suggested she admit herself to the hospital for psychiatric treatment.*" (Ra041- Chopra's **Certification ¶ 45** (b)) This statement is false. Moreover, the word "merely" is editorialized, prejudicial.

164. At the OAE interview in Trenton on August 11, 2025, Chopra started asking about medication and treatment of which I had no recent recollection. I had no idea that those questions would be asked. We were told that the interview was about the Lopez and Faulknor motions in the Supreme Court.

165. We were completely blindsided. I had made copies of multiple documents from various court sites that I took to Trenton to show the magnitude of the interferences on eCourts. Chopra had no interest in those problems.

166. I honestly thought that Dr. Ejiofor's report dated July 18, 2025, that we sent to the OAE would have put to rest any accusation that I had any type of mental problems.

167. Chopra wrote his certification using contents from an old notice of claim attached to my complaint against the ECPO and did not see the need to put us on notice of his intent so that the contents could be clarified.

168. Chopra Cautioned us that we were not allowed to record the interview.

169. We were not sent a copy of the recording of the interview.

170. The Recording was not done by a neutral court reporter.

171. And, no, I am no longer shocked or alarmed by any perceived act to be that of an FBI agent acting ultra vireslty. If I was, I would not be taking steps publicly to have the government make changes to that agency. I am also aware that my political speech is protected.

172. My boldness in contacting the government should not be misconstrued. I have been interacting with Eldridge Hawkins for years and former State Senator. Hawkins son was also the Mayor or Orange.

173. As a former legislator Mr. Hawkins never hesitant to send letters to government agents and Agencies with his concerns and suggestions. He was fully aware that I sent the letter to President Trump and offered his opinion. He also assisted me with my letter to the New Jersey Legislature requesting that changes be made to the Workers' Compensation Act. (**Ra587)**

174. **Trial by Ambush with the Brand-New Allegations by Ms. Gitter: Allows supplementation of the record. Ra004-24)**

175. The Witness Certifications directly rebut the newly raised allegations, making them absolutely necessary for a fair adjudication.

176. **Good Cause Verified:** This motion is brought in good faith based upon meritorious good cause and is absolutely not interposed for the purpose of improper delay.

177. **Certification of Documents: I certify that all documents attached are true and correct copies of their Originals (Ra001-Ra811)**

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

*/s/ Cecile D. Portilla*
**CECILE D. PORTILLA**, ESQUIRE

Dated: August 14, 2026