ELDRIDGE HAWKINS, LLC
60 Evergreen Place, Suite 510
East Orange, NJ 07018
Attorney ID No. 214731967
(973) 676-5070 Fax: (973) 676-7356
hwklaw@aol.com

| | |
|---|---|
| **IN THE MATTER OF CECILE DELROSE PORTILLA, ESQUIRE**<br><br>**AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY**<br><br>**(0121212005)** | **UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY**<br><br>**Civil Action No. 8:26-cv-09035-RMB** |

**APPENDIX OF RESPONDENT IN SUPPORT OF ORDER TO SHOW CAUSE WHY RECIPROCOL DISCIPLINE SHOULD NOT BE IMPOSED**

**VOLUME ONE OF FIVE (Ra001-Ra176)**

---

–

**APPENDIX INDEX**

Certification of service of Suspension Order
dated July 14, 2026………………………………………………………Ra001

Order of Suspension dated July 9, 2026…………………………………….Ra002

Alexandra Gitter's Notice of Motion for leave to file a
Reply June 18, 2026……………………………………………………. Ra004

Certification of Alexandra Gitter in Support of Motion to
to file a Reply Brief June 17, 2026…………………………………………….Ra005

Reply Brief of Alexanda Gitter dated June 18, 2026……………………….Ra007

Email advising that Copy of Respondent' Opposition to OAE's
Petition for medical Exam was delivered to OAE and will be
Forwarded to DRB dated December 22, 2025……………… ……………..Ra025

June 10, 2025 letter with HIPAA form from OAE advising of
referral from the Supreme Court related to motions filed
on behalf of Lopez and Faulknor……………………………………….....Ra027

July 2, 2025 letter from Hawkins to Ms. Gitter advising her that he
represents Respondent……………………………………………………..…Ra032

July 2, 2025 letter from Gitter to Hawkins acknowledging ……..…(same)Ra032

receipt of his letter of representation.

August 6, 2025 Email entitled 'Interview' from Attorney Hawkins to Alexanda Gitter requesting copies of the Faulknor and Lopez Motion documents to determine if Respondent Authored them……………Ra034

August 7, 2025 email from Gitter to Hawkins advising him that the documents are the same as those available to Ms. Portilla on eCourts and to feel free to compare them to Ms. Portilla's Original documents w/o OAE printing hundreds of pages……………………………Ra036

August 14, 2025 letter to Ms. Gitter requesting discovery and advising that he needed discovery for substantive due process and that he did not know what he is defending officially………………………..Ra036

August 18, 2025 email form Gitter to Hawkins advising him that Respondent is being Investigated for Paranoia……………………………….Ra037

Alexandra Gitter's December 2, 2025 Petition for relief for medical and mental health examination and records………………….…….Ra038

Certification of Chopra 11/26/2025 with *attachments.*…………………………………….…………………………..Ra041

*Attached Request for **Accommodation** in Upchurch and for Judicial Notice of previous July 2024 Appendices due to interference with current Appendices filed **2/27/2025** (See Ra570)*

*Attached Notice of Motion for **Accommodation** in Upchurch to paper file documents on eCourts filed 4/25/2025(See.Ra576)*

*Attached Notice of Motion to hold Faulknor's Petition in Abeyance Until the third Party Upload of Documents was properly investigated 2/13/25 (See Ra644)*

*Attached Certification in Faulknor's case in Support of Motion for Accommodation in the Supreme Court to paper file Faulknor's documents on eCourts 4/29/2025 (See Ra646)*

*Attached Complaint Against Essex County Prosecutor's Office FACS/Cyber Crime unit for Conversion and denial of equal Protection (See Ra815)* that *had Old NOC to show that six years SOL was met. Old NOC also had disclosures related to historical therapy for trauma caused by the cyber harassment that EPCO failed to investigate as agreed to do ECOP was not sued for the mental trauma as it did not cause my trauma (Ra842)*

*Alleged Transcripts of OAE Dec 11, 2025 interview – (Not attached as we were not allowed to record the interview And taping was done on Chopra's personal Device and no neutral Court reporter was present)*

*Attached* Report of Dr. Ejiofor dated June 28, 2025 (See Ra170)

Certification of Cecile D. Portilla, Esquire in response to

Chopra's Certification dated 12/09/2026………………………………..Ra071

****Certification of Dr. Ejiofor, APN regarding Cybercrimes affecting his practice, phones being controlled by others and tampering of his clients' prescriptions to different dosages including life threatening dosages……(**Ra805 replaced Ra152)**………..Ra152

Certification of Eldridge Hawkins, Esquire dated June 12, 2025……….. Ra156

Certification of Mario Portilla dated Nov 26, 2017……………………... Ra162

Certification of Ronald Morrison dated December 2, 2025…..…………….Ra166

Report of Dr. Ejiofor, APN stating that not only is Ms. Portilla Mentally competent, she is diligent and purposeful in her career dated 6/28/25…………………………………..……...Ra170

Certification of Latoya Borum dated June 28, 2025………..,,………..…..Ra171

Witness Statement on behalf of Eldridge Hawkins sent to
the OAE September 28, 2025…………………………………..…..…..…..Ra177

Report of Computer Expert Richard Douglas
October 10, 2016…………………………………………………………Ra168
.
Certification of Richard Douglas 10/10/2016……………………..……… ….Ra197

Certification of Adam Portilla Feb 25,2026………………………… …….Ra198

..*Attachment 1*-to Certification of Adam Portilla
Upside down Appellate Brief of Keri Payne………… ……………..… …...Ra201

*Attachment 2*-to Certification of Adam Portilla Cover Page
Of Appendix of Carol Jakson demonstrating lack of active
Hyperlink first Appendix Cover page …………..……..………………..… .Ra204

*Attachment 3*-to Certification of Adam Portilla Cover Page
Of Appendix of Carol Jakson demonstrating active
Hyperlink triggered (little hand) on eCourts…………………………….Ra207

*Attachment 4*-to Certification Geek Squad customer receipt
Wherein Geek quad Agent states he cannot see any active Hyperlinks
in Appendix in his computer while document is in the store…………......Ra210

Order by Timothy Ellis compelling exam and examination by
Medical doctor to determine Respondent's ability to
Practice law signed January 5, 2026…………………………………….Ra212

Email to Ms. Gitter and Mr. Chopra January 14, 2026………… ………Ra214

March 19, 2026 letter from Ms. Gitter to Benjamin with
proposed Order requesting that she assign counsel to
respondent……………………………………………………..…..Ra216

*Attached* Proposed Order…………………..……………………..….……Ra218

Letter from Respondent to Judge Benjamin with copy
of Expert report of Dr. Ejiofor APN attached dated
March 19, 206 declining new counsel. ………………..……………….…..Ra219

*Exhibit A* to letter-Expert Report of Dr. Ejiofor

to letter from Respondent ……………………………………….……..Ra222

Order signed by Judge Benjamin on April 4, 2026
Appointing counsel to Respondent…………………………………..… .Ra224

Brief[1] of Jay Rice asserting ADA Gateway factors
dated May 12, 2026………………………………………………… ..Ra225

Petition for Certification of Angel Lopez
filed October 24, 2024…………………………………….………… ...Ra231

Order denying Lopez Petition dated January 28,2025………………... .Ra258

Certification of Cecile D. Portilla filed in the Appellate
Division dated August 15, 2024 with concerns that Lopez
documents were rotating sideways/upside down and seeking relief
filing certain documents outside of the Appendices…… ……..…Ra259

Appellate Order denying relief regarding Lopez
documents dated August 29, 2024………………………… ..………..…Ra264

Order dismissing Lopez Appeal dated September 17, 2024……..………… ..Ra265

[1] **Brief of Nagel Rice, Esq attached to show that he asserted federal defenses of Portilla to the OAE and advised the OAE of need to Comply with the ADA.**

Letter to Supreme Court Case manager in Lopez
case dated October 17, 2024 advising that documents
had to be filed under miscellaneous as options for
proper filing was not available……………………………………………Ra266

Petition for Certification of Dr. Faulknor
dated January 16, 2025…………………………………………………….Ra268

Order denying Judge D'Elia's recusal on 8/6/21
uploaded to the Supreme Court on January 31, 2025
by third party marked "**submitted in error"** by
the Supreme Court Clerk"……………………………………………….…Ra297

Order denying reconsideration by Judge D'Elia on 8/6/21
uploaded to the Supreme Court on January 31, 2025
by third party marked "**submitted in error**" by the Supreme
Court Clerk"……………. ……………………………………………... Ra298

Amended Petition of Dr. Mavis Faulknor
June 6, 2025…………………………………………………………..… Ra300

Appellate Motion brief on behalf of Dr. Faulknor advising
clerk of documents turning sideways and upside down in
the Appellate division and requesting relief Sept 30, 2022.…………….… Ra334

Supplemental Certification of Dr. Faulknor advising Appellate
Clerk of the problems with documents on eCourt
filed September 30, 2022…………………………………………………. Ra350

Copy of the Faulknor Certification Appellate Certification
that was filed Attached to Lopez motion brief
filed on May 25, 2025……………………………………………………Ra357

Order dated November 12, 2025 denying Faulknor's petition……….…….Ra363

Letter to Appellate Clerk advising that Sutton's documents
were turning sideways and upside down on eCourt and
asking for relief March 13, 2022…………………………….,,,….. ……Ra364

Appellate Order dismissing Faulknor and not
mentioning Rule 1:13-1 June 6, 2025…………………………...……….Ra366

Lopez Rule 4:50-1 Motion Brief with exhibits to Vacate and
Reconsider-uploaded Feb 2025, Amend April 2025
filed May 30,2025…………………………………………………… …..Ra380

Opposition brief to Partial Summary Judgment in
matter of Upchurch v City filed February 19, 2025…………………… ..Ra563

Screen shot of Appendices noted on eCourts in Upchurch
matter with names that Respondent did not give to documents
indicating unlawful interference dated Feb 19,2025………………… ….Ra568

Screen shot of Previously filed Appendices dated 7/10/2024
with names given to past and then present
Upchurch Appendices……………………………...…………………..Ra569

Request for **Accommodation** in Upchurch and for Judicial
Notice of previous July 2024 Appendices due to interference[2]
with current Appendices filed **2/27/2025**…………………………………. Ra570

Notice of Motion for **Accommodation** in Upchurch to paper
file documents on eCourts filed 4/25/2025………………………...……...Ra576

Certification of Respondent in support of Request in Upchurch

[2] The Volumes of Appendices had different names from the names that were given to them on upload to eCourts.

for **Accommodation** to paper file documents on eCourts……………….Ra578

Request for **Accommodation** to OAE and DRB to allow
the Constitutional Issues to be resolved via Judicial review
Prior to surrendering sensitive medical information Feb 8, 2026 ……….**Ra589**

Proposed changes to the Workers' Compensation act
by Cecile D. Portilla, Esquire 9/12/24...................................................**Ra597**

Substantial Compliance by DSM-5-Turnover 2/17/26 Ra609

Exhibit B-Collateral witness list……………………………..……… **Ra612**

Amended Complaint filed against the Essex County
Prosecutor's Office dated September 16, 2025
(NO EMOTIONAL DISTRESS DAMAGES SOUGHT)
by Respondent……………………………………………………… Ra614

Certification of Cecile D. Portilla against Essex County
Prosecutor's Office July 7, 2025…………………………….………..Ra640

Notice of Motion to hold Faulknor's Petition in Abeyance
Until the third Party Upload of Documents
was properly investigated 2/13/25…………………………….……….. Ra644

Certification in Support of Motion for Accommodation in the
Supreme Court to paper file Faulknor's documents on eCourts
4/29/2025……………………………………..…………………Ra646

Email to case manager in Lopez regarding problem with
Upload and intent to make **motion to vacate** and reconsider
Feb 11, 2025…………………………………………………………..Ra659

Certification allegedly of Portilla with the
word "CERTIFIED" not written by her regarding the petition
intent to reconsider the denial of Angel Lopez's petition

dated April 21, 2025……………………………………..……………..Ra660

*Exhibit* A- Supreme Court Case jacket……………………..…………..Ra665

*Exhibi*t B-Certification in support of Request
for Accommodation Request April 21, 2025
in Lopez case…………………………..…………….…………………..Ra667

Email communication dated February 19, 2025 from
Paige Ennis advising Respondent that letter and copies
of documents were given to the Supreme Court Clerk…………………Ra679

Email communication from Respondent to Paige Ennis
advising of issues with the Lopez filing dated
February 20, 2025………………………………………………………Ra681

January 9, 2025 communication to Judge Garder regarding
lack of receipt of Court Notifications after
Notice of Appearance filed……………………………………………..Ra683

March 7, 2025 email from defense Counsel in Respondent's
case against Comcast showing that defense Counsel who
was formerly receiving Court Notification suddenly
stopped receiving Court Notifications…………………………..…….…...Ra685

Judge D'Elias decision in Faulknor v Hudson County
dated June 3, 2021 reflecting that he overlooked
(however caused or engineered) six notices of Claims
and Faulknor's CV ………………………………………………….……..Ra687

Cross Motion for Summary Judgment filed 3/30/2021…….……..………..Ra691

Six Notices of Claims that Hawkins filed on 3/30/2021
on behalf of Faulknor in opposition to
Summary Judgment ……….. ……………………… ……………..…Ra695-709

Cover letter to CV that Faulknor sent to the County on
September 2, 2014……………………………………………………….……Ra710

Faulknor's CV that was filed in support of Summary
Judgment on 3/30/2021 that Judge D'Elia
could not see………………………………………...……….....…Ra711

APN Act upside down ………………………………..……..…....Ra728

Certification of Eldridge Hawkins in
support of motion for Reconsideration in Faulknor………………..… Ra731

Six Notices of Claims filed on behalf of Faulknor in Support
of Motion for Reconsideration on 7/1/2021……………………..……Ra738-750

Hawkins letter communication to
Judge D'Elia on June 14, 2021Requesting that the
Order dismissing case on summary Judgment be filed
so that he can file his motion for reconsideration……………………Ra751

Order denying Reconsideration by Judge

D'Elia in Faulknor dated 8/6/2021……………………………….….Ra752

Order denying recusal of Judge D'Elia dated

August 6, 2021…………………………………………………….….Ra754

Order denying Hawkins Motion to Transfer Venue
in Faulknor matter September 24, 2021……………………......…..Ra755

Order denying reconsideration of All Judge D' Elia's
prior rulings dated August 30, 2021…………………….….………..Ra758

Police report #14045086 related to
the Respondent's home dated 12/11/2014…………………………… Ra762

Grievance and Request for Stay Pending Appeal
to Third Circuit Jan 28, 2026………………………………………….Ra764

Substantial Compliance of DSM-5 Turnover
letter Feb 17, 2026 ……………………………………………………Ra769
Attachment with List of names (See Ra612

Respondent's letter to Former Health +Care Employer
To discharge Patients to other agency for their safety 9/8/2013………..Ra772

Respondent's email letter to Former Health Care
Area Supervisor with concerns for Patient safety 4/30/2013…………..…Ra775

Respondent's written Whistle Blower Complaint Against Maxim
to the OIG 9/23/2013…………………………………………………..Ra776

Respondent's letter to OIG with Concerns related to Maxim
and Agent to assigned to investigate Maxim 12/10/2013…………………Ra785

Letter to Police Officer Romano regarding errors in police
report 7/16/2014……………………………………………………… Ra787

Proof of service to Officer Ramano 7/16/17………………………………Ra790

Mario Portilla's documents related to
early observations 8/7/2014……………………………...…………Ra791

Letter from Eldridge Hawkins to US
Attorney's Office August 29, 2014……………………………………………Ra796

Response to Respondent Portilla from USPS
Regarding mail theft and tampering January 20, 2015……………..…… Ra797

DOF Justice News- Maxin to pay $150 million for
false billings related to 2011 common practice false billing……………. .Ra798

Response from US DOJ to Respondent
with info for FBI with info for FBI related to
wiretaps, stalking hacking of computers and
mail tampering February 10, 2016……………………………………………Ra804

Certification of Dr. Ejiofor stating that his office phone and
Records were hacked and his phone fully controlled after he
Assisted Portilla 12/02/2025……………………………….…………………Ra805

Letter from Portilla to US Attorney Dec 6, 2015 related
to wiretaps and And cyber harassment December 6, 2015…………………..Ra808

Proof of Service of Correspondence with Police Report
To Captain Sanabria on 11/29/21…………………………………………Ra810

Letter to Captain Sanabria from Portilla requesting
Status of Computers November 28 2021………………………………….. Ra811

Letter to Captain Sanabria seeking to know
status of computers……..10/18/16………………………………………… Ra814

****Correct March 3, 2025 copy of Portilla's
Complaint against the ECPO (replacement for Ra614)………………… ..Ra815

*****Note that plaintiff Portilla accused the ECPO
***of abandoning its rescue efforts* causing the cyber
crimes to worsen *making them liable***

********Portilla did not accuse the ECPO of the actual cyber crimes.She accused the EPCO of allowing it to happen by failing to act.***

**Portilla did not sue the ECOP for any emotional distress damages because in 2025 when the suit was brought she had no issues with emotional distress She sued the ECPO for injuries to her DAMAGED rights from the Denial of equal protection and related claims**

*******This OLD Notice of Claim dated April 2022***
was attached to the Amended Complaint solely to show that the 6 years SOL for conversion was satisfied against the County of Essex that *Chopra secretly retrieved* and attached to his certification. Chopra did not ask for explanations of statements made in the Notice of claim. He simply wrote parts of statements and came to conclusions………………Ra842

**SUPREME COURT OF NEW JERSEY**
**M-974/1096 September Term 2025**
**092060**

**IN THE MATTER OF :**

**CECILE DELROSE PORTILLA :**

**AN ATTORNEY AT LAW :**

**(Attorney No. 021212005) :**

**CERTIFICATION OF SERVICE**

I, Lois Guarino, hereby certify:

1) I am employed by the State of New Jersey as an Administrative Specialist 3 with the Supreme Court Clerk's Office.

2) On July 14, 2026, I personally mailed by e-mail, and caused to be served by regular and certified mail, a copy of orders filed July 14, 2026, to respondent's counsel, Eldridge T. Hawkins, Esq., and Jay J. Rice, Esq., to the addresses below:

ATTN: JAY J RICE
NAGEL RICE LLP
103 EISENHOWER PKWY
ROSELAND, NJ 07068
JRICE@NAGELRICE.COM

ATTN: ELDRIDGE T HAWKINS
ELDRIDGE HAWKINS
60 EVERGREEN PLACE-STE 510
EAST ORANGE, NJ 07018
HWKLAW@AOL.COM

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/s/ *Lois Guarino*
Lois Guarino

**FILED,** Clerk of the Supreme Court, 14 Jul 2026, **092060**

**SUPREME COURT OF NEW JERSEY**
**M-974 September Term 2025**
**092060**

| | | |
|---|---|---|
| **In the Matter of** | : | |
| **Cecile Delrose Portilla** | : | **O R D E R** |
| **An Attorney at Law** | : | |
| **(Attorney No. 021212005)** | : | |

The Office of Attorney Ethics having filed with the Court a petition pursuant to Rule 1:20-3(g)(4) and Rule 1:20-11, seeking the immediate temporary suspension from the practice of law of **Cecile Delrose Portilla** of **East Orange**, who was admitted to the bar of this State in 2007;

And good cause appearing;

It is ORDERED that **Cecile Delrose Portilla** is temporarily suspended from the practice of law, effective immediately, and until further order of the Court; and it is further

ORDERED that respondent is restrained and enjoined from practicing law during the period of respondent's suspension; and it is further

ORDERED that all funds, if any, currently existing or hereinafter deposited in any New Jersey financial institution maintained by **Cecile Delrose Portilla** pursuant to Rule 1:21-6 shall be restrained from disbursement

except on application to this Court for good cause shown, pending further order of this Court; and it is further

ORDERED that respondent comply with Rule 1:20-20 dealing with suspended attorneys; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 9th day of July, 2026.

Heather J Baker

**CLERK OF THE SUPREME COURT**

**OFFICE OF ATTORNEY ETHICS**
**P.O. Box 963**
**Trenton, New Jersey 08625**
**609-403-7800**
**By: Alexandra J. Gitter**
**Moving Party/Presenter**

**SUPREME COURT OF NEW JERSEY**
In the Matter of Portilla 092060
Docket No. M-974-25
District Docket No. XIV-2025-0257E

| | |
|---|---|
| **IN THE MATTER OF**<br><br>**CECILE D. PORTILLA, ESQ.,**<br><br>**AN ATTORNEY-AT-LAW** | **NOTICE OF MOTION FOR LEAVE TO FILE A REPLY [R. 2:8-1(b)]** |

**PLEASE TAKE NOTICE** that the Office of Attorney Ethics (OAE) petitions the Supreme Court of New Jersey, pursuant to R. 2:8-1(b), for leave to file the OAE's reply on this date. Please take further notice that in support of the motion, the Office of Attorney Ethics shall rely upon the Certification of Alexandra J. Gitter, Deputy Ethics Counsel, submitted herewith.

By: *Alexandra J. Gitter*
Alexandra J. Gitter
Deputy Ethics Counsel

Dated: June 18, 2026

**OFFICE OF ATTORNEY ETHICS**
**P.O. Box 963**
**Trenton, New Jersey 08625**
**609-403-7800**
**By: Alexandra J. Gitter**
**Moving Party/Presenter**

**SUPREME COURT OF NEW JERSEY**
In the Matter of Portilla 092060
District Docket No. XIV-2025-0257E

**IN THE MATTER OF**

**CECILE D. PORTILLA, ESQ.,**

**AN ATTORNEY-AT-LAW**

**CERTIFICATION IN SUPPORT OF MOTION**
**[R. 2:8-1(b)]**

STATE OF NEW JERSEY :
: ss
COUNTY OF MERCER :

I, Alexandra J. Gitter, of full age, being duly sworn according to law upon her oath, deposes and says:

1. I am employed with the Office of Attorney Ethics (OAE) as a Deputy Ethics Attorney. I have personal knowledge of the following facts.
2. The OAE respectfully requests leave to file the attached letter brief in reply to the letter brief opposition submitted by appointed counsel, Jay J. Rice, Esq. (Rice) on behalf of Cecile D. Portilla, Esq. (Respondent).

3. As explained in the attached letter brief, the OAE obtained from the Supreme Court the response dated December 19, 2025 submitted by Respondent's former counsel, Eldridge Hawkins, Esq. (Hawkins). Since the Disciplinary Review Board considered such response to the OAE's application before entering the Order directing Respondent to submit to the medical examination, the attached letter brief focuses on responding to the arguments raised in Rice's letter brief.

I hereby certify that the forgoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Alexandra J. Gitter
Deputy Ethics Counsel

Sworn and subscribed to
before me this 17th day
of June, 2026.

An Attorney-At-Law of
the State of New Jersey

Jennifer Iseman
NJ Atty ID 022172007

OFFICE OF ATTORNEY ETHICS
OF THE
SUPREME COURT OF NEW JERSEY
P.O. BOX 963
TRENTON, NEW JERSEY 08625
PHONE: (609) 403-7800
FAX: (609) 403-7802

JOHANNA BARBA JONES
*DIRECTOR*

JASON SAUNDERS
*FIRST ASSISTANT ETHICS COUNSEL*

June 18, 2026

Heather Joy Baker, Esq., Clerk
Supreme Court of New Jersey
Richard J. Hughes Justice Complex
P.O. Box 970
Trenton, New Jersey 08625

**Re: In the Matter of Portilla 092060**
**Docket No. M-974-25**
**District Docket No. XIV-2025-0257E**
**Reply to Respondent's Opposition to Petition for Immediate Temporary Suspension**
**[R. 2:8-1(b), R. 1:20-11, R. 1:20-3(g)(4)]**

Dear Ms. Baker:

Please accept this letter brief in lieu of a more formal brief in reply to the opposition submitted by Cecile D. Portilla, Esq. (Respondent) through Respondent's appointed counsel, Jay J. Rice, Esq. (Rice) and Respondent's former counsel, Eldridge Hawkins, Esq. (Hawkins).[1] For the reasons detailed

---

[1] The OAE notes that Rice and Hawkins improperly served their respective opposition upon the OAE and neither has submitted a certification of service with

herein, the Office of Attorney Ethics (OAE) respectfully submits that the Petition for Immediate Temporary Suspension should be granted. The OAE's Petition was based upon Respondent's failure to cooperate with its requests to effectuate the Disciplinary Review Board's (the Board) January 5, 2026 Order compelling Respondent to attend an expediated medical examination to determine her fitness to practice law.

## I. STATEMENT OF FACTS & PROCEDURAL HISTORY

The OAE incorporates by reference the Petition for Immediate Temporary Suspension submitted on May 6, 2026, particularly, the Affidavit of Disciplinary Investigator Rajesh Chopra with exhibits (Affidavit). The following is a summary of counterpoints raised in such Affidavit for purposes of this letter brief.

---

any opposition (R. 1:5-3). Neither Rice nor Hawkins served their initial opposition upon the OAE at all. The OAE learned that opposition was filed by way of the Supreme Court's first deficiency notices on May 20, 2026, then Rice provided a copy of the submissions dated May 12 and May 13, 2026 via email only (R. 1:5-4(b)). Thereafter, on June 1, 2026, the OAE received Rice's corrected opposition and after the Supreme Court's second deficiency notice, on June 16, 2026, the OAE received Exhibit 2 of Rice's "supplemental materials." The submissions that Rice's office sent to the OAE were via email only (R. 1:5-4(b)). The OAE received no pleadings directly from Hawkins in this Supreme Court stage; rather, the OAE obtained Hawkins's submission from the Supreme Court and from Rice.

<u>The OAE's Investigation</u>

On May 29, 2025, based upon a referral from the Supreme Court of New Jersey (Supreme Court) regarding pleadings Respondent submitted, the OAE docketed an investigation regarding Respondent (<u>see</u> **Affidavit, page 2, ¶5**).[2]

In part, the referral related to Respondent's Supreme Court submissions made on behalf of two clients dated April 21, 2025 and April 29, 2025 (**<u>see</u> Affidavit, pages 2 and 5-8; Exhibits 1, 2**). In such pleadings, Respondent reported that she was a whistleblower against a Federal Bureau of Investigation (FBI) Agent who accessed and tampered with documents on eCourts (**<u>see</u> Affidavit, pages 2, 5-8; Exhibits 1, 2**).

In addition to Supreme Court pleadings, Respondent described similar events in pleadings she filed with the Essex County Superior Court, including her Complaint against Essex County entities and individuals in March 2025 as well as pleadings submitted on behalf of a third client in February 2025 (**<u>see</u> Affidavit, pages 8-13; Exhibit 4**).

The OAE explored and sought clarification of Respondent's statements during an interview on August 11, 2025, which Respondent attended with

---

[2] "The Affidavit" cited herein refers to the Affidavit of Disciplinary Investigator Rajesh Chopra with exhibits, which was included with the OAE's Petition for Immediate Temporary Suspension submitted on May 6, 2026.

Hawkins (see **Affidavit; Exhibit 3**). Respondent minimized her prior mental health treatment (see **Affidavit, pages 10, 13-15; Exhibits 3, 4**). Toward the end of Respondent's interview with the OAE, Respondent claimed her statements and Certifications suggest that past events are recent; however, Respondent also confirmed that the eCourts issues persist and that being followed is "on and off" depending on her actions (see **Affidavit, page 15; Exhibit 3, pages 147-49**).

The OAE's Petition for Medical Examination and the Board's Order

On December 2, 2025, the OAE filed an application with the Board to compel Respondent to undergo a medical examination to determine her capacity to practice law pursuant to R. 1:20-12(b) (see **Affidavit; Exhibit 7**). The OAE's application to the Board was based upon the concern that Respondent's extreme persecutory beliefs interfered with her ability to prosecute matters on behalf of her clients. Moreover, Respondent's concession that she was unable to support her claims with direct evidence suggests that her judgment may be impaired. The OAE had and continues to have substantial concerns about Respondent's capacity to practice law (see **Affidavit; Exhibit 7**). As she was represented by Hawkins at the time, the OAE did not request appointment of counsel in its application before the Board.

Hawkins submitted Respondent's response dated December 19, 2025 to the OAE's application (**see Affidavit; Exhibits 11, 12**).

In response to the OAE's January 6, 2026 letter to the Board, the Board advised that the language in its January 5, 2026 Order requiring the OAE to seek appointment of counsel for Respondent was intentionally included. The Board's January 5, 2026 Order directed Respondent to submit to an expedited medical examination by a licensed medical doctor selected, approved and paid for by the OAE; and directed the OAE to seek expedited appointment of counsel for Respondent (**see Affidavit; Exhibits 14 and 15**).

Respondent's Failure to Cooperate with the OAE

From January 2026 through April 2026, first through Hawkins then through Rice, the OAE sought Respondent's compliance with its requests for information to effectuate the Board's Order (**see Affidavit; Exhibits 17, 19, 20, 26, 30, and 31, page 3**). On or about January 14, 2026, Hawkins rejected the medical examination process (**see Affidavit; Exhibits 18, 21, 22**) and filed a motion for reconsideration on behalf of Respondent with the Board (**see Affidavit; Exhibits 23, 24**). On February 6, 2026, the Board denied the motion for reconsideration, reiterated that Respondent remained subject to the January 5, 2026 Order, and stated "the OAE shall promptly apply for Respondents

temporary suspension in the event of non-cooperation" (see **Affidavit; Exhibit 24**).

On January 29, 2026, Hawkins advised the Essex County Superior Court Assignment Judge (Assignment Judge) that Respondent refused the appointment of counsel (see **Affidavit; Exhibit 21, page 2**). The Assignment Judge entered an Order Appointing Representation for Respondent on April 1, 2026. On April 2, 2026, Rice confirmed that Respondent rejected him as her counsel (see **Exhibit 31, pages 8-9**). Rice then advised the OAE that Respondent asked to meet with him and responded substantively (see **Affidavit; Exhibit 31, pages 4-7**).

The OAE received and responded to Hawkins's letter dated February 8, 2026 requesting accommodations for Respondent under the New Jersey Conscientious Employee Protection Act (CEPA) and the Americans with Disabilities Act (ADA) (see **Affidavit; Exhibits 25, 26**). Having received no other accommodation requests (see **Affidavit; Exhibit 25**), the OAE Title II ADA Coordinator (OAE ADA Coordinator) responded by way of a letter dated February 20, 2026 to deny in part the first request for accommodation seeking

electronic storage of medical records and HIPAA forms (**Exhibit A attached hereto; see reference in Affidavit, ¶63, footnote 9**).[3]

As of the date of this submission, despite the OAE's disclosure that a motion for temporary suspension would be filed in the event of non-cooperation, Respondent still has not provided any medical or mental health information so that the OAE may proceed with the expedited medical examination ordered by the Board. Specifically, Respondent has failed to:

(1) Identify all current medical treatment providers, including but not limited to general care physicians and any mental health treatment providers;

---

[3] Specifically, the OAE ADA Coordinator advised Hawkins of the following: the request that Respondent's medical records should not be stored electronically was not a reasonable accommodation based upon Title II of the ADA (Title II); the OAE was unaware of any basis under CEPA in which an accommodation could be made or granted; the Judiciary and the OAE have strident cybersecurity protections and policies as well as court rules which require that all information in its possession be protected; the Court requires that information be transmitted through internal judiciary electronic databases which will necessitate the information be stored and transmitted electronically, and doing otherwise would equate to a fundamental alteration of the nature of Judiciary business; Respondent may decide to deliver the medical information in paper form to the OAE directly, but the OAE will maintain the information electronically abiding with all judiciary cybersecurity protocols; the balance of the request did not reveal anything which could reasonably be interpreted as a request for an accommodation under Title II; should Respondent wish to request any additional ADA accommodations, submit those requests utilizing the eADA system or by emailing the OAE ADA Coordinator; and information was provided to appeal the decision. Respondent did not seek an appeal or submit any additional requests.

(2) Identify any mental health service providers seen over the past ten years regardless of whether she is currently a patient (including but not limited to psychiatrists, psychologists, and any entity providing therapy services); and

(3) Complete the enclosed HIPAA authorization form for each provider (current general health care practitioner, current and/or prior mental health treatment providers, and the providers referenced during the August 11, 2025 interview, specifically, Dr. Ejifor, Dr. Fechter (primary care doctor), urgent care(s) (which Respondent mentioned visiting before returning to Dr. Fechter) and past in-patient hospitalization).

**[See Affidavit; Exhibits 17; Exhibit 19; Exhibit 26; Exhibit 30; and Exhibit 31, page 3.]**

## II. LEGAL ARGUMENT

At the outset, the OAE notes that Rice's letter brief dated May 12, 2026 fails to contain any subheadings to present arguments in an organized fashion, thus, the OAE attempts to provide separate responses below in an effort to streamline the review.[4] The OAE submits that the Board considered Respondent's response dated December 19, 2025 to the OAE's application, submitted through Hawkins, before the Board's Order was entered (**see Affidavit, ¶¶30-42; Exhibits 11, 12**).

---

[4] The OAE notes that Rice failed to identify any specific argument regarding the Fourth Amendment to the U.S. Constitution. As such, the OAE is not addressing that issue here since no argument is asserted to which the OAE can respond.

**1. The Board's Order compelling Respondent to undergo a medical examination is a constitutional exercise of the Supreme Court's authority under the New Jersey Constitution, which does not abridge Respondent's freedom of speech.**

The New Jersey Constitution states, "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press" NJ Const., Art. 1, subsection 6.

Further, the New Jersey Constitution bestows upon the Supreme Court the plenary jurisdiction to regulate "the admission to the practice of law and the discipline of persons admitted." NJ Const., Art. VI, section II, para. 3. Within the sphere of authority granted to it under the New Jersey Constitution, "the rule-making power of the Supreme Court is not subject to overriding legislation[.]" Winberry v. Salisbury, 5 N.J. 240 (1950).

In conformity with its power to "regulate the practice of law" the Supreme Court promulgated the Court Rules, including R. 1:20-12, which govern concerns regarding the capacity of New Jersey licensed attorneys to practice law. R. 1:20-12(b) provides the following:

> Whenever the Director presents evidence which reasonably brings into question the capacity of an attorney to practice law, whether by reason of mental or physical infirmity or illness, or because of addiction to drugs or intoxicants, the Board shall direct that the attorney submit to such medical

> examination as may be appropriate to enable the Director to determine whether the attorney is so incapacitated. Such action shall be taken on an expedited basis.

R. 1:20-12(d) adds, "[i]n conjunction with any such investigation the Director may also request the Board to direct the attorney to submit to an appropriate medical examination."

Rice has not argued that R. 1:20-12 is void for vagueness or that the rule itself violates the New Jersey Constitution. Here, no speech restrictions have been imposed upon Respondent.[5] The OAE's investigation pertaining to Respondent was docketed on May 29, 2025 from a Supreme Court referral concerning pleadings that Respondent submitted.

The OAE reviewed statements made by Respondent in pleadings she filed with the Court as recently as early 2025, which were often filed on behalf of clients (see **Affidavit, pages 2, 5-13; Exhibits 1, 2, 4**). In the pleadings Respondent filed with the Court, rather than focusing on the merits of her

---

[5] Attorneys are "officers of the court" with special responsibilities to protect the administration of justice, therefore, courts have recognized the need for the imposition of some reasonable speech restrictions upon attorneys, based upon the required test: a restriction does not violate the Constitution if the limitation "further[s] an important or substantial governmental interest unrelated to the suppression of expression [and] the restriction [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." In re Hinds, 90 N.J. 604, 614, 615-16 (1982).

client's matter, she stated that she was a whistleblower against an FBI Agent who accessed and tampered with documents she had filed on eCourts (see **Affidavit, pages 2 and 5-8; Exhibits 1 and 2**). The OAE's investigation was docketed based on arguments she made in client matters in 2025, not based upon documents that Respondent drafted four years earlier.

While Respondent minimized her mental health history and attempted to assert that the past events occurred several years ago, Respondent also confirmed that the eCourts issues persist and that being followed is "on and off" depending on her actions (see **Affidavit, page 15; Exhibit 3**).

Pursuant to R. 1:20-12(b), the OAE filed an application with the Board to compel Respondent to undergo a medical examination to determine her capacity to practice law (see **Affidavit; Exhibit 7**). The OAE had, and still has, concerns that Respondent's extreme persecutory beliefs interfered with her ability to prosecute client matters, and Respondent's concession that she was unable to support her claims with direct evidence suggested that she lacked the capacity to practice law (see **Affidavit; Exhibit 7**). Though Hawkins, Respondent's response dated December 19, 2025 was forwarded to and considered by the Board (see **Affidavit; Exhibits 11, 12**).

The Board entered an Order dated January 5, 2026 which was signed by the Board's Chief Counsel. The Board's Order directed Respondent to submit to an expedited medical examination by a licensed medical doctor selected, approved and paid for by the OAE to determine Respondent's capacity to practice law (see **Affidavit; Exhibit 13**). As such, the OAE itself has not entered any Order, compelled Respondent's medical examination, or imposed counsel upon Respondent.

In that regard, contrary to Rice's arguments, the OAE also has not made any finding as to whether Respondent is mentally ill. The OAE is merely investigating whether Respondent has the capacity to practice law and has discovered evidence which reasonably brings into question Respondent's capacity to practice law (R. 1:20-12(b)). The OAE has not and will not determine Respondent's capacity to practice law. Rather, R. 1:20-12 provides a process for the OAE to retain a medical expert to evaluate Respondent's capacity to practice law while affording Respondent due process. The OAE cannot determine whether a hearing will proceed pursuant to R. 1:20-12(d) until the medical examination is complete.

Should Respondent's medical examination reveal no concerns with her capacity to practice law, the OAE would dismiss the matter. On the other hand,

if the medical examination reveals that Respondent does not have the capacity to practice law and such opinion is contested, a hearing on Respondent's physical or mental capacity would be conducted pursuant to R. 1:20-12(d). Any determination of physical or mental incapacity would be subject to appellate review by the Board, and a final determination by the Supreme Court.

The Board's Order that Respondent should submit to a medical examination fully conforms with R. 1:20-12(b) and (d). Respondent filed pleadings which prompted the Supreme Court to refer this matter to the OAE and the OAE commenced an investigation. The OAE requested Respondent's medical examination out of a concern that Respondent may not be fit to practice law. The OAE's request that Respondent submit to a medical examination pursuant to R. 1:20-12 does not infringe upon Respondent's speech. Therefore, the Board's Order is a fully constitutional exercise of the Court's authority to regulate the practice of law in New Jersey.

**2. The Supreme Court's authority to suspend attorneys is constitutional on the same basis and is applicable to Respondent.**

Consistent with its authority to regulate the practice of law, the Supreme Court has the authority to temporarily suspend attorneys for the reasons set forth in R. 1:20, which includes a failure to cooperate with disciplinary authorities (R. 1:20-3(g)(4)), and when the attorney poses a substantial threat of serious harm

to the public (R. 1:20-11(a)). Both concerns are implicated here. R. 1:20-11(c) permits the Supreme Court to enter an order immediately suspending the respondent pending final disposition of a disciplinary proceeding or may take such other action as it deems appropriate.

The Board's Order contained a provision regarding non-compliance (**see Affidavit; Exhibit 13**):

> ORDERED that, if respondent fails to submit to the medical examination as scheduled by the OAE, or fails to promptly produce all medical records requested by the OAE or its examining doctor, the OAE shall promptly apply for respondent's immediate temporary suspension, pursuant to the New Jersey Court Rules

On February 6, 2026, the Board reiterated that Respondent remained subject to the January 5, 2026 Order and stated "the OAE shall promptly apply for Respondent[']s temporary suspension in the event of non-cooperation" (**see Affidavit; Exhibit 24**). In addition, the OAE reiterated its intention to apply for Respondent's temporary suspension should she fail to promptly produce all medical records requested by the OAE or the examining doctor.

Respondent rejected the medical examination process from the outset (**see Affidavit; Exhibits 18, 21, 22**). Nevertheless, the OAE sought Respondent's compliance from January 2026 through April 24, 2026. The OAE's efforts

included asking Respondent on four separate occasions to provide the requested information (see **Affidavit; Exhibits 17, 19, 20, 26, 30, and 31, page 3**). As of the date of this submission, Respondent still has not provided any medical or mental health information, which was requested for the OAE's retained expert, Donald Reeves, M.D., to proceed with the medical examination.

Rice reaffirms Respondent's refusal to comply. As a result, Respondent's temporary suspension is warranted.

**3. The OAE has not appointed counsel for Respondent and lacks the authority to appoint counsel for Respondent; therefore, the OAE could not deprive Respondent of her constitutional right to counsel of her choosing.**[6]

R. 1:20-12(c) provides, "[e]ither the Court or the Board may order the assignment of counsel for an attorney during any proceeding under this rule if it is in the interest of justice to do so." Based upon R. 1:20-12(c), the Board's Order directed the OAE to promptly forward the Order to the Assignment Judge and request the expedited appointment of counsel for Respondent (see **Affidavit; Exhibit 13**). The OAE requested clarification of the appointment of

[6] In the appointment of counsel section of Rice's letter brief, Rice argues that a variety of Certifications have been overlooked. For purposes of a complete and accurate record, the OAE notes its substantial submission to the Supreme Court included the allegedly omitted documents (see **Affidavit; Exhibits 5, 11, 23, 28**).

counsel provision as Hawkins was Respondent's attorney of record at the time (see **Affidavit; Exhibit 14**). In response, the Board confirmed that the language appointing counsel was intentionally included in the Order (**see Affidavit; Exhibit 15**).

The OAE did not request the appointment of counsel for Respondent (**see Affidavit; Exhibit 7**). The OAE takes no position on the issue of appointment of counsel for Respondent. However, the OAE was obligated to abide by the Board's Order. As such, the OAE proceeded with seeking appointment of counsel for Respondent from the Assignment Judge (**see Affidavit; Exhibits 29, 29a, and 31**). Hawkins advised the Assignment Judge that Respondent refused the appointment of counsel (**see Affidavit; Exhibit 21, page 2**). Notwithstanding Respondent's objection, the Assignment Judge ultimately entered the Order Appointing Representation on April 1, 2026 and assigned Rice as Respondent's counsel (**see Affidavit; Exhibit 29**).

On April 2, 2026, after the Order Appointing Representation was entered, Rice confirmed that Respondent rejected his role as counsel (**see Exhibit 31, pages 8-9**). However, Rice then advised that Respondent asked to meet with him and responded substantively (**see Affidavit; Exhibit 31, pages 4-7**). Thus, despite Respondent's prior objections, it appears that she decided to accept

appointed counsel. Respondent was not "forced to accept appointed counsel." Counsel is available to her, and it is her choice whether to consult with appointed counsel.

**4. Reliance upon case law regarding advertising is misplaced and inapplicable to the case at bar.**

Rice cites Supreme Court of Virginia v. Consumers Union of U.S. Inc., 446 U.S. 719 (1980); Consumers Union of U.S. v. Virginia State Bar, 688 F.2d 218 (4th Cir. 1982) and Bates v. State Bar of Arizona, 433 U.S. 350 (1977) in asserting that the OAE must comply with the ADA and the New Jersey Law Against Discrimination (NJLAD). However, both cases concern restrictions on attorney advertising, which has nothing to do with protection of the public from attorneys who lack the capacity to practice law. The OAE takes no further position on Rice's claims as Rice fails to indicate how either case is relevant to his claim that Respondent should not be required to submit to a medical examination to determine her capacity to practice law.

**5. While the ADA claims are vague, the OAE addressed Respondent's request for accommodations.**

Rice fails to indicate any specific ADA provision which the OAE has allegedly violated. Moreover, Rice makes no specific claim that the OAE violated the NJLAD. Without a specific claim that the OAE violated the

NJLAD, the OAE is unable to respond. The OAE received and responded to Respondent's requests for accommodation under CEPA and the ADA (**see Affidavit; Exhibits 25, 26**). Having received no other requests for accommodation aside from Hawkins's letter dated February 8, 2026 (**see Affidavit; Exhibit 25**), the OAE ADA Coordinator responded fully and substantively by way of a letter dated February 20, 2026 (**Exhibit A attached hereto; see reference in Affidavit, ¶63, footnote 9**). As noted, there was no basis in which the OAE could respond to the vague references to CEPA and the OAE fully responded to what could be reasonably determined to be applicable under Title II of the ADA. Thereafter, Respondent filed no appeal and sought no additional accommodation requests.

## III. CONCLUSION

In consideration of the foregoing, it is the OAE's position that the Petition for Immediate Temporary Suspension should be granted pursuant to R. 1:20-11 and R. 1:20-3(g)(4) based on Respondent's refusal to produce the medical and mental health information requested, so that the OAE's expert can complete the expedited medical examination of Respondent per the Board's Order.

Respectfully submitted,

*Alexandra J. Gitter*
Alexandra J. Gitter
Deputy Ethics Counsel

OFFICE OF ATTORNEY ETHICS
OF THE
SUPREME COURT OF NEW JERSEY
P.O. BOX 963
TRENTON, NEW JERSEY 08625
PHONE: (609) 403-7800
FAX: (609) 403-7802

JOHANNA BARBA JONES
*DIRECTOR*

JASON SAUNDERS
*FIRST ASSISTANT ETHICS COUNSEL*

December 22, 2025

**Via Hand Delivery and Email** (drb.mbx@njcourts.gov)

Timothy M. Ellis, Chief Counsel
Disciplinary Review Board
Richard J. Hughes Justice Complex
P.O. Box 962
Trenton, New Jersey 08625-0962

**Re: Office of Attorney Ethics v. Cecile D. Portilla, Esq.**
**OAE Docket No. XIV-2025-0257E**
**Petition for Relief & Request for Medical Examination**
**R. 1:20-12(b)**

**ROUTING OF COPY INCORRECTLY DELIVERED TO THE OFFICE OF ATTORNEY ETHICS**

Dear Mr. Ellis:

Please allow this letter to confirm receipt of Respondent's Opposition to the OAE's Petition for Relief and Request for Medical Examination dated December 19, 2025. Respondent's counsel, Eldridge Hawkins, Esq., delivered both the OAE's and the DRB's copy to our office. Based upon our review, it appears that the two copies copies contain the same documents.

As a courtesy, we are forwarding the DRB's copy that was inadvertently delivered to our office to you via interoffice mail.

Thank you for your kind courtesies.

Respectfully submitted,

*Sandra Hendrickson*

Sandra Hendrickson
Assistant to OAE Director

Enclosures

c: Eldridge Hawkins, Esq., Counsel for Respondent, (Via E-Mail Only)
Alexandra Gitter, Deputy Ethics Counsel
Rajesh Chopra, Disciplinary Investigator

OFFICE OF ATTORNEY ETHICS
OF THE
SUPREME COURT OF NEW JERSEY
P.O. BOX 963
TRENTON, NEW JERSEY 08625
PHONE: (609) 403-7800
FAX: (609) 403-7802

JOHANNA BARBA JONES
*DIRECTOR*

JASON D. SAUNDERS
*FIRST ASSISTANT*
*ETHICS COUNSEL*

June 10, 2025

**Via Certified Mail RRR, Regular Mail, and Email**
Cecile D. Portilla, Esquire
7 Glenwood Ave
Suite 400
East Orange, NJ 07017
Email: portillalaw@gmail.com

**Re: Office of Attorney Ethics v. Cecile D. Portilla, Esquire**
**Docket No. XIV-2025-0257E**

Dear Ms. Portilla:

Please be advised the Office of Attorney Ethics ("OAE") received a referral in connection with the motions you recently submitted to the Supreme Court of New Jersey in the matters of Lopez (#089878/A-001267-23) and Faulkner (#090218/A-000692-21). In accordance with Supreme Court Rules, and along with Disciplinary Investigator, Rajesh Chopra, I have been appointed to investigate this matter.

We would like to conduct an interview in order to fully understand the circumstances. To that end, your interview is scheduled for **Wednesday, July 2, 2025 at 10:00 a.m.** via Microsoft Teams. Your personal appearance via Teams videoconference is required at this examination. A calendar invitation containing a Teams link will be emailed to you in advance at the above email address which is on record with the State of New Jersey. If your email address has changed or you would like us to send the link to a different email address, please advise us immediately.

In addition, we want to make sure you are aware of (1) the New Jersey Lawyers Assistance Program (NJLAP) as well as (2) R. 1:20-12, which addresses attorney incapacity and disability and outlines the process for being transferred to Disability Inactive Status. First, NJLAP is a free and confidential resource assisting all New Jersey lawyers, judges, law students, and law graduates achieve and maintain personal and professional wellbeing. A pamphlet is enclosed and NJLAP's contact information is as follows:

New Jersey Lawyers Assistance Program
One Constitution Square
New Brunswick, New Jersey 08901
1-800-246-5524
info@njlap.org
www.njlap.org

NJLAP is independent of the judiciary and the disciplinary system. Any potential contact with NJLAP will not be shared with anyone outside NJLAP, the OAE included. This information is being sent solely for the purposes of referring you to an available service which may assist you.

Second, we wish to advise you that Disability Inactive Status is available to attorneys who may no longer be able to practice law as a result of a physical or mental infirmity or illness. It appears that you **may** be suited to be transferred to that status, which is not permanent.

To that end, kindly review R. 1:20-12 and advise if you wish to consider Disability Inactive Status. Same can be effectuated by way of a Consent Order for transfer to Disability Inactive Status as well as medical documentation. Medical documentation may be accomplished either via a letter from your treating physician or clinician stating your diagnosis and expressing a medical or clinical opinion that you do not currently have the capacity to practice law. Alternatively, you may execute a HIPAA form of Release so the OAE may obtain the necessary medical information from your treating physician. A HIPAA form is enclosed should you wish to proceed in this manner; please note, the person who witnesses your signature must also sign and date where indicated on page 3. Please be further advised the OAE reserves the right to petition the

Disciplinary Review Board for an expedited examination to determine your ability to practice law in accordance with R. 1:20-12.

Should you have any questions, please contact Mr. Chopra at (609) 403-7800 extension 34116 or rajesh.chopra@njcourts.gov.

Very truly yours,

*Alexandra J. Gitter*
Alexandra J. Gitter
Deputy Ethics Counsel

AJG/tz
Encl.
c: Rajesh Chopra, Disciplinary Investigator

# HIPAA COMPLIANT AUTHORIZATION FOR THE RELEASE OF PATIENT INFORMATION PURSUANT TO 45 CFR 164.508

TO:

Name of Healthcare Provider/Physician/Facility/Medicare Contractor

Street Address

City, State and Zip Code

RE: Patient Name: Cecile D. Portilla

Date of Birth: 09/19/1966

I authorize and request disclosure of all protected information for the purpose of review and evaluation in connection with a legal claim. I expressly request that the designated record custodian of all covered entities under HIPAA identified above disclose full and complete protected medical information including the following:

☒ All medical records, meaning every page in my record, including but not limited to: office notes, face sheets, history and physical, consultation notes, inpatient, outpatient and emergency room treatment, all clinical charts, reports, order sheets, progress notes, nurse's notes, social worker records, clinic records, treatment plans, admission records, discharge summaries, requests for and reports of consultations, documents, correspondence, test results, statements, questionnaires/ histories, correspondence, photographs, videotapes, telephone messages, and records received by other medical providers.

☐ All physical, occupational and rehab requests, consultations and progress notes.

☐ All disability, Medicaid or Medicare records including claim forms and record of denial of benefits.

☐ All employment, personnel or wage records.

☐ All autopsy, laboratory, histology, cytology, pathology, immunohistochemistry records and specimens; radiology records and films including CT scan, MRI, MRA, EMG, bone scan, myleogram; nerve conduction study, echocardiogram and cardiac catheterization results, videos/ CDs/films/reels and reports.

☐ All pharmacy/prescription records including NDC numbers and drug information handouts/ monographs.

☐ All billing records including all statements, insurance claim forms, itemized bills, and records of billing to third party payers and payment or denial of benefits for the period of
to

I understand that I have the right to revoke this authorization at any time. I understand that my revocation must be in writing and addressed to the privacy officer of the above named facility authorized to make this disclosure. I understand that the revocation does not apply to information that has already been released in response to this authorization. Unless otherwise revoked, this authorization will expire in six months.

I understand that any disclosure of information may be subject to re-disclosure by the recipient and may no longer be protected by federal or state law. I understand that I need not sign this authorization to assure treatment. I understand that I may inspect and/or copy the information to be disclosed. I understand that authorizing this

disclosure is voluntary. I understand that if I have any questions about disclosure of my health information, I may contact the privacy officer at the facility listed above that is authorized to disclose this information and request a copy of this authorization.

I understand the information to be released or disclosed may include information relating to sexually transmitted diseases, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV), and alcohol and drug abuse. I authorize the release or disclosure of this type of information. THIS INFORMATION WILL ALSO BE RELEASED UNLESS YOU INDICATE; NO☐ , DO NOT RELEASE (indicate with a check mark).

This protected health information is disclosed for the following purposes: .

This authorization is given in compliance with the federal consent requirements for release of alcohol or substance abuse records of 42 CFR 2.31, the restrictions of which have been specifically considered and expressly waived.

You are authorized to release the above records to the following representatives in the above-entitled matter who have agreed to pay reasonable charges made by you to supply copies of such records:

Name of Representative

Representative Capacity (e.g. attorney, records requestor, agent, etc.)

Address

City, State and Zip Code

I understand the following: See CFR §164.508(c)(2)(i-iii)

a. I have a right to revoke this authorization in writing at any time, except to the extent information has been released in reliance upon this authorization.
b. The information released in response to this authorization may be re-disclosed to other parties.
c. My treatment or payment for my treatment cannot be conditioned on the signing of this authorization.

Any facsimile, copy or photocopy of the authorization shall authorize you to release the records requested herein. This authorization shall be in force and effect and will expire in six months.

Signature of Patient or Legally Authorized Representative
(See 45 CFR § 164.508(c)(1)(vi)) Date

Name and Relationship of Legally Authorized Representative
(See 45 CFR § 164.508(c)(1)(iv))

Witness Signature Date

# Re: [External] Re: Ethics v Portilla

From: Eldridge Hawkins, Esq. (hwklaw@aol.com)

To: alexandra.gitter@njcourts.gov

Cc: portillalaw@gmail.com

Date: Wednesday, July 2, 2025 at 11:26 AM EDT

Good Morning:

I presume today's hearing is adjourned. We are willing to travel to Trenton for the proceedings.

I am presuming that the entire matter is related to the letter received related to Ms. Portilla's mental competency on June 10, 2025. Thus, the answer is yes. I am representing her as to the entire matter.

Please also advise whether you received Dr. Ejiofor's letter related to Ms. Portilla's mental competency.

Please forgive me, but after 58 years in N.J. Bar, I am not familiar with the proceedings.

I ask what happens in each procedure? Be advised that Dr. Ejiofor may want to attend any hearing related to Ms. Portilla's competency. He advised that he is travelling on July 15, 2025 to mid August.

I will not be taking a vacation within the next 6 weeks.

Please feel free to contact me regarding dates for each.

Respectfully submitted,

/s/Eldridge Hawkins
ELDRIDGE HAWKINS, ESQUIRE

On Wednesday, July 2, 2025 at 10:20:11 AM EDT, Alexandra Gitter <alexandra.gitter@njcourts.gov> wrote:

> Good morning, Mr. Hawkins:
>
> We received your letter of representation with enclosures. Per your letter, I understand you will represent Ms. Portilla for the hearing on July 2, 2025 (the interview we rescheduled in light of Ms. Portilla's deliveries on June 27, 2025 and June 30, 2025). To clarify, are you representing Ms. Portilla for the entire matter, or just for her interview?

Ra032

# Fw: [External] Re: Ethics v Portilla

From: Eldridge Hawkins, Esq. (hwklaw@aol.com)

To: portillalaw@gmail.com

Date: Wednesday, July 2, 2025 at 10:52 AM EDT

GOOD MORNING . Please forgive me , but after 58 years in N.J. Bar, I am not familiar with the proceedings . I ask WHAT HAPPENS in each procedure? Also is todays hearing adjourned?

----- Forwarded Message -----
**From:** Alexandra Gitter <alexandra.gitter@njcourts.gov>
**To:** hwklaw@aol.com <hwklaw@aol.com>
**Cc:** Rajesh Chopra <rajesh.chopra@njcourts.gov>
**Sent:** Wednesday, July 2, 2025 at 10:20:11 AM EDT
**Subject:** RE: [External] Re: Ethics v Portilla

Good morning, Mr. Hawkins:

We received your letter of representation with enclosures. Per your letter, I understand you will represent Ms. Portilla for the hearing on July 2, 2025 (the interview we rescheduled in light of Ms. Portilla's deliveries on June 27, 2025 and June 30, 2025). To clarify, are you representing Ms. Portilla for the entire matter, or just for her interview?

I understand Ms. Portilla wrote a note on the folder requesting an in person interview and your letter of representation inquires whether this may be conducted in person. It is possible to Ms. Portilla's interview in person, however, doing so narrows our scheduling options further as we will need to reserve a physical conference room (versus appearing remotely from our own space). We are looking into using a conference room at the Hughes Justice Complex. If Ms. Portilla's interview can occur via Microsoft Teams, please let us know. Also, if you will be on vacation within the next 6 weeks, please let us know which days you are away.

Thank you,

Ali

Alexandra J. Gitter

Deputy Ethics Counsel

Office of Attorney Ethics

P.O. Box 963, Trenton, NJ 08625

P: (609) 403-7800 ext. 34133

F: (609) 403-7802

Supreme Court of NJ
Office of Attorney Ethics

CONFIDENTIALITY NOTICE: This email contains privileged and confidential information intended only for the use of the individual(s) named above. If you are not the intended recipient of this email, or the employee or agent responsible for delivering it to the intended recipient, you are

Ra033

# Re: OAE v. Cecile D. Portilla/Docket No. XIV-2025-0257E - Interview

From: Eldridge Hawkins, Esq. (hwklaw@aol.com)

To: alexandra.gitter@njcourts.gov

Cc: rajesh.chopra@njcourts.gov

Date: Wednesday, August 6, 2025 at 04:14 PM EDT

Ms. Gitter:

We requested that a copy of the motion documents that were allegedly filed by Ms. Portilla in the Faulknor and the Lopez Supreme Court matters be available for pick up by our courier to determine whether she authored them all or were the final copies the result of unlawful tampering of documents on eCourts.

We need to see the exact copies of what you have in your possession so that we can compare them to the Originals,
Thank you.

On Friday, August 1, 2025 at 11:52:28 AM EDT, Alexandra Gitter <alexandra.gitter@njcourts.gov> wrote:

> Mr. Hawkins,
>
> Please see the attached correspondence containing the new interview date in the above-captioned matter.
>
> Kindly acknowledge receipt.
>
> Thank you,
>
> Ali
>
> Alexandra J. Gitter
>
> Deputy Ethics Counsel
>
> Office of Attorney Ethics
>
> P.O. Box 963, Trenton, NJ 08625
>
> P: (609) 403-7800 ext. 34133
>
> F: (609) 403-7802

# RE: [External] Re: OAE v. Cecile D. Portilla/Docket No. XIV-2025-0257E - Interview

From: Alexandra Gitter (alexandra.gitter@njcourts.gov)

To: hwklaw@aol.com

Cc: rajesh.chopra@njcourts.gov

Date: Thursday, August 7, 2025 at 12:47 PM EDT

Mr. Hawkins,

Aside from only providing 30 minutes' notice of your request on the afternoon of August 4, 2025, the documents are the same as those available to Ms. Portilla on eCourts. You are free to compare Ms. Portilla's eCourts records to her originals without the Office of Attorney Ethics printing hundreds of pages.

We look forward to speaking with you and Ms. Portilla on August 11, 2025 at 12:00pm (details in my letter dated August 1, 2025).

Finally, please be reminded (per my letter dated July 10, 2025) that in the event we seek documents from Ms. Portilla, we will issue a letter outlining our request and providing a deadline by which to provide same.

Thank you,

Ali
Alexandra J. Gitter
Deputy Ethics Counsel
Office of Attorney Ethics
P.O. Box 963, Trenton, NJ 08625
P: (609) 403-7800 ext. 34133
F: (609) 403-7802

Supreme Court of NJ
Office of Attorney Ethics

CONFIDENTIALITY NOTICE: This email contains privileged and confidential information intended only for the use of the individual(s) named above. If you are not the intended recipient of this email, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this transmission is strictly prohibited. If you have received this email in error, please immediately notify the sender at (609) 403-7800 ext. 34133 or Alexandra.Gitter@njcourts.gov.

**From:** Eldridge Hawkins, Esq. <hwklaw@aol.com>
**Sent:** Wednesday, August 6, 2025 4:15 PM
**To:** Alexandra Gitter <alexandra.gitter@njcourts.gov>
**Cc:** Rajesh Chopra <rajesh.chopra@njcourts.gov>
**Subject:** [External] Re: OAE v. Cecile D. Portilla/Docket No. XIV-2025-0257E - Interview

Warning: Security Alert

# Re: [External] Re: OAE v. Cecile D. Portilla/Docket No. XIV-2025-0257E - Interview

From: Eldridge Hawkins, Esq. (hwklaw@aol.com)

To: alexandra.gitter@njcourts.gov

Cc: rajesh.chopra@njcourts.gov

Bcc: portillalaw@gmail.com

Date: Thursday, August 14, 2025 at 09:44 AM EDT

Dear Ms. Gitter

I left the meeting with you and Mr. Chopra feeling more than a little uncomfortable . The problem exists that I heard from the two of you statements that I heard outside the alleged subject matter of the investigation . When we requested copies of the subject matter of the investigation , you indicated it was the two brief submissions and indicated that we could pull them from the e-courts as they were multiple pages .

Respectfully, I KNOW WHAT I KNOW! I respectfully request all correspondence submitted to the two of you pertaining to the purpose and subject matter of the investigation. It is necessary so I may have substantive due process for my client. I do NOT know what we are defending OFFICIALLY.

/s/Eldridge Hawkins

On Thursday, August 7, 2025 at 12:47:29 PM EDT, Alexandra Gitter <alexandra.gitter@njcourts.gov> wrote:

> Mr. Hawkins,
>
> Aside from only providing 30 minutes' notice of your request on the afternoon of August 4, 2025, the documents are the same as those available to Ms. Portilla on eCourts. You are free to compare Ms. Portilla's eCourts records to her originals without the Office of Attorney Ethics printing hundreds of pages.
>
> We look forward to speaking with you and Ms. Portilla on August 11, 2025 at 12:00pm (details in my letter dated August 1, 2025).
>
> Finally, please be reminded (per my letter dated July 10, 2025) that in the event we seek documents from Ms. Portilla, we will issue a letter outlining our request and providing a deadline by which to provide same.
>
> Thank you,

RE: [External] Re: OAE v. Cecile D. Portilla/Docket No. XIV-2025-0257E - Interview

From: Alexandra Gitter (alexandra.gitter@njcourts.gov)

To: hwklaw@aol.com

Cc: rajesh.chopra@njcourts.gov

Date: Monday, August 18, 2025 at 12:17 PM EDT

Mr. Hawkins,

We are in receipt of your August 14, 2025 email and respond as follows. First, please note that your email of August 6, 2025 requested "a copy of the motion documents that were allegedly filed by Ms. Portilla in the Faulknor and the Lopez Supreme Court matters be available for pick up by our courier" which is why I indicated Ms. Portilla has access to the motion documents she filed without the OAE printing hundreds of pages on 30 minutes' notice.

As to the subject matter itself, pursuant to R. 1:20-3(g)(2), Ms. Portilla is entitled to know "substance of the matter" being investigated by the OAE – to that end, please refer to the initial letter of June 10, 2025 (attached without enclosures for ease of reference). As indicated therein, the referral from the Supreme Court of New Jersey stemmed from Ms. Portilla's aforementioned motion filings. With such letter, we provided information on the New Jersey Lawyers Assistance Program. Further, the June 10, 2025 letter informed Ms. Portilla that she may be suited to be transferred to Disability Inactive Status, asked her to review R. 1:20-12 and advised, and expressed we reserve the right to petition the Disciplinary Review Board for an examination to determine her ability to practice law pursuant to R. 1:20-12. Thus, pursuant to R. 1:20-12(b), the OAE opened this investigation to determine whether or not Ms. Portilla may face medical circumstances which impair her ability to practice law. In your letter of July 3, 2025, you explained feeling "very suspicious about the apparent paranoia expressed by Ms. Portilla, UNTIL I saw the evidence myself." You have acknowledged what we are investigating.

Please note that every attorney has a duty to cooperate with ethics authorities and should Ms. Portilla fail to do so, we may file a motion for temporary suspension.

Should this matter proceed to a hearing, Ms. Portilla is entitled to discovery per R. 1:20-5(a). However, the matter remains in the investigative stage at this time, which means we are not at the point of producing discovery.

Thank you,

Ali

Alexandra J. Gitter
Deputy Ethics Counsel
Office of Attorney Ethics
P.O. Box 963, Trenton, NJ 08625
P: (609) 403-7800 ext. 34133
F: (609) 403-7802
Supreme Court of NJ
Office of Attorney Ethics

Ra037

**OFFICE OF ATTORNEY ETHICS**
Docket No. XIV-2025-0257E

| | |
|---|---|
| **IN THE MATTER OF**<br><br>**CECILE D. PORTILLA,**<br><br>**AN ATTORNEY-AT-LAW** | **PETITION FOR RELIEF AND REQUEST FOR MEDICAL EXAMINATION [R. 1:20-12(b)]** |

STATE OF NEW JERSEY :
: SS
COUNTY OF MERCER :

Petitioner, Alexandra J. Gitter, of full age, in regard to the above-named attorney, says that:

1. I am employed as Deputy Ethics Counsel by the Office of Attorney Ethics (OAE) and am familiar with the facts of this case.

2. Cecile D. Portilla, Esq. (Respondent) was admitted to the practice of law in New Jersey in 2007. Respondent's attorney registration is listed as active and in good standing.

3. Respondent maintains a law office at 7 Glenwood Ave, Suite 400, East Orange, Essex County, New Jersey 07017.

4. Submitted in support of this petition is a Certification of Disciplinary Investigator, Rajesh Chopra, with Exhibits 1 through 6.

5. For the reasons and good cause shown in the attached documents, Petitioner respectfully seeks the following relief:

   a) An Order directing Respondent to submit to a medical examination to determine her ability to practice law and adequately defend the pending ethics matter, by and a report from, a licensed medical doctor or mental health professional selected and approved by the OAE and at the expense of the OAE; and

   b) Should the medical report indicate a lack of fitness to practice law, whether mental, physical, or otherwise, Petitioner requests the Board recommend to the Court that Respondent be immediately transferred to Disability Inactive Status until further order of the Court; and

6. In accordance with the facts and circumstances set forth herein and in the appended documents, Petitioner asks that the requested relief be immediately granted.

Dated: December 2, 2025

/s/ *Alexandra J. Gitter*
Alexandra J. Gitter
Deputy Ethics Counsel
Office of Attorney Ethics

**OFFICE OF ATTORNEY ETHICS**
Docket No. XIV-2025-0257E

| | |
|---|---|
| **IN THE MATTER OF**<br><br>**CECILE D. PORTILLA,**<br><br>**AN ATTORNEY-AT-LAW** | **CERTIFICATION IN SUPPORT OF PETITION FOR RELIEF**<br>**[R. 1:20-12]**<br>**[Confidential Pursuant to R. 1:20-9]** |

STATE OF NEW JERSEY :
: ss
COUNTY OF MERCER :

Rajesh Chopra, of full age, says that:

1. I am employed as Disciplinary Investigator by the Office of Attorney Ethics (OAE) and am familiar with the facts of this case.

2. Cecile D. Portilla, Esquire (Respondent) was admitted to practice law in New Jersey in 2007 and maintains an office for the practice of law at 7 Glenwood Ave, Suite 400, East Orange, Essex County, New Jersey 07017.

3. In connection with her law practice, Respondent maintains the following accounts at PNC Bank:

   a. Attorney Business Account ("ABA") ending in [redacted]; and

   b. Attorney Trust Account ("ATA") ending in [redacted].

4. I submit this certification to attest to my first-hand observations of Respondent that give rise the OAE's concern that Respondent is

experiencing psychological issues that reasonably bring into question her capacity to practice law.

5. Respondent is currently the subject of an investigation docketed by the OAE on May 29, 2025 following a referral from the Supreme Court of New Jersey (Supreme Court).

6. On April 29, 2025, Respondent filed a Notice of Motion Miscellaneous and supporting Certification on behalf of a client with the Supreme Court under Docket Number 090218 (**Exhibit 1**). The Notice of Motion Respondent filed on April 29, 2025 is titled:

> "MOTION TO HOLD MATTER IN ABEYANCE IN THE INTEREST OF JUSTICE UNTIL A DECISION IS MADE REGARDING GRANTING THE PLAINTIFF'S COUNSEL'S REQUEST FOR ACCOMODATION IN BEING ABLE TO PAPER FILE HER DOCUMENTS AS SHE IS A WHISTLE BLOWER AGAINST THE FBI WHOSE DOCUMENTS ON ECOURTS ARE BEING TAMPERED WITH GIVEN UNLAWFUL INTERFERENCE (NOW INCLUDING FRAUDULENT UPLOADS) DIRECTLY ON THE COURT SITE AFTER BEING FILED ON ECOURTS, BY THOSE PERCEIVED OT BE HOSTILE FBI AGENTS SEEKING TO RETALIATE AGAINST PLAINTIFF'S ATTORNEY . . . ."
>
> (**Exhibit 1**, **page 2**)

7. In her Certification submitted in support of such Notice of Motion, Respondent alleges:

> I am a 2013 whistle[b]lower [sic] against an FBI Agent who has threatened to destroy my law practice, make me work for free,

> and cause me to become homeless...Based upon information and belief, this Agent has been unlawfully accessing court documents on eCourts and tampering them. I have put Courts, Court Clerks and law enforcement on [n]otice.
>
> **(Exhibit 1, Certification, paragraphs 3 and 5; and Exhibit 4)**

8. The OAE conducted an in-person interview of Respondent on August 11, 2025 in Trenton, New Jersey in the presence of her counsel of record, Eldridge Hawkins, Esq. (Hawkins) (**Exhibit 3**).

9. The OAE asked Respondent during her interview on August 11, 2025 to identify the Federal Bureau of Investigations (FBI) agent mentioned in her court filing. Respondent clarified the FBI agent is Special Agent Eugene Fayer (Special Agent) from the Office of Inspector General (OIG) Division. She described Special Agent as "the ringleader" (**Exhibit 3, page 12, L5-7**). Respondent stated she is followed by many individuals at Special Agent's direction (**Exhibit 3**). She claims that she is being harassed by the FBI, West Orange Police Department (WOPD) and other people (**Exhibit 3; and Exhibit 4**).

10. Responded conceded she does not have proof of the source of the issues she has been experiencing (**Exhibit 3, page 58-59**).

11. Respondent elaborated that in 2013, she was the Director of Nursing for Maxim Healthcare Services (Maxim), and she reported Maxim for Medicaid and Medicare fraud (**Exhibit 3, pages 12 and 14; and Exhibit**

4). According to Respondent, Special Agent was assigned to investigate Maxim, having investigated a similar allegation against Maxim in 2009 to 2011 (**Exhibit 4, page 3**).

12. Further, Respondent spoke with Special Agent via telephone then met with him in February 2014 in the presence of other FBI agents (**Exhibit 3, pages 12-14; and Exhibit 4**). Special Agent requested Respondent's contact information, specifically, her phone numbers, which she provided. Soon afterward, Respondent began to have issues with her cell phones and landlines (**Exhibit 4, pages 4-5**). For example, Respondent attempted to call businesses, insurance companies, other attorneys, and the Superior Court, but the phone numbers were "not in service" (**Exhibit 4, page 5**).

13. Respondent reported Special Agent to the OIG because he had "no interest" in the Maxim investigation and wanted to let Maxim slide (**Exhibit 4, page 3**). Respondent filed a lawsuit against Maxim between September 2014 and 2015 (**Exhibit 4, page 4; and Exhibit 4, Exhibit B, page 1**).[1]

---

[1] This timeframe is provided to include both dates provided by Respondent. Respondent indicated she filed a lawsuit against Maxim on September 23, 2014 under Docket Number ESX-L-006774-14 (**Exhibit 4, Exhibit B, page 1**). In a separate section of Respondent's pleadings, she mentions she "sued Maxim in 2015" (**Exhibit 4, page 4, paragraph 7**).

14. Therefore, Respondent concluded that the FBI, including Special Agent, helped Maxim because no technological issues with her computers or cell phone existed prior to Respondent reporting Maxim in 2013 (**Exhibit 3, pages 92-94**). Respondent stated in or about early 2014, she became aware that her phones, emails, computers, fax machines, and printers were being fully controlled by others (**Exhibit 4, page 4, paragraph 11**). Respondent indicates she advised the Essex County Prosecutor's Office (ECPO) of her belief that Maxim and a Special Federal Agent with the initials "GF" were responsible for the cybercrimes against her (**Exhibit 4, page 7**).

15. Respondent described definitive action by Special Agent in her Certification filed on April 29, 2025:

> In January 2025, I was able to obtain conclusive proof that others perceived to be the FBI Agent (and those assisting him), have ***direct unlawful administrative access to the Supreme Court's electronic site*** and were uploading documents to eCourts [sic].
>
> On January 31, 2025 those perceived to be FBI Agents uploaded several documents entitled "Exhibit" purportedly from the Appellate Division to the Supreme Court for the clear purpose of sabotaging Dr. Faulknor's Petition for Certification. (Pa001, Pa003).[2]

---

[2] Although Respondent's Certification cites Pa001 and Pa003 of her submission to the Supreme Court (Exhibit 1, Certification, paragraph 8), the documents referenced are found at bate-stamps Pa003 and Pa005-006.

Pa003 is an Order Denying Recusal dated August 6, 2021 entered by the Honorable Anthony V. D'Elia, J.S.C. of the Superior Court of New Jersey, Hudson County, Law Division, in the Faulknor matter. Pa003 is stamped

(**Exhibit 1, Certification, paragraphs 7 and 8**)

16. When asked by the OAE during her August 11, 2025 interview to elaborate upon the facts that led Respondent to believe the Superior Court Order dated August 6, 2021 was conclusive proof of a FBI Agent's interference with eCourts, Respondent explained, "I became aware that when I filed the Supreme Court appeal or petition, someone, who was not me, uploaded two orders. One was for reconsideration and one order was to recuse Judge D'Elia" (**Exhibit 3, page 10, L10-14**).

17. During her interview, Respondent further explained that Pa003 should have been uploaded within an appendix rather than by itself, Appendices are sent from the Appellate Division to the Supreme Court, and the date stamp on the documents did not match the original appendix (**Exhibit 3, pages 26 and 37**).

18. As a further example of someone else's actions in Respondent's cases, she indicated:

> These perceived Federal Agents are removing email addresses from case docket sheets to prevent court notifications from being sent to us and other lawyers;

---

"FILED" with the Appellate Division on November 11, 2021 and "FILED" with the Supreme Court on April 29, 2025.

Pa005-006 is an Order Denying Reconsideration which is also dated August 6, 2021, entered by Judge D'Elia, in the aforementioned matter. Pa005-006 is also stamped "FILED" with the Appellate Division on November 11, 2021 and "FILED" with the Supreme Court on April 29, 2025.

> rearranging documents in the ACMS and causing our documents to appear as if filed after the documents filed by other attorneys.
>
> (**Exhibit 1, Certification, paragraph 21**)

19. Respondent explained that the FBI Agents wanted to maliciously influence the outcome of her client's matter (**Exhibit 1, Certification, paragraph 10**).

20. When the OAE asked Respondent during her interview why the FBI would want to maliciously influence the outcome of her client's matter, Respondent replied, "to sabotage my license…someone is trying to put me on notice that they're going to destroy me, take my license, make me work for free, and I don't have food to eat." (**Exhibit 3, page 38**).

21. On or about April 21, 2025, Respondent filed or attempted to file a document on behalf of a client in a second matter with the Supreme Court under Docket Number 089878 (**Exhibit 2**). Respondent's submission is stamped "Amended" and titled "CERTIFIED [sic] OF CECILE D. PORTILLA IN SUPPORT OF MOTION FOR RECONSIDERATION OF THE DENIAL OF PETITION FOR CERTIFICATION." Such filing

consists of a signed Certification of Respondent dated April 21, 2025 with exhibits (**Exhibit 2**).[3]

22. Respondent explains interference with documents she electronically uploaded on February 10, 2025 (**Exhibit 2, Certification**). Respondent describes "unlawful changes made to the docket sheets without our knowledge" and further alleges:

> We have had cases dismissed because (based on information and belief), the Judge and Court staff *could not see* documents that were uploaded and filed on a Court's [website].
>
> I have been told on two occasions that an attorney *could not see* my submissions that were attached to the Superior Court's [website].
>
> Thus, we believe that our documents are being blocked from view on the Court site as desired by these agents.
>
> (**Exhibit 2, Exhibit B, paragraphs 19 to 22**)

23. Respondent expressed an intent to write to the legislature on this issue, and stated:

> I feel so strongly about the unlawful acts by alleged government agents especially the crimes on our courts, that I am sending a letter to the New Jersey legislature proposing that our Constitution be amended to change the

---

[3] Exhibit A is stamped "RECEIVED" by the Supreme Court on March 12, 2025 under Docket Number 089878. Exhibit B is a Certification of Respondent dated April 21, 2025, marked "AMENDED" and submitted in support of her "request for accommodation to file paper documents pursuant to NJCEPA, NJSA 10:1-2, NJSA 10:5-12(d)(e)(f)" (**Exhibit 2, Exhibit B, pages 1 and 11**).

> definition of ***TREASON*** to include ***unlawful cyber accessing and interference with Court Documents and Court Orders by any person***.
>
> (**Exhibit 2, Exhibit B, paragraph 32**)

24. In both of the pleadings Respondent submitted to the Supreme Court in early 2025, Respondent indicated:

> These persons broke into my home and stole documents; placed my doctor under surveillance and hacked his office computers seeking fruit of the poisonous tree to have his license taken away as punishment for helping me.
>
> (**Exhibit 1, Certification, paragraph 59; and Exhibit 2, Exhibit B, paragraph 53**)

25. During her interview with the OAE on August 11, 2025, Respondent further explained her reference to the doctor in her Certifications. Respondent explained Dr. Berger is a chiropractor who wrote a report for one of her clients. Dr. Berger began describing issues with his phone and suddenly he disappeared. Respondent indicated she feels that something happened to Dr. Berger (**Exhibit 3, pages 106 and page 107**).

26. Respondent's Certifications describe an occasion at Hawkins's office where she wrote words on a yellow pad, which Hawkins then held upside down at Respondent's request (**Exhibit 1, Certification, paragraph 54; and Exhibit 2, Exhibit B, paragraphs 44 to 48**). Respondent's Certifications explain, "[d]ays later, perceived FBI Agents advised me of

the words that were written on a yellow pad in Attorney Hawkins' Office." (**Exhibit 1, Certification, paragraph 53; and Exhibit 2, Exhibit B, paragraph 48**).

27. During her August 11, 2025 interview with the OAE, when asked to expand upon the facts that led Respondent to believe the FBI Agents knew what she wrote on the yellow pad to Hawkins, Respondent stated "somebody knew exactly what was written on [the notepad]" (**Exhibit 3, page 111, L9-8**). Respondent further expressed the following in regard to the yellow pad incident:

    a. Respondent asked Hawkins to read her message on the yellow pad upside down (over his head) then put the pad face down on her desk (**Exhibit 3, page 109**);

    b. Aside from Respondent and Hawkins, no one knew what Respondent wrote on the yellow pad (**Exhibit 3, page 109**);

    c. Two days after writing the comment on the yellow notepad, the exact contents appeared on the text box of Respondent's cell phone (**Exhibit 3, page 109**);

    d. As a result, Respondent "knew" someone came to Hawkins's office (**Exhibit 3, page 109**); and

e. Respondent stated if an individual presented a license or a badge and says "I'm with the FBI" and" I have the authority and I'm monitoring this person, please let me in" then that individual will be admitted into the building (**Exhibit 3, page 111**).

28. On March 3, 2025, Respondent filed a Complaint with jury demand against the County of Essex, ECPO, Essex County Cyber Crime Unit (CCU),[4] et al. under Docket Number L-001684-25 (Essex County Complaint), which is categorized as a law against discrimination (LAD) matter (**Exhibit 4**).

29. In the Essex County Complaint, Respondent reiterates the same allegations contained in the pleadings she filed with the Supreme Court, specifically, Respondent explained the involvement of Essex County agencies and employees as follows (**Exhibit 4, pages 2 and 7**):

a. Her law office and CCU were both located at 7 Glenwood Avenue, East Orange, New Jersey in 2016.

b. Then ECPO Captain David Sanabria (Sanabria), advised Respondent that CCU can examine her computer.

---

[4] Respondent refers to CCU as the "FACTS Unit" (**Exhibit 4, pages 2 and 8**).

c. ECPO Detective Heather Cassidy (Cassidy) contacted Respondent to bring her computers to CCU for forensic examination.

d. In early 2016, Respondent dropped off her computers with CCU Detective Mullings (Mullings).

e. Respondent sent a letter dated May 4, 2017 to CCU titled "**HELP ME**" to seeking assistance for the "continued acts of cyber terror" and an update on the forensic examination (**Exhibit 4, page 8 and Exhibit A**).

f. Respondent states she wrote to Sanabria again on November 29, 2021 (**Exhibit 4, page 8**).

30. In Respondent's 2017 letter to CCU, as well as during her interview with the OAE, she added significance and relatedness to isolated events, for example:

a. Respondent stated that she called Maxim's benefit department concerning funds left in her benefits account. The representative who assisted her "later became a familiar voice assuming the identity of others from different companies" (**Exhibit 4, Exhibit A, page 1**); when Respondent called Comcast, the same Maxim representative answered the telephone as "Bev from Comcast"

(**Exhibit 4, Exhibit A, page 2**). Similarly, Respondent contacted Blue Cross Blue Shield and the same Maxim representative identified herself as "Vanessa L," and directed Respondent to a fictitious phone number (**Exhibit 4, Exhibit A, page 2**); and

b. According to Respondent, when she contacted Comcast for technical assistance, the Comcast representative stated "I can't help you, because I don't know what I am doing. Comcast did not give me enough training. I was only given a few weeks training in Virginia" (**Exhibit 4, Exhibit A, page 5**). Respondent described the significance as she requested proper training while employed by Maxim and Maxim sent her to Virginia for training (**Exhibit 3, page 61**). Respondent stated, "[s]o the same argument Maxim is being told to me on the Comcast line, which means somebody was trying to harass me" (**Exhibit 3, page 61**).

31. Respondent's Essex County Complaint further detailed that between 2014 to 2017, she filed multiple police reports for cybercrimes/harassment with the WOPD and the Morristown Police Department (MPD) (**Exhibit 4, page 2; and Exhibit 4, Exhibit B, page 2**).

32. In the Essex County Complaint (**Exhibit 4**), Respondent listed examples of the cybercrimes and harassment she experienced, which are summarized as follows:

a. Respondent became aware she was being followed everywhere she went when various vehicles and the same faces started to become familiar (**Exhibit 4, page 4**).

b. Respondent's emails disappeared from the inbox from her laptop/desktop (**Exhibit 4, page 6**). In addition, words were being remotely added to the text area of her cell phone. (**Exhibit 4, page 6**).

c. Respondent stated her computers were "fighting her" (**Exhibit 4, page 5**).

d. Respondent received multiple calls from "USA" and a pop up in her text stated "FBI" as to scare her (**Exhibit 4, page 6**).

e. Per Respondent, when she used her electronic toothbrush, a picture of an individual using an electronic toothbrush would appear on her computer home page (**Exhibit 4, page 6**). Furthermore, when Respondent sat on her bed, a picture of a mattress appeared on her homepage (**Exhibit 4, page 6**).

f. Due to all the difficulties Respondent was having with her computers, she took her computer to Geek Squad (**Exhibit 4, page 6**). Upon arriving at Geek Squad, the settings would be normal; however, when Respondent returned home with her computers, the proxy settings would reappear (**Exhibit 4, page 7**).

g. Respondent's computers became "plagued with: access denied to her own files; page unresponsive alerts; server unavailable; guest modes; downgrade attack to her server and fax forwarding on" (**Exhibit 4, page 9**).

h. In 2014, Respondent travelled to Pennsylvania to make sure Comcast was served with a complaint (ESX-L-7496-24). According to Respondent, "hostile persons maliciously" tampered with her electronic equipment blocking her researching issues while she was in Pennsylvania (**Exhibit 4, page 13**).

i. Individuals hacked H&R Block in order to set up Respondent by injecting "multimillion dollars cost into her 2022 Federal tax documents" (**Exhibit 4, pages 13-14**).[5]

---

[5] During her interview with the OAE on August 11, 2025, Respondent explained that her accountant presented a multimillion-dollar write-off that appeared on Respondent's draft tax returns for the 2022 tax year (**Exhibit 3, pages 104-106**).

33. Respondent attached to the Essex County Complaint her letter dated April 28, 2022 addressed to the Essex County Clerk and the ECPO (**Exhibit 4, Exhibit B**), which details the following additional cybercrimes and harassment:

- One day upon showing up at a pay phone, that [Respondent] had used on two prior occasions, the pay phone was no longer there [**Exhibit 4, Exhibit B, page 5**].
- In 2017, the word "f[-]ck" flashed across her computer while [Respondent] was home in bed having sex with her husband [**Exhibit 4, Exhibit B, page 6**].

> ...SOMONE HACKED INTO THE *Portilla v. Maxim* case Jacket [sic] [(ESX-L-006774-14)] on ECOURTS **between MARCH 18, 2022 and APRIL 23, 2022, FIVE YEARS (5) AFTER AN ENTRY WAS MADE BY JUDGE CAREY on 12/15/2017** [**Exhibit 4, Exhibit B, page 6**].
>
> The outrageous act of hacking into the State of New Jersey's ecourts [sic] to delete and make changes to [Respondent]'s 2014 civil case jacket...and perpetual hacking since 2014, are directly linked [**Exhibit 4, Exhibit B, page 7**].
>
> The hackers have changed their tactics since 2016 and are managing all [Respondent]'s phones and computer devices, as if they are the real owners...The hackers use [Respondent]'s phones to make calls, and answer her phones. [Respondent], upon leaving her phone unattended at times, will return to find multiple outgoing calls on her phone call logs, that are made when she is away from her phone. The hackers type messages into her cell phone text box and use her email address to send emails [**Exhibit 4, Exhibit B, page 7; and Exhibit 4, page 4**]. Numerous calls and text messages are missing from [Respondent]'s monthly detailed phone bills [**Exhibit 4, Exhibit B, page 7**].

Upon calling Comcast, Verizon and T-Mobile to get help, the hackers will intercept the calls and answer [Respondent], pretending to be agents of Comcast, Verizon and T-Mobile [**Exhibit 4, Exhibit B, page 7**].

* * *

In 2021, Essex County allowed [h]ackers to impersonate [Respondent], and use her name and business phone to schedule a medical appointment for one of her clients [**Exhibit 4, Exhibit B, page 10**].

Almost all documents that [Respondent] tries to print in [Microsoft W]ord form are forced into mandatory double-sided printing, and the option to change the printer setting to one-sided page printing is blocked by hackers [**Exhibit 4, Exhibit B, page 10**].

The [ECPO] has allowed, hackers to continue to control the settings on all her phones, computers, fax machines and printers since 2016. The [ECPO] has allowed hackers to continue to delete words, paragraphs, change dates, insert wrong rules and statutes or make outrageous changes to [Respondent]'s briefs. The hackers are in full control of her [A]dobe [A]crobat [**Exhibit 4, Exhibit B, page 11**].

[In] [a]pproximately February 2021, while unclothed and in her bathroom with her cell phone, [Respondent] looked down at her cell phone that was on the counter and noticed that the words "zoo animal" were written in the text box [**Exhibit 4, Exhibit B, page 11; and Exhibit 4, page 9**].

[The ECPO] knew that [Respondent's] home was being invaded by the hackers and enabled the invasion [**Exhibit 4, Exhibit B, page 12**]. [As an example, Respondent advised the ECPO] that hackers knew [Respondent] had a water leak in her own basement even before she did and sent her a text message to inform her about the leak, and asked whether they should send a power dry company to her house to take care of the leak [**Exhibit 4, Exhibit B, page 12**].

34. During her August 11, 2025 interview with the OAE, Respondent affirmed her belief that these incidents were the result of an FBI agent and others acting under his direction.

35. On or about February 27, 2025, Respondent filed a Certification she authored on behalf of a third client with the Superior Court of New Jersey, Essex Vicinage (**Exhibit 4, Exhibit C**), stating she is "aware that the FBI has told others, including West Orange Police, that I am 'psychotic.' Any such diagnosis was done at the instruction of FBI Agents" (**Exhibit 4, Exhibit C, page 6**). Respondent added, she "felt it necessary to make these clarifications because the FBI placed me on notice on 2/26/2025 as to their intent to convey to others that I have a mental problem" (**Exhibit 4, Exhibit C, page 6**). Respondent indicates she did not upload the documents filed on February 19, 2025 (**Exhibit 4, Exhibit C, pages 1, 2, and 4**).

36. When asked for further explanation of her awareness that the FBI told others, including WOPD, that Respondent is psychotic,[6] she provided a specific example of these actions which she had not previously mentioned. Specifically, Respondent contacted the WOPD to report her car was

---

[6] See Respondent's Certification dated February 26, 2025 (**Exhibit 4, Exhibit C, page 6**).

vandalized while it was parked in the driveway (**Exhibit 3, pages 120-25**):

a. An individual came into her driveway and threw garbage into her car and all over her car over a two-week period.

b. The individual did not remove the money that was stored in the glove compartment.

c. Respondent contacted the WOPD on more than one occasion.

d. The WOPD did not do anything to investigate the matter.

e. According to Respondent, the third time she called WOPD for this incident, the responding officer asked, "have you ever seen your police records?"

f. The officer advised Respondent, the WOPD has documentation which describes her as "psychotic."

37. In addition, Respondent noted during her interview that she asked WOPD Detective McConnell for assistance in 2020, which he refused until Respondent was examined by a psychiatrist (**Exhibit 3, pages 83-85**). Respondent stated that J.U. Ejiofor, Ph.D., MSN, APN of Luminous Cares, LLC (Ejiofor) examined her and advised there is not anything wrong with her (**Exhibit 3, pages 84**). As a result, Respondent believes the FBI working the WOPD and agents from the FBI advised McConnell

to tell Respondent that she needs to be examined by a psychiatrist (**Exhibit 3, pages 85**).

38. During her August 11, 2025 interview with the OAE, Respondent also advised that she notified the WOPD, although they did not assist her, that individuals entered her house on more than one occasion without her permission and stole documents (**Exhibit 3**). Respondent believes the WOPD brought an FBI agent disguised as a police officer to Respondent's house when she called WOPD; Respondent saw the same individual elsewhere twice years later (**Exhibit 3, pages 19-23**).

39. Responded added she brought her cell phone to the WOPD upon noticing her emergency contact was set to "prison" which she interpreted as a threat that she is going to prison (**Exhibit 3, pages 42-43**).

40. Further, Respondent indicated she feels WOPD is involved with whoever was harassing her and acknowledged she does not have proof to confirm her belief (**Exhibit 3, pages 18-19**).

41. When asked to elaborate as to words appearing in the text message box of her cell phone and/or her computer, during her August 11, 2025 interview with the OAE, Respondent further explained the following phrases appeared in the text box of her cell phone, as if they were an unsent text message (**Exhibit 3, pages 38-39**):

a. Text box stated "Goodbye LLC" (**Exhibit 3, page 39**);

b. Text box with a picture of the "X-Files" (**Exhibit 3, page 39**);

c. Ad stated "this is how dogs call for help" (**Exhibit 3, page 40**);[7]

d. Text box stated "do you want Power Dry" [Respondent explained this occurred at some point between 2006 and 2016] (**Exhibit 3, pages 40-42**);

e. Text box stated "you did not sweep under the kitchen table" (**Exhibit 3, page 108**)

f. "iced tea for dinner?" (**Exhibit 3, page 108; and Exhibit 4, Exhibit B, page 11**)

g. Text box stated "suffer" (**Exhibit 3, page 142; and (Exhibit 4, Exhibit B, page 6**)

h. Text box stated "the court won't be dismantled." Respondent clarified that this incident occurred a few weeks before the August 11, 2025 interview and that she will be the one who is

---

[7] See also **Exhibit 4, Exhibit B, page 11**, wherein Respondent states:

> In 2022, [Respondent contacted 911 after] becoming frustrated by the hackers constantly manipulating the . . . settings on her [W]ord document . . . For at least two weeks after the 911 call, an ad with a picture of a dog that stated "this is how dogs call for help" showed up besides the in box [sic] of her email.

dismantled, which she interpreted as a threat (**Exhibit 3, page 158**).

42. In regard to the efforts Respondent made to escape the technological issues she experienced and the impact of same on her mental health, Respondent's letter dated April 28, 2022 to the Essex County Clerk and the ECPO (**Exhibit 4, Exhibit B**) describes the following:

> From 2016 to present, the cybercrimes against [Respondent] have intensified, causing her to experience severe emotional distress, PTSD, Anxiety and Severe Depression [**Exhibit 4, Exhibit B, page 3**].
>
> - [I]n order to avoid the intense hacking, cyber sodomy, virtual rape, harassment and mental torment, [Respondent] was forced out of her house and office to use library computers and printers [**Exhibit 4, Exhibit B, page 5**].
>
> - [Respondent was] being followed, would leave her phones and car at home, has been forced to take buses or taxis to a public -libraries [sic] to do her work [**Exhibit 4, Exhibit B, page 5**].
>
> - [Respondent was] being followed and was now taking buses, trains and taxis and spending her days searching for places all over New Jersey and New York, where pay phones were still available, so that she could call her clients and follow up on her cases [**Exhibit 4, Exhibit B, page 5**].
>
> - [Respondent] started going into businesses places such as 7/11s, grocery stores, doctors' offices, gas stations, emergency rooms, department stores, liquor stores, banks and other places to borrow phones, and was asking strangers that she met on the streets, to please allow her to use their phones [**Exhibit 4, Exhibit B, page 5**].

- [Respondent] was afraid to borrow phones from people she knew, because, people who assisted her, would also became victims of cybercrimes [**Exhibit 4, Exhibit B, page 5**]. In 2017, [Respondent] was forced to expend excessive time for mental Health [sic] care while trying to run her business [**Exhibit 4, Exhibit B, page 5**].

- From 2020 through early 2021, [Respondent] was being hacked, hyperjacked, cyber stalked and pursued by hackers, became psychologically exhausted and stopped leaving her home, unless she had to [**Exhibit 4, Exhibit B, page 5**].

- [Respondent] remained in her bed room [sic], night and day with blackout curtains, and was terrified of going near her computers [**Exhibit 4, Exhibit B, page 5**].

- In April 2021, [Respondent] who barely ate and could not sleep, and was having flash backs [sic] of acts of cyber terror, was taken to the emergency room by her husband [**Exhibit 4, Exhibit B, page 5**].

* * *

- [Respondent] experiences severe emotional distress and is reduced to tears on many occasions in anticipation of repeated system exception errors when she tries to file documents [**Exhibit 4, Exhibit B, page 8**].

* * *

- Upon desperately texting a message to 911 in 2022, [ECPO] allowed hackers to block [her] text message causing her to be traumatized [**Exhibit 4, Exhibit B, page 11**].

**<u>Injuries sustained</u>**

PTSD, Severe Anxiety and Depression [**Exhibit 4, Exhibit B, page 12**].

> Severe Emotional Distress [**Exhibit 4, Exhibit B, page 13.**]

> Ms. Portilla has been permanently injured. She will need psychotherapy for the rest of her life [**Exhibit 4, Exhibit B, page 13**].

43. In contrast to Respondent's prior statements, she supplied the OAE with a letter from Dr. Ejiofor[8] dated June 28, 2025, regarding Respondent's mental health (**Exhibit 5**), which states:

> I have been asked by Ms[.] Portilla to prepare a letter concerning her mental competency.
>
> I have known Ms[.] Portilla for many years. In fact, after she advised me in approximately 2020 that the [WOPD] was refusing to provide her with assistance regarding her concerns that she was being harassed by government agents regarding her whistle-blowing activities, and trying to suggest that she was mentally incompetent, and by dint of my professional expertise I offered to go to the police station with her in her defense. I called the [WOPD] Station line many times for this purpose, but no one either picked up nor returned my calls.
>
> Not only is Ms[.] Portilla mentally competent, she is diligent and purposeful in her professional career as a black woman.
>
> I am convinced that Ms[.] Portilla, in fact, made all the observations that she has reported over the years.

44. When asked by the OAE to elaborate upon the source of Dr. Ejiofor's letter and her treatment with him, during her August 11, 2025 interview

---

[8] Respondent referenced Dr. Ejiofor's attempts to contact WOPD in her Certification dated February 26, 2025, which is attached as Exhibit C to her Essex County Complaint (**Exhibit 4, Exhibit C, page 6**).

with the OAE, Respondent explained she began seeing him in approximately 2017 to 2019 but could not recall the last time she saw him for mental health treatment; they are both religious and pray together, and Respondent is constantly in contact with him for work-related reasons and refers all her clients to him (**Exhibit 3, pages 80-92**).

45. Respondent further minimized her past mental health treatment during her interview with the OAE on August 11, 2025, specifically:

a. Prior to or around the same time as Respondent began seeing Ejiofor, she saw a mental health professional recommended by her husband until such professional retired, and she tried to see a female provider but did not proceed for insurance reasons (**Exhibit 3, pages 93-96**);

b. Respondent indicated Ejiofor advised she should merely rest when Respondent's husband suggested she admit herself to the hospital for psychiatric treatment (**Exhibit 3, pages 143-44**);

c. After 2017, Respondent voluntarily admitted herself to the hospital for psychiatric treatment for one to two weeks, during which time she "just stayed there and rested" (**Exhibit 3, pages 142-46**);

d. Respondent was prescribed Xanax for anxiety, Ambien and "something else. I don't remember" (**Exhibit 3, pages 146-47**);

e. After being discharged from psychiatric treatment, Respondent went back to or began seeing Ejiofor who prescribed an anxiety medication and Ambien (**Exhibit 3, pages 89-90 and 147**); and

f. Respondent works in a psychiatric unit, and she did not think she needed anything after the hospitalization (**Exhibit 3, page 89**).

46. In addition, with respect to the timing of the issues Respondent has experienced, Respondent claimed her statement and her Certifications suggest the events are recent, but they are in the past (**Exhibit 3, pages 147-48**). However, she confirmed the eCourts issues remain current (**Exhibit 3, page 148**). Respondent indicated being followed is "on and off" and when she talks about these incidents or takes action, they will follow her again to show she is being watched (**Exhibit 3, pages 148-49**).

47. During her interview with the OAE on August 11, 2025, Respondent noted Ejiofor was placed under surveillance due to his helping her (**Exhibit 3, pages 71-74**). In addition, the licensing board suddenly received tons of complaints against Ejiofor while he was helping Respondent (**Exhibit 3, pages 71-72**). Finally, somebody called Medicaid or Medicare on Ejiofor (**Exhibit 3, page 72**).

48. During her interview with the OAE on August 11, 2025, Respondent stated in 2022, she received a letter from a pest control company. She described the letter as stating, "we can help you with your pest control issue. We will come to the law firm, and while we are taking care of the pests, we will go into your legal books" (**Exhibit 3, pages 46-47**). Respondent added that she brought the letter to an attorney named Kim Ringler who indicated the letter was concerning but not to worry (**Exhibit 3, pages 46-47**).

49. Respondent previously submitted a letter dated December 9, 2024 to the OAE, Ombudsman and Superior Court Clerk on which President Donald Trump was copied (**Exhibit 6**). Respondent alleged she been "hooked up to the FBI main frame in VA since approx. 2013, after I blew the whistle against a Federal Special Agent AKA-FBI" (**Exhibit 6**).

50. During her interview with the OAE on August 11, 2025, Respondent confirmed her belief that her IP address is located in Virginia, which she perceives to be confirmation of the mainframe hookup (**Exhibit 3, pages 103, 127, and 131**). Such discovery occurred after her son observed "Comcast guys coming out of a PSE&G van to make change out of my house without our consent, without our knowledge" (**Exhibit 3, page 127**).

51. In Respondent's letter dated December 9, 2024 (**Exhibit 6**), she further expressed that the FBI: has cameras in her bedroom and bathroom; turned off the power at her office; blocked her heat in the winter; entered her home and office; and removed her business records (**Exhibit 6**).

52. Respondent further described that she began using a courier service instead of the United States Postal Service (USPS) as the FBI interfered with USPS as well (**Exhibit 6**). During her interview with the OAE, Respondent identified the courier by name and specified that she began using his services in 2023 (**Exhibit 3, pages 68-69**).

53. Respondent explained she went to Walmart to set up a phone for a client and received assistance from an employee. When Respondent returned to the Walmart employee per his instructions, the employee declined to assist Respondent further because the FBI had called the employee and told the employee a lie to change his mind (**Exhibit 6**). During her interview with the OAE on August 11, 2025, Respondent confirmed this incident and added same occurred within the past four years (**Exhibit 3, pages 43-44**).

54. Based on the foregoing, the OAE has concerns that Respondent's extreme persecutory beliefs are interfering with Respondent's ability to prosecute matters on behalf of her clients. Respondent concedes she is unable to

support her claims with direct evidence, which brings into question the capacity of Respondent to practice law pursuant to R. 1:20-12(b).

55. This certification is submitted in support of the OAE's Emergent Application for a medical examination pursuant to R. 1:20-12(b) so that the OAE can determine whether Respondent lacks the capacity to practice law.

56. I submit this certification in the course of my duties as a Disciplinary Investigator for the OAE based on my investigation of the matters at issue and my knowledge of the facts as set forth herein.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: 11/26/25

Rajesh Chopra
Disciplinary Investigator
Office of Attorney Ethics

Sworn and subscribed to
before me this 26th day
of November, 2025.

Brittany Anne Competello, Esq.
An Attorney-At-Law of
the State of New Jersey
Bar ID: 026992008

## EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | April 29, 2025 Respondent Motion and Certification filed with the Supreme Court of New Jersey, docket number 090218, in the Faulknor matter |
| 2 | April 21, 2025 Respondent Amended Certification (with exhibits) submitted to the Supreme Court of New Jersey, docket number 089878, in the Lopez matter |
| 3 | August 11, 2025 Transcript of Demand Interview of Respondent |
| 4 | March 3, 2025 Respondent Complaint and Jury Demand to Superior Court of New Jersey, Essex County |
| 5 | June 28, 2025 Letter from Dr. J.U. Ejiofor |
| 6 | December 9, 2024 Respondent letter to the OAE, Ombudsman and Superior Court Clerk on which President Donald Trump |

**ELDRIDGE HAWKINS LLC, ATTORNEY AT LAW**
**Attorney ID No. 214731967**
**60 Evergreen Place, Suite 510**
**East Orange, New Jersey 07018**
**Tel: (973) 676-5070**
**Fax: (973) 676-7356**
**hwklaw@aol.com**

| | |
|---|---|
| **IN THE MATTER OF CECILE D. PORTILLA, AN ATTORNEY-AT-LAW** | **RESPONDENT'S RESPONSE IN OPPOSITION TO CERTIFICATION OF**<br><br>**RAJESH CHOPRA**<br><br>**AND OPPOSITION TO MOTION COMPELLING AN EMERGENCY MENTAL EVALUATION**<br><br>***Respondent hereby waives her right to privacy and requests that her responses (and documents including all prior Medical Records attached herein), become a part of New Jersey's Public Records**** |

1. I am employed as Disciplinary Investigator by the Office of Attorney Ethics (OAE) and am familiar with the facts of this case.

**Response:**

**Admit that the male who interviewed Ms. Portilla respondent identified himself as such.**

2. Cecile D. Portilla, Esquire (Respondent) was admitted to practice law in New Jersey in 2007 and maintains an office for the practice of law at 7 Glenwood Ave, Suite 400, East Orange, Essex County, New Jersey 07017.

**Response;**

**Admit.**

3. In connection with her law practice, Respondent maintains the following accounts at PNC Bank:

a. Attorney Business Account (" ABA") ending in - ; and

b. Attorney Trust Account ("ATA") ending in

**Response:**

**No way to admit or deny as the account numbers cannot be seen**

4. I submit this certification to attest to my first-hand observations of Respondent that give rise the OAE's concern that Respondent is experiencing psychological issues that reasonably bring into question her capacity to practice law

**Response:**

**Denied.**

**Mr. Chopra did not rely solely on first hand observations. He collected litigation documents that Attorney Portilla filed against her Adversaries.**

**Ms. Portilla has no current psychological issues that reasonably brings into question her capacity to practice law.**

**Her Mental Health Provider who treated her when she was traumatized after her bombardment with cyber crimes presented a recent report in July 2025 as to her current mental capacity. (Exhibit-Report of Dr. Ejiofor dated 6/28/2026 )**

**Dr. Ejiofor is licensed and qualified by the State of New Jersey to to assess, diagnose and treat patients with mental health illnesses. He has contracts with Medicare and Medicaid and almost all insurance companies to provide psychiatric mental health services to patients. He has prescription privileges.**

**All the information as to any trauma to which Mr. Chopra refers are in the past (2022). Ms. Portilla has no current complaints of Anxiety, Depression or PTSD.**

Ms. Portilla is happy and thriving and due to her new outlook on life, and has chosen at this time to start fighting back against others who have violated her rights in egregious ways in the past.

Even back in 2022, because Ms. Portilla's problems were not from a diseased mind but from external harassment, Ms. Portilla despite hardships that slowed her down, even causing her not to want to get out of bed some days, that did not affect her mental capacity, was still able to do her work.

This is year 2025 going on 2026.

While Mr. Chopra was apparently looking for external sources of information, he did not attach Mr. Hawkins Certifications as to his observations and corroborating some of the problems on eCourts that was hand delivered to Ms. Gitter. (Exhibit-Certification of Eldridge Hawkins, Esquire, June 12, 2025, See also Witness statement of Cecile D. Portilla in support of Eldridge Hawkins, Esquire dated September 28, 2025)

He attached Ms. Portilla's husband's statements but don't cite to them as supporting her contentions.

He did not cite the statement from the Geek Squad Agent who like Ms. Portilla could not see the hyperlinks that were being triggered only on eCourts that caused her appellate documents to be rejected.

He failed to interview Ronald Morrison (our client and Courier) who became a victim of outrageous harassment by law enforcement personnel after he started to deliver Ms. Portilla's mail to prevent mail theft and tampering and ripping up of mail by her enemies. (Exhibit-Certification of Ronad Morrison dated December 2, 2025)

Ronald Morrison upon going to the Car dealership to buy a car, was identified as a deceased person in the credit reporting system. (Certification of Ronad Morrison).

Because Ronald Morrison was identified as dead person in the Credit Reporting system, he was unable to qualify for credit to buy his car. (Certification of Ronad Morrison)

Based on Ronald Morrison's Certification, an intelligent reader who has the ability to analyze and utilize deductive reasoning, would reasonably conclude that the credit reporting system is *no different from eCourts.*

**Thus, if persons can unlawfully access the Credit Reporting system and make outrageous types of changes, such as identifying a living citizen as deceased, they can do the same on eCourts.**

**Like Ms. Portilla, Ronald Morrisons' SIM card was strangely removed from his cell phone. (Exhibit-Certification of Ronad Morrison)**

**Ronald Morrison worked for Uber for 10 years. He certified that upon *suddenly* being required to submit to a back ground check November 2025 within 10 months of the last one, that he was told that he failed warranting immediate termination, he was able to pass the same back ground check for LYFT and his license renewal for his weapon. (Exhibit-Certification of Ronad Morrison)**

**Since Mr. Chopra looked at the Complaint against Essex County Prosecutor's Office, Mr. Chopra could have also asked to interview computer expert Richard Douglas whose report is also attached to that complaint (Who is now an IT expert at University Hospital as told to Ms. Portilla) who was initially assisting Ms. Portilla with her computers.**

**Richard Douglas a computer expert with 20 years of experience had an office on the sixth floor at 55 Washington Street where Eldridge Hawkins had his first Office. He examined her computers in 2016 and found evidence of unlawful access but could not say who the intruders were. His report was attached to the Amended Complaint against ECPO.**

**Mr. Chopra apparently did not feel the need to state any of this in his certification.**

**Upon Richard Douglas examining Ms. Portilla's computer and hearing some of the problems he said that "this is FBI Sh*t."**

**Upon Richard Douglas placing a device on Ms. Portilla's new computer that he said would capture the IP address of persons who might have gained unlawful access, and discussing further plans to support her, Richard Douglas was *suddenly* FALSELY accused by Comcast of down loading pornography and that due to sch violation his comcast services had to be permanently disconnected forcing him out of private business**

**Ms. Portilla who has NO current complaints of anxiety, depression or PTSD whose treating physician recently opined that she is mentally competent, is suddenly deemed to be in need of an EMERGENT MENTAL EXAMINATION for old symptoms that she complained of in 2022 that were already treated.**

**Eldridge Hawkins' (Ms. Portilla's solid rock, anchor and safe harbor in life) was investigated by the OAE. Ms. Portilla prepared a witness statement of behalf of Eldridge Hawkins that also weighs in her favor.**

5. Respondent is currently the subject of an investigation docketed by the OAE on May 29, 2025 following a referral from the Supreme Court of New Jersey (Supreme Court).

**Response:**
**Unable to admit or Deny.**

**The Respondent lacks sufficient knowledge as to why she would be investigated for engaging in Advocacy of her clients.**

**Mr. Chopra did not attach the Lopez Motion Brief with Appendix as part of the documents that he reviewed in support of his Certification. In the Motion brief Ms. Portilla advocates on behalf of her client Angel Lopez as follows:**

> ***"The United States Supreme Court has expressed that when institutional officials have "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," deliberate indifference will suffice for substantive-due-process liability. County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)."***

***(Lopez Motion Brief)***

> ***"Thus, when "extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Id.***

*(Lopez Motion Brief)*

> *"The duty to accommodate is perfectly consistent with the well-established . due process principle that, within the limits of practicability, a State must afford to all individuals a meaningful opportunity to be heard in its courts. Boddie v. Connecticut, 401 U.S. 371, 379 (1971)."*

*(Lopez Motion Brief )*

> *"New Jersey had ample time to review the requests for accommodations, the various complaints about problems on the web site and the Notices of claims outlining the problems. [ ] New Jersey even has an article published on its web site that is entitled in part "Access and fairness"*

> *"Angel Lopez has not experienced the Access and the fairness that New Jersey purports to offer."*

*(Lopez Motion Brief )*

These are clear words of advocacy and speech related to a matter of public concern for which Ms. Portilla should not be punished.

"Speech involves a matter of public concern when it fairly can be said to relate to any matter of political, social, or other concern to the community" Huppert v. City of Pittsburg, 574 F.3d 696, 701, 703 (9th Cir. 2009).

Public concern" does not have a precise definition, but "the essential question is whether the speech addressed matters of `public' as opposed to `personal' interest." Desrochers v. City of San Bernardino, 572 F.3d 703, 709 (9th Cir.2009)

Ms. Portilla spoke on a matter of public concern that was corroborated Eldridge Hawkins' Certification. (See Exhibit ). Ronald Morrioson's Certification (that Mr. Chopra and Ms. Gitter failed to obtain) provides strong circumstantial evidence of the types of interferences and manipulation of technology that cyber criminals (FBI or NOT) are capable of orchestrating. (Exhibit).

If unlawful actors are able to change Ronald Morrison's status in the Credit Reporting system to "DECEASED" to prevent him from getting credit to purchase a car, logic dictates that the same can be done on eCourts. (Exhibit)

The credit reporting system is foundational to the functioning of the U.S. economy. It enables efficient lending, supports multiple industries, and provides the informational backbone for trillions of dollars in economic activity. Hacking this system is not a mere inconvenience or isolated cybercrime; it is a direct threat to economic stability, consumer welfare, and national financial security. Protecting the integrity of credit reporting is therefore essential to safeguarding the broader economic ecosystem.

Simply put, if the Credit Reporting system can be breached, then so can eCourts. The OAE can run from the truth, but is cannot hide. eCourts is being hacked!!!! See Equifax Data Breach Case Study (Thomas, 2019) Source: Jason E. Thomas, *A Case Study Analysis of the Equifax Data Breach -showing that these secure systems can be hacked)*

Ms. Portilla's advocacy by criticizing the State of New Jersey for doing NOTHING after her repeated complaints was not simply to protect Angel Lopez and Dr. Mavis Faulknor from being denied of their substantive due process on eCourts that is being caused by cyber crimes. Circumstantial evidence of the ability of cyber criminal (FBI or Not) to deny citizens of substantive due process was also disclosed in Ronald Morrison's certification that Mr. Chopra and Ms. Gitter failed to obtain.

Ronald Morrison who is being harassed by law enforcement after he started to assist Ms. Portilla, who has a clean background as evidenced by his ability to pass the background check for LYFT, for his TWIC card and his weapons permit failed the background check for

UBER five days (for which he was immediately terminated) before passing the background checks for the other entities. (Exhibit).

The background check system is a cornerstone of public safety, economic stability, and institutional trust in the United States. It protects children, patients, consumers, employers, and the public at large. When hackers compromise this system or create false profiles, the damage is not limited to data integrity—it threatens lives, undermines institutions, and destabilizes the economy. If hackers (FBI or Not) can breach this system and create false profiles that cause citizens to be terminated then hacking of eCourts to dictate the outcome of litigation can be done with the same ease.

Electronic court-filing systems (e.g., eCourts, e-Filing, PACER-integrated portals) are often described as secure, robust, and protected by advanced cybersecurity measures. But this claim must be evaluated in the real-world context of modern cyber threats. The fact that credit reporting systems and background check systems—both of which employ sophisticated cybersecurity infrastructure—have been successfully hacked demonstrates a simple but unavoidable truth:

No electronic system connected to the internet is immune from compromise. If systems with far greater resources, budgets, and cybersecurity sophistication can be breached, then court-filing systems, which typically operate with smaller budgets and slower modernization cycles, are logically at equal or greater risk as shown by the acts of interferences that have been witnessed by Eldridge Hawkins, Esquire.

Retaliatory motive related to speech may be inferred from timing, pretext, and lack of legitimate basis. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003).

There is no legitimate basis for an Emergency Exam for symptoms complained of in 2022 in a Notice of Claim. The investigation was close in time to the motions of advocacy filed on eCourts.

Ms. Portilla engaged in protected activity regarding cyber crimes on eCourts which is a matter of public concern. She argued in her Lopez motion brief that eCourts was compromised. The OAE responded by seeking to destroy her credibility by having her mentally examined where the risk of misdiagnosis could destroy her career. The government responded with a request for an EMERGENCY MENTAL EXAM that would "deter a person of ordinary firmness" from exercising their rights. The disclosure in her brief and in her court related to advocacy was a substantial or motivating factor in the retaliatory action.

The extremeness of motive is inferred from the lack of legitimate basis, pretext and the timing for a suggested adverse Action An adverse action is one "sufficient to deter a

person of ordinary firmness from exercising his or her rights." Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)

**A Compelled Psychiatric Exam Constitutes an Adverse Action That Would Chill A Person of Ordinary Fitness.** Compelled psychiatric evaluation is a constitutionally significant adverse action because it is a Serious Liberty Deprivation (U.S. Supreme Court) Vitek v. Jones, 445 U.S. 480 (1980).

The Supreme Court held that forced psychiatric evaluation and treatment is a major deprivation of liberty that carries a "stigmatizing" effect and reputation damaging and requires heightened constitutional protection. "The transfer to a mental hospital, coupled with mandatory behavior modification, constitutes a major change in the conditions of confinement... and is stigmatizing." Vitek, 445 U.S. at 491–94.

The third Circuit has held that Compelled Mental Evaluation Violates Substantive Due Process When Used Arbitrarily. Doby v. DeCrescenzo, 171 F.3d 858 (3d Cir. 1999). It intrudes upon the most fundamental liberty interests." — Id at 871–72.

The Third Circuit has held that state mandated mental evaluations implicate fundamental liberty interests and cannot be imposed arbitrarily or as a substitute for evidence.

Ms. Gitter and Mr. Chopra claim that an Emergency exists based on symptoms that existed in 2022 that no longer exists today. Ms. Portilla has told no one that she is still traumatized, anxious or depressed.

All those symptoms were outlined in a 2022 Notice of claim that was attached to a Complained filed in 2025 against the ECPO, wherein she asserts damages for injuries to her rights and makes no demands for mental or emotional injuries.

**Because neither Mr. Chopra attached the Lopez Motion brief with the appendix is is assumed that they did not read them despite their contention that the referral was based on Ms. Portilla's motion to the Supreme Court.**

6. On April 29, 2025, Respondent filed a Notice of Motion Miscellaneous and supporting Certification on behalf of a client with the Supreme Court under Docket Number 090218 (Exhibit 1). The Notice of Motion Respondent filed on April 29, 2025 is titled:

"MOTION TO HOLD MATTER IN ABEYANCE IN THE INTEREST OF JUSTICE UNTIL A DECISION IS MADE

REGARDING GRANTING THE PLAINTIFF'S COUNSEL'S REQUEST FOR ACCOMMODATION IN BEING ABLE TO PAPER FILE HER DOCUMENTS AS SHE IS A WHISTLE BLOWER AGAINST THE FBI WHOSE DOCUMENTS ON ECOURTS ARE BEING TAMPERED WITH GIVEN UNLAWFUL INTERFERENCE (NOW INCLUDING FRAUDULENT UPLOADS) DIRECTLY ON THE COURT SITE AFTER BEING FILED ON ECOURTS, BY THOSE PERCEIVED TO BE HOSTILE FBI AGENTS SEEKING TO RETALIATE AGAINST PLAINTIFF'S ATTORNEY .... "
(Exhibit 1, page 2)

**Response:**

**Admit in part.**

**Respondent admits that such a Motion was filed after discovering that someone who was not her upload documents to the Supreme Court that were Not uploaded by her. Mr. Chopra has not explained who uploaded them. The Supreme Court case manager said they were submitted in error. Whose error? (Exhibit-Order denying recusal filed 1/31/2025, (Exhibit-Order denying reconsideration filed 1/31/2025 )**

**However, since the exhibit was not attached with the January 31, 2025 date on it, then neither Mr. Chopra or Ms. Gitter have disputed Ms. Portilla's statements.**

7. In her Certification submitted in support of such Notice of Motion, Respondent alleges:

I am a 2013 whistle[b]lower [sic] against an FBI Agent who has threatened to destroy my law practice, make me work for free, **and cause me to become homeless ...** Based upon information and belief, this Agent has been unlawfully accessing court documents on eCourts and tampering them. I have put Courts, Court Clerks and law enforcement on [ n ]otice.

(Exhibit 1, Certification, paragraphs 3 and 5; and Exhibit 4)

**Response:**
**Admit in part that those words were expressed and are true.**

**Respondent provided the certification of Eldridge Hawkins corroborating the strange occurrences on eCourts. Mr. Chopra has failed to attach Mr. Hawkins' certification that validates Respondent's statements.**

8. The OAE conducted an in-person interview of Respondent on August 11, 2025 in Trenton, New Jersey in the presence of her counsel of record, Eldridge Hawkins, Esq. (Hawkins) **(Exhibit 3).**

**Response:**
**Admit in part that an interview was conducted.**

**Ms. Portilla was not allowed to record the interview and cannot verify the veracity of the transcripts. If persons can interfere with and make changes to documents on eCourts then they can also make changes to any transcripts.**

9. The OAE asked Respondent during her interview on August 11, 2025 to identify the Federal Bureau of Investigations (FBI) agent mentioned in her court filing. Respondent clarified the FBI agent is Special Agent Eugene Fayer (Special Agent) from the Office of Inspector General (OIG) Division. She described Special Agent as "the ringleader" **(Exhibit 3, page 12, LS-7).** Respondent stated she is followed by many individuals at Special Agent's direction **(Exhibit 3).** She claims that she is being harassed by the FBI, West Orange Police Department (WOPD) and other people **(Exhibit 3; and Exhibit 4).**

**Response:**

**Admit that Respondent perceived that she was being harassed by the FBI. This is based on overwhelming circumstantial evidence and Richard Douglas opining that this is FBI S**t. She did NOT say she was being harassed by the police.**

**The police reports over the years did not add up and often did not reflect Ms. Portilla's words.**

**Respondent stated that it took her many years until 2025 to realize that the West Orange Police was a part of the crimes (meaning covering up for perceived FBI Agents). Respondent explained that over the years that the West Orange Police wrote reports that were false and did not reflect her true words.**

**In 2025, Upon Respondent going fishing with her husband in Jersey City she was approached by an individual who came up to her and asked how was the fishing. Upon looking into his face, she recognized him as an individual who the police had brought into her home in the early years.**

**He was wearing plain clothes. Respondent recalls that she had also seen him in the parking lot of Mr. Hawkins office.**

**Upon seeing his face, she recalled all the bad feeling of the past when the harassment had started. He was in fact one of the persons who had been following her. He was African American.**

10. Responded conceded she does not have proof of the source of the issues she has been experiencing (Exhibit 3, page 58-59).

**Response:**
**This is an ambiguous statement that is DENIED.**

**Respondent's current issues are the issues on eCourts which were the basis for the two motions in the Supreme Court.**

**Respondent gave her background history, so that the Court could use circumstantial evidence and infer that the FBI who threatened retaliation, are the persons currently engaged in the outrageous acts on the Court site.**

**Respondent has multiple copies of documents that were tampered on eCourts and copies of cases jackets from which her name was removed at the attorney of record that Mr. Hawkins has corroborated. Mr. Chopra has failed to attach the evidence in support of Respondent's statements.**

**Respondent taught Mr. Hawkins to start looking at the ACMS system. He became aware that on multiple occasions, our documents that are filed first in time will be entered last in time in the system and given a number designation that would cause others to conclude that our documents are being filed AFTER our adversaries' documents**

Respondent has multiple case jackets that show that someone (or some persons) removed her name as the attorney or record and placed Eldridge Hawkins' name in her place. (See Exhibit-Certification of Eldridge Hawkins). The complaints were filed with her name on the CIS under her account and somehow had her name removed from.

Respondent attached documents on the Faulknor matter showing that Judge D'Elia COULD NOT HAVE SEEN multiple Notices of claims that were filed and refiled because he threw out multiple counts of the complaint on the basis the NO notices of claims were filed. Multiple Notices of claims were filed that he should not have missed had he seen them.

Multiple proofs are attached to the Faulknor Motion and the Lopez Supreme Court Motions.

The two Orders identified on the Faulknor matter in the Supreme Court as "Exhibits" by someone, that were marked by the case manager as "Submitted in Error" to the Supreme Court were NOT uploaded by her on January 31, 2025. (Exhibit) WHO SUBMITTED THEM???

The Multiple unjustified baseless failures to prosecute notifications on her documents and Eldridge Hawkins documents-Who is doing all this?

**Ms. Portilla again observed something very strange in the matter of Rashawn Atkinson v County of Hudson, HUD-L-3390-22. Ms. Portilla noted that Eldridge Hawkins had requested default 3 times in the Atkins matter, yet the defendants were able to make their way to Summary Judgment without the requests for default being addressed.**

**Ms. Portilla noticed an Order dated September 15, 2023 signed by Judge Turula strangely stating**

> **"Plaintiff should have renewed their request for an entry of default following entry of the May 12, 2023 order. Denied."**
>
> **"A subsequent motion to dismiss was filed on July 12, 2023, accordingly no default may enter at this time"**

**(Exhibit sent to Trenton to Gitter)**

**Eldridge Hawkins had in fact renewed the request for default several times!**

Respondent after carefully looking at the case jacket of Atkinson matter in 2025 and concluded that Judge Turula COULD NOT HAVE SEEN the requests for default that plaintiff filed on 8/3/2023 and 8/11/2023 or he would NOT have made such a statement in his Order.

The Clerk Notifications that followed Eldridge Hawkins requests for default were clearly bizarre. The defendants had already made their way to Summary Judgment when the occurrences on the case jacket that clearly did NOT make any sense.

Respondent concluded that something was NOT QUITE right that would cause the submissions by Eldridge Hawkins to be overlooked by the Judge in the Atkinson matter. Although more than a year had passed Respondent relying on on Rule 1:13-1 decided to challenge it.

On 3/8/2025, Ms. Portilla felt compelled to file a Motion for default out of time in the Atkinson matter followed by a request to correct clerical error. Upon filing a reply Respondent noted that a clerk notice appeared under her reply advising her that the reply WOULD NOT BE CONSIDERED.

On 5/7/2025, Respondent decided to file a motion to correct clerical error with the contents of her reply as she was advised that "the reply would not be considered." (Exhibit sent to Trenton to Gitter)

Upon filing the Motion to correct clerical error, Respondent later noted that page two of her certification in support her motion that connected the dots was strangely missing. (Exhibit sent to Trenton to Gitter

Respondent was again forced to upload the certification with page two included. (Exhibit sent to Trenton to Gitter)

Judge D'Elia, at oral argument, upon hearing the motion, did not use the hard copy of the documents that Ms. Portilla had HAND delivered to him.

Judge D'Elia read from his computer the chronological Order of submissions on the Atkinson matter. Judge D'Elia's Chronological Order did not mention Edridge Hawkins requests for default filed 8/3/2023 and 8/11/2025.

The defense Counsel's who also prepared a Chronological list of submissions did not mention the plaintiff's three requests for default among the submissions. (See Exhibit)

**How is that even possible? The public needs to know!**

11. Respondent elaborated that in 2013, she was the Director of Nursing for Maxim Healthcare Services (Maxim), and she reported Maxim for Medicaid and Medicare fraud (Exhibit 3, pages 12 and 14; and Exhibit 4). According to Respondent, Special Agent was assigned to investigate Maxim, having investigated a similar allegation against Maxim in 2009 to 2011 (Exhibit 4, page 3).

**Response:**

**Admit in part that those statements were made.**
**Respondent cannot attest to any attachment that she cannot see as she does not know what Exhibit 4, page 3 is.**

12. Further, Respondent spoke with Special Agent via telephone then met with him in February 2014 in the presence of other FBI agents (Exhibit 3, pages 12-14; and Exhibit 4). Special Agent requested Respondent's contact information, specifically, her phone numbers, which she provided. Soon afterward, Respondent began to have issues with her cell phones and landlines (Exhibit 4, pages 4-5). For example, Respondent attempted to call businesses, insurance companies, other attorneys, and the Superior Court, but the phone numbers were "not in service" (Exhibit 4, page 5).

**Response:**

**Admit that Special Agent requested ALL her phone numbers which made her uneasy.**

**Respondent was intuitive enough to give her cell phone to Eldridge Hawkins and another individuals each time she heard strange recordings or responses so that others could hear the strange recordings that "law firm numbers were no longer in service" and the "Superior Court's number was not in service" being told to "enter her pass code when she called a government office" and others strange things that she was hearing.**

13. Respondent reported Special Agent to the OIG because he had "no interest" in the Maxim investigation and wanted to let Maxim slide

(Exhibit 4, page 3). Respondent filed a lawsuit against Maxim between September 2014 and 2015 (Exhibit 4, page 4; and Exhibit 4, Exhibit B, page 1).

**Response:**

**Respondent reported Eugene Fayor because of his neglect of duty.**

**Maxim was on probation after a 2009 Medicare/Medicaid fraud charges wherein it had to pay millions to the government. Several individuals had gone to jail. Eugene Fayer was the investigator in the prior 2009 fraud charges against Maxim.**

**Maxim was still on probation and was supposed to be properly monitored, when the new complaint was made by Ms. Portilla. Special Agent Eugene Fayer had a DUTY to know that the fraud from 2009 was continuing into 2013, if he was properly doing his job. He was not!**

**Pursuant to the reports, Eugene Fayer had no interest in the 2009 investigation. The patient who reported Maxim the first time for fraud and his attorney had already filed the Qui Tam Complaint and did most of the work themselves before got involved in the 2009 matter.**

**In 2013, Eugene Fayer was ASSIGNED as the investigator. He was NOT at liberty to NOT be interested.**

**Ms. Portilla who did not work in the business department at Maxim, discovered that her name was attached to multiple documents that she did not author, which was the reason why she wanted the matter properly investigated as several people went to jail during the first 2009 Maxim Medicare/Medicaid fraud investigation.**

**It was easy to understand how they went to jail if their names were being signed to documents without their consent. Respondent was an attorney and a Nurse. She was not ignorant of the law and understood fraud when she saw it.**

**Ms. Portilla called the OIG again to report that Maxim had not stopped its fraud. Ms. Portilla who did not work in the business department became alarmed when discovered that her name was signed to documents that she did not author.**

The night before the interview at the US Attorney's office, Ms. Portilla received a call from a phone number with all zeros.

Eugene Fayor was hostile and defensive when Ms. Portilla met with him, FBI Agent Joseph Maggipino and United States Investigator P. Sharma at the Federal building in Newark in February 2014. Special Agent Fayer was hostile to Ms. Portilla during the interview. As Ms. Portilla recalls, the Special Agent stated that the Nurses who were documenting care falsely, did so because they were probably scared!

While walking out of the interview room she heard Special Agent Fayer who was focused on himself, state that he had done nothing to cause Ms. Portilla to complain about him.

After the 2014 interview Ms. Portilla became aware that she was being followed almost every where that she went and that her life had become a living hell. Her husband Marrio Portilla corroborated that fact that Ms. Portilla was being followed in a written Certification.

Respondent did not know that Mr. Chopra would be focused on Eugene Fayor when she went to the interview. Respondent and her lawyer were told that they would be going to Trenton related to the Two Supreme Court Motions.

Has she known, that she would have brought her boxes of exhibits and screen shots that she had taken over the years to Trenton. She was blindsided by the interview that she was not allowed to record.

Respondent wants to make clear that two copies of the Maxim Case Jackets were attached to the Lopez Appendix. Thus, any dispute with exact dates of the

**filing of the complaint should be resolved by the case jackets. Mr. Chopa is encouraged to look at the two case jackets printed on the two different dates that were attached to the Lopez Motion Appendix.**

**When Ms. Portilla showed the case jackets to the Essex County Ombudsman years later, the Ombudsman studied them and told her to take them to the Essex County Prosecutor's Office. Does Mr. Chopra even know why?**

**Respondent kept her silence for many years and came forward only because she wanted to protect eCourts and the people of New Jersey. Respondent cannot determine the validity or veracity to any Exhibits in paragraph 13 to which Mr. Chopra cites as they were not provided to her.**

14. Therefore, Respondent concluded that the FBI, including Special Agent, helped Maxim because no technological issues with her computers or cell phone existed prior to Respondent reporting Maxim in 2013 **(Exhibit 3, pages 92-94).** Respondent stated in or about early 2014, she became aware that her phones, emails, computers, fax machines, and printers were being fully controlled by others **(Exhibit 4, page 4, paragraph 1 1).** Respondent indicates she advised the Essex County Prosecutor's Office (ECPO) of her belief that Maxim and a Special Federal Agent with the initials "GF" were responsible for the cybercrimes against her **(Exhibit 4, page** 7).

**Response:**

- **Denied. Only Eugene Fayer was identified as helping Maxim. Other perceived FBI Agents were identified as helping Eugene Fayer with his perceived acts of retaliation and his perceived crimes.**
- **Experts advised Ms. Portilla that the persons who were engaged in the acts against her were *not* ORDINARY criminals.**

- Barbara Volta, Business Manager, and Laura Riddle, Administrator were acting in a threatening manner towards Respondent prior to her last day at Maxim.

- One Expert in 2016 upon examining her computers said that "this is "FBI Sh*t."

- Investigator Chopra was provided with strong circumstantial evidence of FBI involvement.

  Respondent advised Mr. Chopra that after becoming aware that her phones were compromised (maybe not the exact words) she stopped using her cell phones and would use pay phones or go to places like gas stations to borrow phones to communicate with others.

  Ms. Portilla explained that upon going to one gas station in Morristown, where she had never been before, to borrow a phone, that the attendant was noted coming out to her with a phone even before even she asked him to borrow the phone and said to her, "here is the phone."

  Unless Mr. Chopra wants to contend that the Gas Station attendant was psychic, Respondent submits that *logic dictates* that someone who was following her to other places and knew her business, called the gas station as soon as Ms. Portilla got close enough and instructed the attendant to bring the phone out to her.

  Logical and intelligent reasoning also allows the conclusion to be drawn, that only persons with the ability to influence others, could get a citizen to comply with such a request.

Respondent also adds that Maxim was still on probation and was supposed to be properly monitored, when the new complaint was made by Ms. Portilla.

Special Agent Eugene Fayor had a duty to know that the fraud from 2009 was continuing into 2013, if he was properly doing his job.

By not doing his job Fayer allowed the Fraud to continue.

**15.** Respondent described definitive action by Special Agent her Certification filed on April 29, 2025:

> In January 2025, I was able to obtain conclusive proof that others perceived to be the FBI Agent ( and those assisting him), have *direct unlawful administrative access to the Supreme Court's electronic site* and were uploading documents to eCourts [sic].
> On January 31, 2025 those perceived to be FBI Agents uploaded several documents entitled "Exhibit" purportedly from the Appellate Division to the Supreme Court for the clear purpose of sabotaging Dr. Faulknor's Petition for Certification. (Pa00 1, Pa003 ).

**Response:**
**DENIED.**

**Respondent used the word "PERCEIVED"**

**The Respondent is allowed to perceive based on Circumstantial Evidence!**

**Respondent's allegation that there was conclusive proof that documents were uploaded to the Supreme Court by others remain undisputed and unrebutted!**

**The Appellate case manager marked the two strange loose "Exhibits" that Respondent DID NOT UPLOAD as UPLOADED in ERROR (Exhibit)**

**Whose error?**

**And WHY were those specific documents chosen that were clearly intended to make her co-counsel Eldridge Hawkins look bad? (Exhibit)**

**It is believed that Mr. Chopra did not ask the Supreme Court Case Manager the identity of the persons who uploaded those documents *in error.***

**Mr. Chopra has not explained why the Respondent's perception is unreasonable.**

**The New Jersey Supreme Court has expressed that Circumstantial Evidence at times can be more compelling than direct evidence.**

**The Essex County Prosecutor (a lawyer) and Prosecutors (lawyers) all over the United States have arrested, indicted and imprisoned defendants based on circumstantial evidence alone without their mental competencies being challenged**

**Based on this, the question is asked- why is Mr. Chopra as perceived, challenging Ms. Portilla's mental competence in a disparate fashion?**

**Mr. Chopra does not provide the exact Orders denying recusal and the Order denying reconsideration by Judge D'Elia that were filed stamped on January 31, 2025 by the Supreme Court (See Exhibit-Order of recusal, See Exhibit Order denying Reconsideration) that were later marked uploaded in error.**

16. When asked by the OAE during her August 11, 2025 interview to elaborate upon the facts that led Respondent to believe the Superior Court Order dated August 6, 2021 was conclusive proof of a FBI Agent's interference with eCourts, Respondent explained, "I became aware that when I filed the Supreme Court appeal or petition, someone, who was not me, uploaded two orders. One was for reconsideration and one order was to recuse Judge D'Elia" (Exhibit 3, page 10, L10-14).

**Response**

**See Id wherein the word "PERCEIVED" was used.**
**Adults are allowed to perceive and deduce based on Circumstantial evidence.**

17. During her interview, Respondent further explained that Pa003 should have been uploaded within an appendix rather than by itself, Appendices are sent from the Appellate Division to the Supreme Court, and the date stamp on the documents did not match the original appendix (Exhibit 3, pages 26 and 37).

**Response**

**Unable to admit or deny.**

**Mr. Chopra has reason to know that all "documents " apart from briefs or certifications filed in the Appellate Division and the Supreme Court must be filed as part of an Appendix and not as loose "Exhibits"**

Mr. Chopra and Ms. Gitter declined to send Eldridge Hawkins an exact copy of the Lopez Motion documents and the Faulkor Motion documents on which they relied. We asked that the exact documents be sent prior to the interview.

One of Respondents main concern is that documents on eCourts are being authored by others who have gained unlawful access. This was the reason why Respondent requested from Ms. Gitter an exact physical copy of the alleged motion documents at issue. They declined to send them.

One of Ms. Portilla's main contention is that eCourts is compromised and that Judges are being blocked from seeing documents and may be seeing documents that Ms. Portilla reasonably concludes were NOT authored by her.

The matter of Atkinson is the clearest evidence:

Ms. Portilla again observed something very strange in the matter of Rashawn Atkinson v County of Hudson, HUD-L-3390-22. Ms. Portilla noted that Eldridge Hawkins had requested default 3 times in the Atkins matter, yet the defendants were able to make their way to Summary Judgment without the requests for default being addressed.

Ms. Portilla noticed an Order dated September 15, 2023 signed by Judge Turula strangely stating

> "Plaintiff should have renewed their request for an entry of default following entry of the May 12, 2023 order. Denied."
>
> "A subsequent motion to dismiss was filed on July 12, 2023, accordingly no default may enter at this time"

(Exhibit in Atkinson matter that was sent to Ms. Gitter in Trenton)

Eldridge Hawkins had in fact renewed the request for default several times!

Respondent carefully looked at the case jacket of the Atkinson matter in 2025 and concluded that Judge Turula COULD NOT HAVE SEEN the requests for default that Eldridge Hawkins filed on 8/3/2023 and 8/11/2023 or he would NOT have made such a statement in his Order.

The Clerk Notifications that followed Eldridge Hawkins requests for default were clearly bizarre. The defendants had already made their way to Summary

**Judgment when Ms. Portilla reviewed that case jacket and saw the sequence of submissions on the case jacket that clearly did NOT make any sense.**

**Respondent concluded that something was NOT QUITE right that would cause the submissions by Eldridge Hawkins to be overlooked by the Judge in the Atkinson matter. Although more than a year had passed, Respondent relying on on Rule 1:13-1 decided to challenge it.**

**On 3/8/2025, Ms. Portilla felt compelled to file a Motion for default out of time in the Atkinson matter followed by a request to correct clerical error.Upon filing a reply Ms. Portilla noted that a clerk notice appeared under her reply advising her that the reply WOULD NOT BE CONSIDERED.**

**On 5/7/2025, Ms. Portilla decided to file a motion to correct clerical error with the contents of her reply as she was advised that "the reply would not be considered."**

**Upon filing the Motion to correct clerical error, Respondent later noted that page two of her certification in support her motion that connected the dots was strangely missing. (Exhibit). Ms. Portilla was again forced to upload the certification with page two included. (Exhibit)**

**Judge D'Elia, at oral argument, upon hearing the motion, read from his computer the chronological Order of submissions on the Atkinson matter. The Chronological Order that he read did not mention Edridge Hawkins requests for default.**

**The defense Counsel's had also prepared a Chronological list of submissions. His chronological Order of submissions did not mention the Eldridge Hawkins three requests for default among the submissions.**

**How is that even possible?**

18. As a further example of someone else's actions in Respondent's cases, she indicated:

> These perceived Federal Agents are removing email addresses from case docket sheets to prevent court notifications from being sent to us and other lawyers; rearranging documents in the ACMS and causing our documents to appear as if filed after the documents filed by other attorneys.
> (Exhibit 1, Certification, paragraph 21)

**Response**
**Admit in part and denied in part.**

**It is concerning that Mr. Chopra did not see the need to communicate in his Certification that Eldridge Hawkins filed a Certification corroborating many of the occurrences on eCourts. (Certification of Eldridge Hawkins attached)**

**As the respondent recalls, when she first to Eldridge Hawkins with her concerns, he asked to meet with her husband to determine the validity of her concerns. When Respondent saw the first mental health provider years agio, the provider asked to meet with her husband.**

**Mr. Chopra did not desire to meet with Ms. Portilla's witness.**

**Is Mr. Chopra alluding that Ms. Portilla, Eldridge Hawkins, Ronald Morrison, Mario Portilla and Ms. Portilla's son Adam, the Agent at Geek Squad may all be mentally ill, related to witnessed observations that Ms. Portilla has verbalized to the Ombudsman, Court Clerks, the Police, the Supreme Court, Page Ennis, Judges, Saul Hernandez, (the prior Clerk of the Appellate Court) over the years?**

19. Respondent explained that the FBI Agents wanted to maliciously influence the outcome of her client's matter (Exhibit 1, Certification, paragraph 10).

**Response**
**Admit that based on circumstantial evidence, perceived FBI Agents who have been unlawfully accessing documents on eCourts and following her and harassing her, are trying to maliciously influence the outcome of litigation.**

**Perceived FBI agents influenced the background check of Ronald Morrison as well as his Credit worthiness. (Exhibit)**

**Admit as to the statement based on circumstantial evidence and deductive reasoning**

**Denied as to the supporting exhibits because Respondent has no ability to know what Exhibit 1, Certification, paragraph 10 happens to be.**
**What are they?**

20. When the OAE asked Respondent during her interview why the FBI would want to maliciously influence the outcome of her client's matter, Respondent replied, "to sabotage my license ... someone is trying to put me on notice that they're going to destroy me, take my license, make me work for free, and I don't have food to eat." **(Exhibit 3, page 38).**

**Response**
**Admit.**

**Admit as to the Statement that was made based on logical and deductive reasoning.**

**Persons perceived to be FBI Agents advised Ms. Portilla that they planned to make her work for free, become a former attorney and become homeless.**

**As told to Mr. Chopra ( and if not told, Respondent is saying it now) after her interview at the US Attorney's Office in 2014, there was a big picture of "THE X FILES" next to the login area of Ms. Portilla's email.**

**Respondent received multiple communications over the years that she was being investigated. That she would be required to appeal her status as an attorney.**

**Respondent received communications that Ethics would be coming after her.**

**That her clients were better off with other attorneys. That she would lose her home.**

**Over the past week alone, Ms. Portilla has received multiple phone calls from voices that she recognizes, telling her that they want to buy her house at 3 Ardmore Road. One caller was clearly calling from a radio type device.**

**A communication was received thanking her Husband for seeking a mortgage with a specific company when no such request was made.**

**Ms. Portilla has no knowledge as to what Exhibit 3, page 38 is and cannot attest to its veracity.**

21. On or about April 21, 2025, Respondent filed or attempted to file a document on behalf of a client in a second matter with the Supreme Court under Docket Number 089878 (Exhibit 2). Respondent's submission is stamped "Amended" and titled "CERTIFIED [sic] OF CECILE D.

PORTILLA IN SUPPORT OF MOTION FOR RECONSIDERATION OF THE DENIAL OF PETITION FOR CERTIFICATION." Such filing consists of a signed Certification of Respondent dated April 21, 2025 with exhibits (Exhibit 2).

**Response**

**Respondent cannot admit or deny because she does not know whether the documents to which Mr. Chopra cited were authored by her or by the persons who are tampering documents and causing the unlawful interferences on eCourts.**

****Mr. Chopra does not attach the Lopez Motion Brief with the Appendix. We are confused.**

**Ms. Portilla admits that she in fact filed a motion for reconsideration of the denial of Petition for Certification of the Lopez matter, as his documents of ALL her clients were given the most OUTRAGEOUS ACTS OF TAMPERING ON ECOURTS. The motion was supported by a Certification with a Brief and Appendix. (Exhibit)**

**Ms. Portilla sat down with Eldridge Hawkins and went over the documents that made up the Lopez Supreme Court Appendix. Since Mr. Chopra did not attach it, it is presumed that it was never reviewed.**

**They were clearly tampered and changed and blocked from being properly filed. Pages were darkened and faded and blurred. Pages were upside down and sideways and hyperlinks were being triggered after the documents were uploaded.**

**New Jersey eCourts FAILED the client because it has done nothing to ensure the safety of documents that are field on that site.**

**22**. Respondent explains interference with documents she electronically uploaded on February 10, 2025 (Exhibit 2, Certification). Respondent describes "unlawful changes made to the docket sheets without our knowledge" and further alleges:

> We have had cases dismissed because (based on information and belief), the Judge and Court staff *could not see* documents that were uploaded and filed on a Court's [website].
> I have been told on two occasions that an attorney *could not see* my submissions that were attached to the Superior

Court's [website].
Thus, we believe that our documents are being blocked from view on the Court site as desired by these agents. (Exhibit 2, Exhibit B, paragraphs 19 to 22)

**Response**

**However, respondent has in fact made the alleged expressions and again refer Mr. Chopra to Ronald Morrsion's Certification so that reasonable minds may determine whether the Credit reporting system and the Back ground check system are more vulnerable than eCourts, causing falsified evidence to be injected in them, that CANNOT similarly be done on eCourts.**

**Respondent also again outline the Faulknor and Atkinson matters so that intelligent minds can review and formulate rational opinions:**

**In the case of Faulknor v Couty of Hudson HUD-l-3792-18, that Ms. Portilla shares with Eldridge Hawkins, Esquire, the trial Court dismissed the case on Summary Judgment and for some strange reason included in his statement of reasons that Eldridge Hawkins did not file ANY NOTICES OF CLAIMS and that certain Counts were being dismissed on that basis alone. (Exhibit).**

**Because Eldridge Hawkins had uploaded six Notices of Claims repeatedly thirty seven (37) times over the years, Ms. Portilla who was assisting Eldridge Hawkins, reasonably concluded that someone blocked the Judge from seeing them.**

**She could see them. Eldridge Hawkins could see them. Her son Adam could see them. Why could the Judge NOT see them and declared that NONE were filed?**

**This was one of the basis for seeking reconsideration in the Supreme Court on the Faulknor matter.**

**Ms. Portilla again observed something very strange in the matter of Rashawn Atkinson v County of Hudson, HUD-L-3390-22. Ms. Portilla noted that Eldridge Hawkins had requested default 3 times in the Atkins matter, yet the defendants were able to make their way to Summary Judgment without the requests for default being addressed.**

**Ms. Portilla noticed an Order dated September 15, 2023 signed by Judge Turula strangely stating**

> **"Plaintiff should have renewed their request for an entry of default following entry of the May 12, 2023 order. Denied."**
>
> **"A subsequent motion to dismiss was filed on July 12, 2023, accordingly no default may enter at this time"**

**(Exhibit sent to Ms. Gitter in Trenton)**

**Eldridge Hawkins had in fact renewed the request for default several times!**

**Plaintiff after carefully looking at the case jacket of Atkinson matter in 2025 and concluded that Judge Turula COULD NOT HAVE SEEN the requests for default that plaintiff filed on 8/3/2023 and 8/11/2023 or he would NOT have made such a statement in his Order.**

**The Clerk Notifications that followed Eldridge Hawkins requests for default were clearly bizarre. The defendants had already made their way to Summary Judgment when the occurrences on the case jacket that clearly did NOT make any sense.**

**Plaintiff concluded that something was NOT QUITE right that would cause the submissions by Eldridge Hawkins to be overlooked by the Judge in the Atkinson matter. Although more than a year had passed plaintiff relying on on Rule 1:13-1 decided to challenge it.**

**On 3/8/2025, Ms. Portilla felt compelled to file a Motion for default out of time in the Atkinson matter followed by a request to correct clerical error. (Exhibit) Upon filing a reply plaintiff noted that a clerk notice appeared under her reply advising her that the reply WOULD NOT BE CONSIDERED.**

**On 5/7/2025, Plaintiff decided to file a motion to correct clerical error with the contents of her reply as she was advised that "the reply would not be considered."**

**Upon filing the Motion to correct clerical error, plaintiff later noted that page two of her certification in support her motion that connected the dots was strangely missing. (Exhibit). Plaintiff was again forced to upload the certification on 5/8/2025 with page two included.**

**Judge D'Elia, at oral argument, upon hearing the motion, read from his computer the chronological Order of submissions on the Atkinson matter and the Chronological Order did not mention Edridge Hawkins requests for default. The**

**defense Counsel's who also prepared a Chronological list of submissions did not mention the plaintiff's three requests for default among the submissions. (See Exhibit)**

**How is that even possible?**

**It is also noted that Mr. Chopra does not say that Ms. Portilla was totally incorrect about the Faulknor Notices of claim because he looked and NONE were there as stated by the Judge!**

**Mr. Chopra has not disputed any of the the allegations related to Lopez or Atkins matters or issues related to the ACMS system.**

**If the allegations are undisputed then WHY does Ms. Portilla need an EMERGENT medical exam.**

**Mr. Chopra also did not allow us to see his proofs or exhibits and told us that we could not record the interview!!!**

**Due process requires much more!!!**

**Without seeing the contrasting proofs, without seeing the exhibits on which Mr. Chopra relies, without the audio and the transcripts the Respondent is being denied of a reasonable opportunity to be heard before being compelled to submit to a Mental Health Examination.**

**As stated by the Respondent to the Hon. Judge Leitner and John Watson, Esquire during a Workers' Compensation case conference, " the very fact that one doctor can find that NOTHING is wrong with a petitioner and the OTHER can find that the same petitioner is 100 disabled from his injuries, means that one of those doctors is LYING.**

**That was the reason why the Respondent sent a letter to the New Jersey Legislature requesting that changes be made to the Workers' Compensation Act to allow ALL petitioners the right to Jury trials.**

23. Respondent expressed an intent to write to the legislature on this issue, and stated:

> I feel so strongly about the unlawful acts by alleged government agents especially the crimes on our courts, that I am sending a letter to the New Jersey legislature

> proposing that our Constitution be amended to change the **definition of *TREASON* to include *unlawful cyber accessing and interference with Court Documents and Court Orders by <u>any</u> person.***

**(Exhibit 2, Exhibit B, paragraph 32)**

**Response**

**Admit**

**Admits that Respondent, like Eldridge Hawkins considers her self an advocate on behalf of the people of New Jersey.**

**Admit that Respondent intends to follow through and seek public support that will allow the definition of *TREASON* to include *unlawful cyber accessing and interference with Court Documents and Court Orders by <u>any</u> person including FBI Agents acting ultra viresly who are NOT above the law.***

24. In both of the pleadings Respondent submitted to the Supreme Court in early 2025, Respondent indicated:

> These persons broke into my home and stole documents; placed my doctor under surveillance and hacked his office computers seeking fruit of the poisonous tree to have his license taken away as punishment for helping me.

(Exhibit 1, Certification, paragraph 59; and Exhibit 2, Exhibit B, paragraph 53)

**Response**

**Admit**
**Admit that those words were stated by the respondent.**
**Respondent cannot determine the validity or veracity of the Exhibits to which Mr. Chopra cites as they were not provided to her.**

**Admits and agrees that Respondent's home was broken into and that persons perceived to be her harassers, stole documents and that after becoming upset by the burglary, the persons perceived to have broken into her home communicated that they were "authorized" to do so.**

**Admit that Respondent expressed that persons "placed doctor Ejiofor under surveillance and hacked his office computers seeking fruit of the poisonous tree to have his license taken away as punishment for helping [her]"**

**Admit that the surveillance of Dr. Ejiofor continues. On 12/03/2025 Dr. Ejiofor certified in as follows:**

> **I Udoka Ejiofor of full age with knowledge of the penalties of affirming falsely hereby certify the following to be true:**
>
> 1. **I am a Psychiatric Mental Health Provider.**
> 2. **I am the Owner of Luminous Cares , LLC that is located in East Orange, New Jersey.**
> 3. **I am an APN with prescription privileges.**
> 4. **I provided a report on behalf of Ms. Portilla Esquire on June 28, 2025 at which time I declared that she was mentally competent.**
> 5. **After I wrote the report for Ms. Portilla, I started to have very strange problems with my business cell phone and my surveillance Camera.**
> 6. **My cell phone started to behave as if it was being controlled by others.**
> 7. **Someone created a chat entitled "Mass text" in my business cell phone as it was not created by me.**
> 8. **The Mass text includes Ms. Portilla's business cell phone and <u>my private</u> number.**
> 9. **After I wrote the report for Ms. Portilla, someone changed a prescription that I wrote for a patient to a different drug "Risperdal."**
> 10. **I have never prescribed Risperdal for any of my patients.**
> 11. **The dose of Risperdal was also excessive and could have killed my patient.**
> 12. **After, I became disturbed by that event, I later became aware that another prescription was also changed to another drug that I did not Order for the patient.**
> 13. **Ms. Portilla advised me that both she and Eldridge Hawkins, Esquire had persons who were not really seeking legal services come into their offices pretending to be clients in need of a lawyer.**
> 14. **She advised me to carefully screen my patients due to my association with her.**
> 15. **It is my firm belief that whomever is harassing Ms. Portilla is also trying to interfere with my practice to try and scare me.**
> 16. **I am a man of God, I do not live in fear.**
>
> **I certify that the above statements made by me are true. I am aware that if any of the foregoing statements are willfully false that I am subject to punishment**

**Udoka Ejiofor**

**Dated 12/03/2025**

**(Exhibit-Certification of Dr. Ejiofor-dated 12/03/25)**

**Based on this certification, not only are persons seeking fruit of the poisonous tree to use against Dr. Ejiofor, they are *creating their own poisonous fruits* by tampering with Dr. Ejiofor's Prescriptions for which *he will be blamed if his patients die or are harmed in any way.***

**As shown by Mr. Morrison's Certification, whom ever changed the Uber background check, *created his or her own poisonous fruit* that caused Mr. Morrison to be terminated from his Uber employment.**

**As shown by Mr. Morrison's Certification someone unlawfully accessed the Credit reporting system and created fruit of the poisonous tree evidence that caused Mr. Morrison to be identified as DEAD person, causing him to be denied of his right to property, liberty, happiness, defamed him and cast him in false light without due process of law. (Exhibit-Certification of Ronald Morrison dated 12/02/2025)**

25. During her interview with the OAE on August 11, 2025, Respondent further explained her reference to the doctor in her Certifications. Respondent explained Dr. Berger is a chiropractor who wrote a report for one of her clients. Dr. Berger began describing issues with his phone and suddenly he disappeared. Respondent indicated she feels that something happened to Dr. Berger (Exhibit 3, pages 106 and page 107).

**Response.**
**This paragraph is confusing and ambiguous as such Respondent is unable whether to Admit or Deny**

**The doctor to whom plaintiff referred as being "*placed under surveillance and hacked his office computers seeking fruit of the poisonous tree to have his license taken away as punishment for helping me*" is Dr. Ejiofor.**

**Dr. Ejiofor was plaintiff's treating doctor when she was traumatized by the harassment and Cyber crimes in 2022.**

**Dr. Berger was never Ms. Portilla's doctor.**

**Dr. Berger like a few other doctors became victimized after treating or writing reports for certain clients.**

**Respondent who could never reach Dr. Berger by phone was forced to go in person to his office related to three of her client's cases. When she called his phone, her calls were not received by him.**

**When Respondent went in person to Dr. Berger's office on one occasion and dialed his cell phone while she was standing right next to his desk. DR. BERGER'S CELL PHONE DID NOT RING! He said that he did not turn off the ringer, did not silence or mute his phone and that his phone was working fine ALL DAY.**

**When Dr. Berger tried to email a client's report to her, the report could not be received easily.**

**Plaintiff does not know what happened to Dr. Berger and as always worried about his wellbeing.**

26. Respondent's Certifications describe an occasion at Hawkins's office where she wrote words on a yellow pad, which Hawkins then held upside down at Respondent's request (Exhibit 1, Certification, paragraph 54; and Exhibit 2, Exhibit B, paragraphs 44 to 48). Respondent's Certifications explain,"[ d]ays later, perceived FBI Agents advised me of the words that were written on a yellow pad in Attorney Hawkins' Office ." (Exhibit 1, Certification, paragraph 53; and Exhibit 2, Exhibit B, paragraph 48).

**Response**
**Admit as to the statements. The words are the truth, the whole truth and nothing but the truth!**

**Respondent further adds that the persons who are harassing her states that she is surviving because Eldridge Hawkins, Esquire lives.**

27. During her August 11, 2025 interview with the OAE, when asked to expand upon the facts that led Respondent to believe the FBI Agents knew what she wrote on the yellow pad to Hawkins, Respondent stated

"somebody knew exactly what was written on [the notepad]" (Exhibit 3, page 111, L9-8). Respondent further expressed the following in regard to the yellow pad incident:

a. Respondent asked Hawkins to read her message on the yellow pad upside down ( over his head) then put the pad face down on her desk (Exhibit 3, page 109);

b. Aside from Respondent and Hawkins, no one knew what Respondent wrote on the yellow pad (Exhibit 3, page 109);

c. Two days after writing the comment on the yellow notepad, the exact contents appeared on the text box of Respondent's cell phone (Exhibit 3, page 109);

d. As a result, Respondent "knew" someone came to Hawkins's office (Exhibit 3, page 109); and

e. Respondent stated if an individual presented a license or a badge and says "I'm with the FBI" and" I have the authority and I'm monitoring this person, please let me in" then that individual will be admitted into the building (Exhibit 3, page 111).

**Response:**

**Admit**

**Admit that all factual statement above are the truth the whole truth and nothing but the truth so help respondent God.**

28. On March 3, 2025, Respondent filed a Complaint with jury demand against the County of Essex, ECPO, Essex County Cyber Crime Unit (CCU), 4 et al. under Docket Number L-001684-25 (Essex County Complaint), which is categorized as a law against discrimination (LAD) matter (Exhibit 4).

**Response**
**Admit that a Complaint was filed against the Essex County Prosecutor's Office.**

**However, respondent does not recall providing a copy of the Complaint that was prepared for litigation purposes to Mr. Chopra.**

29. In the Essex County Complaint, Respondent reiterates the same allegations contained in the pleadings she filed with the Supreme Court, specifically, Respondent explained the involvement of Essex County agencies and employees as follows (Exhibit 4, pages 2 and 7):

**Response**

**Denied that the THE SAME allegations were reiterated in the Complaint against Essex County Prosecutor's Office. Many allegations were different including the allegations against the policy makers.**

a. Her law office and CCU were both located at 7 Glenwood Avenue, East Orange, New Jersey in 2016.
b. Then ECPO Captain David Sanabria (Sanabria), advised Respondent that CCU can examine her computer.

c. ECPO Detective Heather Cassidy (Cassidy) contacted Respondent to bring her computers to CCU for forensic examination.
d. In early 2016, Respondent dropped off her computers with CCU Detective Mullings (Mullings).
e. Respondent sent a letter dated May 4, 2017 to CCU titled **"HELP ME"** to seeking assistance for the "continued acts of cyber terror" and an update on the forensic examination **(Exhibit 4, page 8 and Exhibit A).**
f. Respondent states she wrote to Sanabria again on November 29, 2021 **(Exhibit 4, page 8).**

**Response**
**The facts outlined are old background information that showed how Respondent became involved with the Essex County Prosecutor's Office.**

**The complaint against the ECPO was prepared as documents in support of litigation on behalf of Respondent's clients who are represented jointly by the Respondent and Eldridge Hawkins, Esquire.**

**They were never intended to be used against the Respondent by Mr. Chopra.**

**Imagine a world where all attorneys had ethics charges brought against them, based on the contents of their litigation documents?**

**The right to advocacy would be destroyed and the OAE would be helping the non targeted attorneys to prevail on their matters.**

30. In Respondent's 2017 letter to CCU, as well as during her interview with the OAE, she added significance and relatedness to isolated events, for example:

a. Respondent stated that she called Maxim's benefit department concerning funds left in her benefits account. The representative who assisted her "later became a familiar voice assuming the identity of others from different companies" (Exhibit 4, Exhibit A, page l); when Respondent called Comcast, the same Maxim representative answered the telephone as "Bev from Comcast" (Exhibit 4, Exhibit A, page 2).

Similarly, Respondent contacted Blue Cross Blue Shield and the same Maxim representative identified herself as "Vanessa L," and directed Respondent to a fictitious phone number (Exhibit 4, Exhibit A, page 2); and

b. According to Respondent, when she contacted Comcast for technical assistance, the Comcast representative stated "I can't help you, because I don't know what I am doing. Comcast did not give me enough training. I was only given a few weeks training in Virginia" **(Exhibit 4, Exhibit A, page 5).**

Respondent described the significance as she requested proper training while employed by Maxim and Maxim sent her to Virginia for training **(Exhibit 3, page 61).**

Respondent stated, "[s]o the same argument Maxim is being told to me on the Comcast line, which means somebody was trying to harass me" **(Exhibit 3, page 61).**

**Response**

**Admit and denied in part.**

**It is unclear why these old facts are relevant to the two motions filed in the Supreme Court?**

Mr. Chopra truncates facts and goes through documents not given to him by plaintiff and Omits important important!
Because of his omissions, the Ethics Committee is being presented with confusion and half truths that make no sense.

The relevance of the first part of (para 30 a) was that Comcast has NO department identified as "Phones and Faxes."

Respondent in approximately 2015, upon becoming aware that individuals were hunting for, sending bogus clients to her, and using her phone and Fax machine to harass her, gave one of her cell phones to Bev (who was Mr. Hawkins prior clerk) and told Bev to answer all her phone calls and to collect faxes from Mr. Hawkins fax machine after directing her clients to use Mr. Hawkins fax number.

Prior to requesting that Bev answer all her phone calls and faxes, Respondent was receiving tons of faxes that were constantly flooding through her fax machine using up all her paper and cartridge. The Companies were advertising mainly "roofs" – "paper roofs, "rubber roofs" and used cars. Respondent could not unsubscribe from these ads although she had never subscribed for any faxed ads in the first place.

After assigning Bev to her phone calls and faxes, plaintiff became aware that upon calling Comcast, one perceived fake agent was now identifying herself as "*Bev from phones and Faxes*"

The relevance of paragraph (30 b ) was that Respondent's email was some how stuck in a different time zone. Respondent called Comcast for technical report because and she could not tell what time her emails were actually received, could not anticipate retrieval of emails and often could not find her inbox.

Upon calling Comcast for assistance, a perceived fake agent responded, who seemingly knew what had happened at Maxim. Respondent while at Maxim had complained that "Maxim did not give me enough training"

Maxim then sent plaintiff to Virginia for a few weeks of training. Upon calling Comcast regarding being stuck in a different time zone, a perceived fake agent answered the phone.

Upon Respondent telling the agent about her business related issues the agent replied "*I can't help you, because I don't know what I am doing. Comcast did not give me enough training. I was only given a few weeks training in Virginia*"

**Mr. Chopra does not mention all facts that would paint a clear cohesive picture. He presents bits and pieces of irrelevant information to paint a scattered picture.**

**These Old historical facts were drafted for litigation purposes attached to a legal complaint that Respondent DID NOT give to Mr. Chopra.**

**These facts were not outlined in the Lopez and Fauknor Motions that were submitted to the Supreme Court seeking that the Supreme Court take steps to protect eCourts.**

31. Respondent's Essex County Complaint further detailed that between 2014 to 2017, she filed multiple police reports for cybercrimes/harassment with the WOPD and the Morristown Police Department (MPD) (Exhibit 4, page 2; and Exhibit 4, Exhibit B, page 2).

**Response**

**These Old historical facts were drafted for litigation purposes attached to legal complaint that Respondent DID NOT give to Mr. Chopra.**

**These facts were not outlined in the Lopez and Fauknor Motions that were submitted to the Supreme Court seeking that the Supreme Court take steps to protect eCourts.**

32. In the Essex County Complaint (Exhibit 4), Respondent listed examples of the cybercrimes and harassment she experienced, which are summarized as follows:

a. Respondent became aware she was being followed everywhere she went when various vehicles and the same faces started to become familiar (Exhibit 4, page 4).

b. Respondent's emails disappeared from the inbox from her laptop/desktop (Exhibit 4, page 6). In addition, words were being remotely added to the text area of her cell phone. (Exhibit 4, page 6).

c. Respondent stated her computers were "fighting her" (Exhibit 4, page 5).

d. Respondent received multiple calls from "USA" and a pop up in her text stated "FBI" as to scare her (Exhibit 4, page 6).

e. Per Respondent, when she used her electronic toothbrush, a picture of an individual using an electronic toothbrush would appear on her computer home page (Exhibit 4, page 6). Furthermore, when Respondent sat on her bed, .a picture of a mattress appeared on her homepage (Exhibit 4, page 6).

f. Due to all the difficulties Respondent was having with her computers, she took her computer to Geek Squad **(Exhibit 4, page 6).** Upon arriving at Geek Squad, the settings would be normal; however, when Respondent returned home with her computers, the proxy settings would reappear **(Exhibit 4, page 7).**

g. Respondent's computers became "plagued with: access denied to her own files; page unresponsive alerts; server unavailable; guest modes; downgrade attack to her server and fax forwarding on" **(Exhibit 4, page 9).**

h. In 2014, Respondent travelled to Pennsylvania to make sure Comcast was served with a complaint (ESX-L-7496-24). According to Respondent, "hostile persons maliciously" tampered with her electronic equipment blocking her researching issues while she was in Pennsylvania **(Exhibit 4, page 13).**

1. Individuals hacked H&R Block in order to set up Respondent by injecting "multimillion dollars cost into her 2022 Federal tax documents" (Exhibit 4, pages 13-14). 5

**Response**

**Denied that Respondent travelled to Pennsylvania in the year 2014. Respondent travelled to Pennsylvania in 2024.**

**She travelled to Pennsylvania in 2024 as that Complaint against Comcast was filed in 2024. Neither Courier Morrison nor Guaranteed Subpoena could guarantee that the service upon comcast was effective in 2024.**

**Thus, Respondent was forced to travel to Pennsylvania where she paid the local Sherrif's office to serve Comcast.**

**All factual statements actually made by the Respondent that are not Mr. Chopra's opinions are the truth, the whole truth and nothing but the truth.**

**These very Old historical facts were drafted for litigation purposes attached to a legal complaint that Respondent DID NOT give to Mr. Chopra.**

**Litigation documents cannot reasonably be used as the source for an ethics complaint or the right to advocacy will be violated. An ethics investigator should not take steps that will cause prejudice an active law suit.**

**Most of these facts were not outlined in the Lopez and Fauknor Motions that were submitted to the Supreme Court seeking that the Supreme Court take steps to protect eCourts.**

**Respondent did not seek relief from the Supreme Court for any of these old acts outlined in a document created for litigation purposes on behalf of her clients (Cecile D. Portilla, Esquire and Cecile D. Portilla, Attorney at Law LLC)**

**Mr. Chopra does not show how the persons who were engaged in these old past acts were not the same persons now engaged in the unlawful acts against eCourts.**

**Respondent's only request to the Supreme Court was to make eCourts safe for all users or to allow paper filing.**

**All factual statements that were actually made by plaintiff in her Complaint against Comcast and Essex County are the truth.**

**(See Exhibit-Clean Copy of Notice of Claim dated April 2025)**

33. Respondent attached to the Essex County Complaint her letter dated April 28, 2022 addressed to the Essex County Clerk and the ECPO (Exhibit 4, Exhibit B), which details the following additional cybercrimes and harassment:

• One day upon showing up at a pay phone, that [Respondent] had used on two prior occasions, the pay phone was no longer there [Exhibit 4, Exhibit B, page 5].

• In 2017, the word "f[-]ck" flashed across her computer while [Respondent] was home in bed having sex with her husband [Exhibit 4, Exhibit B, page 6] .

... SOMONE HACKED INTO THE *Portilla v. Maxim* case Jacket [sic] [(ESX-L-006774-14)] on ECOURTS between MARCH 18, 2022 and APRIL 23, 2022, FIVE YEARS (5) AFTER AN ENTRY WAS MADE BY JUDGE CAREY on 12/15/2017 [Exhibit 4, Exhibit B, page 6].

The outrageous act of hacking into the State of New Jersey's ecourts [sic] to delete and make changes to [Respondent]' s 2014 civil case jacket ... and perpetual hacking since 2014, are directly linked [Exhibit 4, Exhibit B, page 7].

The hackers have changed their tactics since 2016 and are managing all [Respondent]'s phones and computer devices, as if they are the real owners ... The hackers use [Respondent]' s phones to make calls, and answer her phones. [Respondent], upon leaving her phone unattended at times, will return to find multiple outgoing calls on her phone call logs, that are made when she is away from her phone. The hackers type messages into her cell phone text box and use her email address to send emails **[Exhibit 4, Exhibit B, page 7; and Exhibit 4, page 4].** Numerous calls and text messages are missing from [Respondent]'s monthly detailed phone bills **[Exhibit 4, Exhibit B, page 7].**

Upon calling Comcast, Verizon and T-Mobile to get help, the hackers will intercept the calls and answer [Respondent], pretending to be agents of Comcast, Verizon and T-Mobile **[Exhibit 4, Exhibit B, page 7].**

In 2021, Essex County allowed [h Jackers to impersonate [Respondent], and use her name and business phone to schedule a medical appointment for one of her clients **[Exhibit 4, Exhibit B, page 10].**
Almost all documents that [Respondent] tries to print in [Microsoft W] ord form are forced into mandatory double-sided printing, and the option to change the printer setting to one-sided page printing is blocked by hackers **[Exhibit 4, Exhibit B, page 10].**
The [ECPO} has allowed, hackers to continue to control the settings on all her phones, computers, fax machines and printers since 2016. The [ECPO] has allowed hackers to continue to delete words, paragraphs, change dates, insert wrong rules and statutes or make outrageous changes to [Respondent]'s briefs. The hackers are in full control of her [A]dobe [A]crobat **[Exhibit 4, Exhibit B, page 11].**

[In] [a]pproximately February 2021, while unclothed and in her bathroom with her cell phone, [Respondent] looked down at her

cell phone that was on the counter and noticed that the words "zoo animal" were written in the text box **[Exhibit 4, Exhibit B, page 11; and Exhibit 4, page 9].**
[The ECPO] knew that [Respondent's] home was being invaded by the hackers and enabled the invasion **[Exhibit 4, Exhibit B, page 12].** [As an example, Respondent advised the ECPO] that hackers knew [Respondent] had a water leak in her own basement even before she did and sent her a text message to inform her about the leak, and asked whether they should send a power dry company to her house to take care of the leak **[Exhibit 4, Exhibit B, page 12**
**Response**

**These very Old historical facts in the 2022 Notice of Claim were drafted for litigation purposes attached to a legal complaint that Respondent DID NOT give to Mr. Chopra.**

**These facts were not outlined in the Lopez and Fauknor Motions that were submitted to the Supreme Court seeking that the Supreme Court take steps to protect eCourts.**

**Respondent cannot determine the validity or veracity of any Exhibits cited to by Mr. Chopra as they were not provided to her.**

**Respondent did not seek relief from the Supreme Court for any of these old acts outlined in a document created for litigation purposes on behalf of her clients (Cecile D. Portilla, Esquire and Cecile D. Portilla, Attorney at Law LLC)**

**Mr. Chopra does not show how the persons who were engaged in these old past acts were not the same persons now engaged in the unlawful acts against eCourts. Thus it is unclear why old acts for which plaintiff already received treatment and is declared competent is relevant to the Supreme Court Motions with facts that supports those motions that are not being disputed.**

**Respondent's only request to the Supreme Court was to make eCourts safe for all users or to allow paper filing.**

34. During her August 11, 2025 interview with the OAE, Respondent affirmed her belief that these incidents were the result of an FBI agent and others acting under his direction.

**Response**

**Misleading.**

**Many of these acts were confined to documents that were NOT provided to Mr. Chopra nor were they included in the Faulknor Motion or the Lopez Motion.**

**While Respondent perceives that the historical acts contained in the Complaint against Essex County and Comcast are acts of her harassers, Mr. Chopra simply cannot grab old information for all over the place and make such a global statement.**

**Mr. Chopra cannot explain that who uploaded the documents to eCourts that plaintiff said that she did not upload.**

**Mr. Chopra cannot explain who changed the background check in back brough check system causing Uber to terminate Mr. Morrison.**

**Mr. Chopra cannot explain who accessed the Credit reporting system that is required to be as secure as eCourts and changed Mr. Morrison's status to deceased causing the car dealership to determine that because he was a dead person he was not eligible for credit.**

**What Mr. Chopra is really saying is that if Ms. Portilla was locked away in a psych ward, she will not be able to see all problems of eCourts that he and the Administrators of the New Jersey Courts cannot explain.**

**The only problems is that she has credible witnesses to many of the outrageous acts that Mr. Chopra omitted to mention and refused to interview.**

35. On or about February 27, 2025, Respondent filed a Certification she authored on behalf of a third client with the Superior Court of New Jersey, Essex Vicinage (Exhibit 4, Exhibit C), stating she is "aware that the FBI has told others, including West Orange Police, that I am 'psychotic.' Any such diagnosis was done at the instruction of FBI Agents" (Exhibit 4, Exhibit C, page 6). Respondent added, she "felt it necessary to make these clarifications because the FBI placed me on notice on 2/26/2025 as

to their intent to convey to others that I have a mental problem" (Exhibit 4, Exhibit C, page 6). Respondent indicates she did not upload the documents filed on February 19, 2025 (Exhibit 4, Exhibit C, pages 1, 2, and 4).

**Response**

**However, Respondent did become aware in approximately 2022 that the someone advised the West Orang that she was psychotic.**

**Persons perceived to be FBI made it clear over the years that if she opened her mouth that they would tell others that she was psychotic.**

**Ms. Portilla 's mental Health doctor who is licensed and trained and certified by the State of New Jersey, states that she is competent. (Exhibit -Report of Dr. Ejoifor ) He even advised in his letter report, that he offered to go to the West Orange Police years ago to correct the record, but that no one would answer his call.**

**Even in 2022 when the Respondent was traumatized, unhappy and not wanting to get out of bed some days, she still found a way to do her work.**

- **As shown, when Respondent's mail was being ripped up, and her her green certified mail receipts were not being returned to her, she hired a Courier so that she could do her work.**
- **When Respondent's phones calls were not getting anywhere, she made house calls, used pay phones, used track phones and asked others to help her.**
- **Respondent's son, her husband and others were assisting her in hand delivering documents.**
- **She persisted and prevailed and started telling the public what was happening to her.**
- **She started sending out Notices of Claims and started making others responsible for their action and in actions.**
- **She hired a Cyber Security Company and associated herself with other attorneys.**
- **It was Respomndent's Cyber Security company that told her to google her IP address after the company could find nothing wrong with her computer. Upon doing so she discovered that her IP address was in Virginia.**

**This is year 2025. Respondent is happy vibrant, productive. She has told NO ONE that she is anxious, depressed or has symptoms of PTSD.**

**Ms. Portilla is also a licensed Registered Nurse as well as her husband , her daughter and her best friend. If Ms. Portilla was mentally ill her family and friend would be the first to know and provide her with assistance.**

**The fact that Respondent wants to make Comcast and the Essex County Prosecutor's Office and the West Orange Police responsible *for their inactions* for her past misery, does not mean that she still has the symptoms that she revealed in the past. The complaints against these entities have to mention the past along with the past symptoms.**

36. When asked for further explanation of her awareness that the FBI told others, including **WOPD,** that Respondent is psychotic, she provided a specific example of these actions which she had not previously mentioned. Specifically, Respondent contacted the WOPD to report her car was vandalized while it was parked in the driveway **(Exhibit 3, pages 120-25):**

a. An individual came into her driveway and threw garbage into her car and all over her car over a two-week period.
b. The individual did not remove the money that was stored in the glove compartment.
c. Respondent contacted the WOPD on more than one occasion.
d. The WOPD did not do anything to investigate the matter.
e. According to Respondent, the third time she called WOPD for this incident, the responding officer asked, "have you ever seen your police records?"
f. The officer advised Respondent, the WOPD has documentation which describes her as "psychotic."

**Response**
**It unclear what the words "she had not previously mentioned" connotates.**

**"To whom" "when" "was respondent supposed to mention something"**

**Was she supposed to mention something on a day or months before the interview" "was she supposed to mention it in the two motion briefs" and "why is it relevant?"**

**Respondent was told that the interview was related to the Lopez and Faulknor Motions. This has gone beyond those motions.**

**Respondent was not required to mention it in her Lopez or Faulknor motion to get the Court to stop those who are engaged in cyber crimes on eCourts.**

**The young police officer who appeared in her drive way was the first person who told Respondent that something was written. Respondent 's treating doctor has never diagnosed her with "psychosis."**

**Respondent has told NO ONE since 2022 that she felt Anxious, Depressed or Traumatized.**

**The law protects the mentally ill and the perceived mentally ill unless they are dangerous to self and property within the reasonable foreseeable future.**

**Multiple attorneys suffer from Depression and Anxiety. PTSD is common place among professionals.**

**Respondent is a happy, health hard working productive human being who has a great relationship with ALL her clients.**

37. In addition, Respondent noted during her interview that she asked WOPD Detective McConnell for assistance in 2020, which he refused until Respondent was examined by a psychiatrist **(Exhibit 3, pages 83-85).** Respondent stated that J.U. Ejiofor, Ph.D., MSN, APN of Luminous Cares, LLC (Ejiofor) examined her and advised there is not anything wrong with her **(Exhibit 3, pages 84).**

As a result, Respondent believes the FBI working the WOPD and agents from the FBI advised McConnell to tell Respondent that she needs to be examined by a psychiatrist **(Exhibit 3, pages 85).**

**Response**
**Denied the words "as a result"**

**Persons perceived to be FBI agents advised respondent that if she came forward and disclosed the acts against her, that they would lie and state that she was psychotic. That is circumstantial evidence. McConnel is responsible for his own defamation.**

**Respondent is a Workers' compensation Attorney and a health Care professional. She was not about to let a doctor retained by the police to touch her.**

**She has clients who are employees of Municipalities. She knows exactly what happens when petitioners are sent to these types of doctors which is the reason when she sent a Letter to the New Jersey Legislature requesting changes to the Workers' Compensation act.**

38. During her August 11, 2025 interview with the OAE, Respondent also advised that she notified the WOPD, although they did not assist her, that individuals entered her house on more than one occasion without her permission and stole documents (Exhibit 3). Respondent believes the WOPD brought an FBI agent disguised as a police officer to Respondent's house when she called WOPD; Respondent saw the same individual elsewhere twice years later (Exhibit 3, pages 19-23).

**Response**
**Plaintiff does not recall stating that the person in plain clothes was disguised as a police Officer. The fact that he was in plain clothes shows that he was not disguised.**

**Plaintiff does not recall saying anything about this person in the two motions that she filed with the Supreme Court.**

**She recalls stating that the suspected person was the only one in plain clothes that came into her home with the police.**

**She had recognized him later when she saw him in in the parking lot of Eldridge Hawkins' Office. He later came up to her in year 2025 while she was fishing with her Husband at Liberty Park asking her how was the fishing.**

**She recalls stating that while she was suspicious that the police was a part of the crimes, it was only in 2025 after that person came up to her at Liberty Park that she became sure that the West Orange police was part of the crimes.**

**Petitioner believes that she told Mr. Chopra that the police reports by West Orange PD over the years were false, filled with Omissions and misleading. If she did not, then she is saying it now.**

39. Responded added she brought her cell phone to the WOPD upon noticing her emergency contact was set to "prison" which she interpreted as a threat that she is going to prison **(Exhibit 3, pages 42-43).**

**Response:**
**DENIED as ridiculous and false! !!!!!!! If the interview audio states this, then it was altered. If the transcripts states this, then the transcripts were altered.**

**Plaintiff is an Adult American. She did NOT tell anyone that she perceived this as a threat that she is going to prison.**

**She saw it as an act of harassment!!!!!!!**

**Plaintiff did not give anyone's HER consent to set any emergency contact in her phone.**

**The fact that it was set to prison, is circumstantial evidence that likely FBI agents who she perceived as her harassers were involved.**

40. Further, Respondent indicated she feels WOPD is involved with whoever was harassing her and acknowledged she does not have proof to confirm her belief **(Exhibit 3, pages 18-19).**

**Response**
**Respondent already explained to Mr. Choprs what happened in 2025 to convince her of WOPDs involvement. That is considered circumstantial evidence.**

**Years again when I threatened to sue the FBI, persons perceived to be FBI agents communicated to me that I would never get proof of FBI involvement.**

**Mr. Chopra's investigation was limited to the motions that were before the Supreme Court in the Lopez and Faulknor case.**

**Respondent did not take her screen shots or any of the police reports filled with Omissions by WOPD to the Ethics interview. This is surprise.**

**She did know that Mr. Chopra had interest in all information that was not related to protecting eCourts.**

**Mr. Chopra has not stated anything so far, that disputes Ms. Portilla's concerns that there is unlawful interference on eCourts.**

41. When asked to elaborate as to words appearing in the text message box of her cell phone and/or her computer, during her August 11, 2025 interview with the OAE, Respondent further explained the following phrases appeared in the text box of her cell phone, as if they were an unsent text message **(Exhibit 3, pages 38-39)**

**Response:**
**Mr. Chopra in his investigation went beyond the boundaries of the Faulknor and Lopez motions after advising Respondent and her attorney that the motions were the reason for the interview.**

**It is clearly not so. As to paragraphs ( a through h) Mr. Chopra after going beyond the boundaries of the Lopez and the Faulknor motions, seemingly has been trying to defend the Police, Essex County, the FBI and Eugene Fayer.**

**He has taken paragraphs a-h totally out of context.**

**It is believed that he knows, that if placed in context, that intelligent minded persons may immediately conclude that only persons with expert access to information such as the FBI are responsible for the contentions outlined in paragraphs a to h below.**

a. Text box stated "Goodbye LLC" **(Exhibit 3, page 39)**

**Response:**

**"Goodbye LLC." These words were repeatedly noted in the Respondent's text box after perceived to be FBI threatened to force the Respondent out of business**

*** Ronald Morrison (who assists the Respondent) was forced out of his Uber business based on a false background check report that was suddenly requested within 10 months of the last one. (Exhibit)**
*** Richard Douglass who assisted Respondent with her computers was suddenly forced out of his private business after being falsely accused of down loading Pornagraphy. He was the first to write a report that someone was unlawfully accessing Ms. Portilla's Computers before she hired a Cyber Security Company. (Exhibit Report of Richard Douglas)**

*** Some one created false bogus prescriptions for patients in Dr. Ejiofor's name which he concludes as an attempt to interfere with his business due to his association with Ms. Portilla.**

*** Good Bye LLC is perceived by Ms. Portilla as threat to destroy her business.**

b. Text box with a picture of the "X-Files" (Exhibit 3, page 39)

**Response:**

- The picture of the X-Files was located right next to the log in area of the Respondents' business email.
- **X-files also means X-attorney as communicated to the respondent on may occasions.**
- **Ronald Morrison (who assists the Respondent) was *forced out* of his Uber business based on a false background check report that was suddenly requested within 10 months of the last one. (Exhibit)**
- **Richard Douglass who assisted Respondent with her computers was suddenly *forced out* of his private business after being falsely accused of down loading Pornagraphy. He was the first to write a report that someone was unlawfully accessing Ms. Portilla's Computers before she hired a Cyber Security Company.**
- **Some one wrote false bogus prescriptions for two patients in Dr. Ejiofor's name which he concludes as an attempt to *interfere with his business* due to his association with Ms. Portilla.**
- **The picture of the X-files was perceived by Ms. Portilla as threat to destroy her business.**

c. Ad stated "this is how dogs call for help" (Exhibit 3, page 40)

**Response:**

**Mr. Chopra does not make clear to readers that Respondent stated that after calling the police one night after feeling harassed, that an AD popped up on her computer that was affixed for a long time that states "this is how dogs call for help"**

**A reasonable reader who read this and knowing Ms. Portilla's history with the FBI, would could perceive based on circumstantial evidence of FBI activity as opposed to mental illness.**

**Respondent has not asked the Court for assistance with any problems related to HER computers.**

**Respondent has a contract with a CYBER SECURITY COMPANY to protect her Computers and Eldridge Hawkins' Computers.**

**Respondent is only concerned with the problems that are occurring on eCourts.**

d. Text box stated "do you want Power Dry" [Respondent explained this occurred at some point between 2006 and 2016] (Exhibit 3, pages 40-42)

**Response:**

**This is an old unrelated matter unrelated to the current problems on eCourts and not believed to be mentioned in the two motions.**

**Respondent certainly DID NOT EXPLAIN to ANYONE that this occurred between 2006 and 2016!! Adding the year "2006" conveniently distracts from the "FBI" who came into respondent's life in "2013"**

**Respondent clearly remembers the time period, because Eldridge Hawkins' son Junior was running for the Mayorship of West Orange when it occurred.**

**Eldridge Hwkins Jr. ran for Mayor in 2006 and again in 2014.**

**Respondent was actually assisting Eldridge Hawkins Jr's 2014 campaign that day when she received the text message.**

**Had Mr. Chopra or Ms. Gitter advised the Respondent the REAL purpose of the interview, Respondent would have taken her police reports and other exhibits to Trenton.**

Moreover, if Respondent told anyone that this was simply written in her text box, then this is a mistake as this is part of a police report.

Respondent actually received a text message from a company identifying itself as a Power Dry Company in approximately 2015. The company wanted to know whether Respondent wanted the water leak in her home to be dried up?

Respondent ignored the text message. When she went down to her basement where she had not been in three days, the basement was flooded.

The police was called whereby Respondent's husband explained the strange situation to the police.

Mr. Chopra does not clearly mention these facts that were accessible to him.

A reasonable reader would conclude that it was impossible for any Power Dry Company to know of a water leak in her home without "persons" accessing her home in some fashion.

Respondent's perception that this was the act of the FBI who threatened her is quite logical!

e. Text box stated "you did not sweep under the kitchen table"
**(Exhibit 3, page 108)**

**Response:**

**Mr. Chopra does not go into detail and explain the significance of these words that would immediately provide circumstantial evidence of perceived FBI involvement.**

**Respondent has consistently explained to many people that one day while she was in her private home, she quickly swept her kitchen without sweeping under the Kitchen table.**

**After putting away the broom, Respondent was SHOCKED to see the words in her text box "you did NOT sweep under the table!"**

**This was later reported to the police.**

**Most people knowing Respondent's history with the FBI and her concerns over the years, would immediately conclude that the FBI would be the only ones who could see plaintiff in her kitchen and knew that she did not sweep under the Kitchen table that day.**

f. "iced tea for dinner?" (Exhibit 3, page 108; and Exhibit 4, Exhibit B, page 11)

**Response:**

**Mr. Chopra has omitted facts and incorrectly opines as to Respondent's perceptions**

**Here, Mr. Chopra does not emphasize why the statement "ice tea for dinner is relevant"**

**One night, the Respondent while in her private home, who was tired, advised her family that she did not want dinner and wanted to go to bed. Prior to going to bed, the Respondent drank a large container of ice tea**

**While lying in her bed, respondent reached to pick up her cell phone and noted the words "ice tea for dinner"?**

**Because Respondent's smart phone is NOT that smart, circumstantial evidence exists that some one heard her in her home decline dinner and saw her drinking the ice tea before going to her bed.**

g. Text box stated "suffer" **(Exhibit 3, page 142; and (Exhibit 4, Exhibit B, page 6)**

**Response:**
**Respondent was not feeling well while at home and as such went to the Emergency room approximately 3-4 years ago.**

**Respondent, while in the emergency room was about to type a text message when she saw that words "suffer" already written in her text box.**

h. Text box stated "the court won't be dismantled." Respondent clarified that this incident occurred a few weeks before the August 11, 2025 interview and that she will be the one who is dismantled, which she interpreted as a threat **(Exhibit 3, page 158).**

**Response:**
**Admits.**

**Respondent maintained her silence for years regarding the unlawful acts on eCourts, because the persons who she perceives to be harassing her, conveyed to her that they would tell others that she was mentally ill if she disclosed her observations.**

**Upon seeing the evidence, Courier Morrison expressed "If they can do ALL that, what is the purpose of having an eCourt?"**

**In approx 2022, Respondent became brave and wrote a flyer that she had reproduced at Staples calling for the dismantlement of eCourts. This is attached as Pa004 to the Lopez Appendix. This was done out of concern for the people of New Jersey.**

**Courier Ronald Morrison and an unnamed individual who are aware of the problems on eCourts, agreed to help Respondent distribute the flyers. The flyers were distributed to multiple law firms and several County Courts.**

**The Flyer basically called for the dismantlement of eCourts.**

**Upon having a conversation with someone wherein Respondent expressed that unless New Jersey can make eCourts secure, it should be dismantled and paper filing resumed.**

**These words on the Flyer are protected as speech related to a matter of great public concern. (Pa004-Lopez Appendix)**

**The persons whom Respondent perceived to be her harassers later communicated to her that eCourts would not be dismantled but that she would be.**

**Respondent perceived that as a threat that she would be the one forced out of her practice.**

42. In regard to the efforts Respondent made to escape the technological issues she experienced and the impact of same on her mental health, Respondent's letter dated April 28, 2022 to the Essex County Clerk and the ECPO (Exhibit 4, Exhibit B) describes the following:

**Response**

**Denied**

**Denied that Respondent wrote a LETTER to the Essex County Clerk and the ECPO on April 28, 2022. Respondent wrote a NOTICE OF CLAIM (NOC)on April 28, 2022. (Exhibit-NOTICE OF CLAIM April 2022). There is a distinct difference between a letter and a notice of claim that was prepared for *litigation* purposes.**

**Respondent served a Notice of Claim dated April 28, 2022 putting Essex County on Notice that it and its Agents were being sued. The Notice of claim was a document prepared in anticipation of litigation that Respondent did not give to Mr. Chopra.**

From 2016 to present, the cybercrimes against [Respondent] have intensified, causing her to experience severe emotional distress, PTSD, Anxiety and Severe Depression [Exhibit 4, Exhibit B, page 3].

**Response:**

**Admit that all cyber crimes on intensified to 2016 to early 2022. The harassers are now focused on unlawful acts on eCourts.**

**Denies that plaintiff still has symptoms of PTSD, Anxiety and Depression in the present.**

• [I]n order to avoid the intense hacking, cyber sodomy, virtual rape, harassment and mental torment, [Respondent] was forced out of her house and office to use library

computers and printers [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

**Denies that in recent recent years that plaintiff still has symptoms of PTSD, Anxiety and Depression in the present.**

- [Respondent was] being followed, would leave her phones and car at home, has been forced to take buses or taxis to a public -libraries [sic] to do her work [Exhibit 4, Exhibit B, page 5

**Response:**

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

- [Respondent was] being followed and was now taking buses, trains and taxis and spending her days searching for places all over New Jersey and New York, where pay phones were still available, so that she could call her clients and follow up on her cases [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

- [Respondent] started going into businesses places such as 7 /11 s, grocery stores, doctors' offices, gas stations, emergency rooms, department stores, liquor stores, banks and other places to borrow phones, and was asking strangers that she met on the streets, to please allow her to use their phones [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

• [Respondent] was afraid to borrow phones from people she knew, because, people who assisted her, would also became victims of cybercrimes [Exhibit 4, Exhibit B, page 5]. In 2017, [Respondent] was forced to expend excessive time for mental Health [sic] care while trying to run her business [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

**Denies that in recent recent years that plaintiff still has symptoms of PTSD, Anxiety and Depression.**

• From 2020 through early 2021, [Respondent] was being hacked, hyperjacked, cyber stalked and pursued by hackers, became psychologically exhausted and stopped leaving her home, unless she had to [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the 2022 Notice of Claim.**

**Denies that in recent recent years that plaintiff still has symptoms of PTSD, Anxiety and Depression.**

**This is 2025 going on to 2026. There can be no emergency based on old symptoms.**

• [Respondent] remained in her bed room [sic], night and day with blackout curtains, and was terrified of going near her computers [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the April 2022 Notice of Claim.**

**Denies that in recent recent years that plaintiff still has symptoms of PTSD, Anxiety and Depression.**

• In April 2021, [Respondent] who barely ate and could not sleep, and was having flash backs [sic] of acts of cyber terror, was taken to the emergency room by her husband [Exhibit 4, Exhibit B, page 5].

**Response:**

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

**Denies that in recent recent years that plaintiff still has symptoms of PTSD, Anxiety and Depression.**

**This is year 2025 going on 2026.**

**The New Jersey legislature intended that persons with perceived mental illness be afforded equal protection and equal opportunity to get treatment; the dignity and liberty of choosing their own treatment providers; and the right to continue to their lives without past symptoms being used as a stain and punishment against them.**

• [Respondent] experiences severe emotional distress and is reduced to tears on many occasions in anticipation of repeated system exception errors when she tries to file documents [Exhibit 4, Exhibit B, page 8] .

**Response**
**Admit to the truthfulness of statements outlined in the Notice of Claim.**

**Denies that in recent recent years that plaintiff still has Emotional Distress.**

**This is year 2025 going on 2026.**

**The New Jersey legislature intended that persons with perceived mental illness be afforded equal protection and equal opportunity to get treatment; the dignity and liberty of choosing their own treatment providers; and the right to continue to their lives without past symptoms being used as a stain and punishment against them.**

• Upon desperately texting a message to 911 in 2022, [ECPO] allowed hackers to block [her] text message causing her to be traumatized [Exhibit 4, Exhibit B, page 11].

**Admit to the truthfulness of statements outlined in the Notice of Claim.**

**Denies that in recent recent years that plaintiff still traumatized from the 2022 911 call that was blocked.**

**This is year 2025 going on 2026.**

**The New Jersey legislature intended that persons with perceived mental illness be afforded equal protection and equal opportunity to get treatment; the dignity and liberty of choosing their own treatment providers; and the right to continue to their lives without past symptoms being used as a stain and punishment against them.**

Injuries sustained PTSD, Severe Anxiety and Depression [Exhibit 4, Exhibit B, page 12].

**Response**

**Admit that Dr. Ejiofor diagnosed Respondent with PTSD, Anxiety and Depression in approx. 2017.**

**Dr. Ejiofor evaluated, diagnosed, provided treatment, re-evaluated and discharged the Respondent from his professional care a long time ago as he is trained and licensed by the State of New Jersey to do.**

**Respondent is satisfied with the Care that was provided to her by HER chosen doctor.**

**This is year 2025 going on 2026.**

**The New Jersey legislature intended that persons with perceived mental illness be afforded equal protection and equal opportunity to get treatment; the dignity and liberty of choosing their own treatment providers; and the right to continue to their lives without past symptoms being used as a stain and punishment against them.**

Ms. Portilla has been permanently injured. She will need psychotherapy for the rest of her life [Exhibit 4, Exhibit B, page 13].

**Response**

**Admit that Respondent used these words in 2022 to convey her anger and frustration at Essex County's abandonment of her.**

**Even lay persons know that when it comes Psychiatry, the focus is on CAUSE and EFFECT.**

**The cause of the Respondent's trauma was cyber terror!**

**Stopping the root cause is the most important factor.**

**The only way to stop the cause is for the State or Federal Government to prosecute the cyber terrorists. Ms. Portilla perceives that FBI agents acting ultra viresly are the cyber terrorists!!!**

**The alternative is help from GOD. Dr. Ejiofor is a man of God. (Exhibit- Certification of Dr. Ejiofor). Ms. Portilla grew up in a very religious home. The rest and the prayer were therapeutic. Ms. Portilla and Dr. Ejiofor have not stopped praying. Ms. Portilla prays every day. She and Eldridge Hawkins prays.**

**Having Ms. Portilla drugged up on psychiatric medications or locked away in a psych ward cannot stop cyber terror and harassment! In fact, one of the harassers, who Ms. Portilla perceived to be an FBI agent, showed up at Overlook Hospital and was parked outside the window of the group therapy room with his brakes light on every day!**

**Her harassers also followed her to Dr. Ejiofor's office for every therapy session. One day when Ms. Portilla pretended not to see one harasser, he started pressing his horn so that she would look and acknowledge his presence!**

Dr. Ejiofor is a highly intelligent man. He has a PhD in Engineering. Not many people can accomplish that! Dr. Ejiofor was the one who diagnosed Respondent with the Depression, Anxiety and PTSD. Dr. Ejiofor is vested with the authority to diagnose mental health conditions. He is also vested with authority under the laws of the State of New Jersey to decide how those conditions should be treated.

The medications, routine therapy and hospitalization did not stop the Cyber terror (the root cause). No amount of therapy, medication of hospitalization will stop the root cause.

Mr. Chopra cannot show that had Ronald Morrison taken a pill or spent a week in psychotherapy, that he would would have passed the background check for Uber. Manipulation of technology was the likely cause.

Mr. Chopra cannot show that had Ronald Morrison spent two weeks in a psychiatric ward that he would not have shown up DEAD in the credit reporting system. Manipulation of technology was the likely cause.

Ms. Portilla and Dr. Ejiofor decided that the best course was prayer since the Government failed to act and were not prosecuting the harassers. The laws of New Jersey allow patients to be involved in their own care.

Ms. Portilla made reports to the FBI and to the State Government that have been ignored.

The symptoms outlined in the 2022 Notice of Claim were both old and limited to that time period. Ms. Portilla no longer has any of those symptoms.

This is year 2025 going on 2026. Ms. Portilla's husband, her daughter and her best friend are Nurses. If Ms. Portilla still had symptoms, they would be the first to know it and direct her to get help.

The people around Ms. Portilla say to her "you are the hardest working person that I know." Even this day on 12/08/2025, the printer technician in Eldridge Hawkins' Office stated to her "*why do you work so hard, do you ever take vacations*?"

Those words are a far cry from her wanting to stay in bed in 2022.

Ms. Portilla wants the persons that she perceived as her violators to know that although they placed hurdles in her way, THEY DID NOT BREAK HER. She is a fighter and a fierce advocate who wants the justice that was denied to her.

**Respondent hired a Cyber Security Company in late 2022. She is happy and at peace and waiting for the government to do its part.**

**It should also be noted, that although Ms. Portilla attached the NOC dated 2022 to her complaint against Essex County Prosecutor's Office, she did NOT request any damages for emotional distress or psychological injuries.**

**Her injuries sustained were injuries to her "rights."**

**Respondent uses prayer as therapy EVERY day.**
********Note Carefully that Mr. Chopra focuses mainly on the subjective observations of Ms. Portilla that a technologically savvy person could dispute if he or she chose to do so***********

**Investigator Chopra does not mention observations that would lead a reasonable IT expert to conclude that Ms. Portilla was being egregiously violated. Just as Mr. Chopra failed to interview Ronald Morris (a critical witness), Mr. Chopra leaves out critical observations from the Notice of Claim against Essex County Prosecutor's Office whereby Ms. Portilla states:**

> ***-Essex County Prosecutor's Office, Essex County FACTS Unit (Cyber Crime Unit) by starting a rescue, upon which Ms. Portilla relied, then negligently abandoning its rescue efforts, led the hackers to believe that Ms. Portilla had no support from law enforcement officials. As such, the Hackers became emboldened, and ramped up their hacking efforts, thereby paralyzing her.***
>
> *-Upon abandonment by the Essex County Prosecutor's office, Ms. Portilla, lost meaningful, productive and private use of her phones, fax machines, computers and printers that are now hyperjacked and fully controlled by the hackers;*
>
> *-Ms. Portilla became plagued with:* ***access denied*** *to her own files, page unresponsive alerts; server unavailable; guest modes; downgrade attack to server; fax forwarding on; email forwarding on; administrative permission required to access folder alerts; remote access connection manager entered the running state; file recently shared; guest drivers admin; guest drivers operational; roaming files; large amounts of temporary files; virtual ports; system exception errors; make file accessible for web viewing; file unavailable; file is corrupt and cannot be opened; error 8s;*
>
> *-files cannot be saved due to external alteration in volume; error encountered while removing private application data; strange printers*

*installing themselves to her computers; her printers icons disappearing from her computers forcing her to reinstall them; old archived files being forced opened while she prepares new documents; pages disappearing while she types; forced extensive computers updates updates causing the devices to be inaccessible before she can use them; relentless, freezing of computers;*

*-constant fax communication errors; search and recover deleted files devices in flash drive; changes made to file after you last saved; leak in C drive; difficulty controlling her cursors; a strange triangular shaped object trailing behind each word being typed; the font types and font sizes of words changing from one paragraph to another while she typed;*

*-words, sentences or paragraphs being added or deleted while she typed documents; wrong statutes, wrong, rules, date changes, emojis inserted in her briefs and grammar alteration to her documents; constant pop-up ads in her email displaying computers and phones and anti-viral software. Particular ads will remain next to her emails for hours.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

**Also compelling from the NOC that was <u>prepared for litigation purposes</u> that Mr. Chopra conveniently refers to as a mere " letter" are the following:**

***In early about 2014, Ms. Portilla became aware that her phones, emails, computers, fax machines and printers were being hacked. In early 2014, Ms. ·Portilla became aware that she had lost the ability to communicate with others; that incoming and outgoing calls were being intercepted and aborted; numbers were being erased from the call logs on her phones; emails were being read before she read them; emails were disappearing from her in box; lap top and desk top computers were all freezing and fighting her; word files developed strange short cuts; documents were being tampered; some word files had the internet explorer logo attached to them; her business email was stuck in a GMT time zone; she could not log out of her personal email that forced her to "keep session active."***

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

***Ms. Portilla noticed that each time she walked by a desk top computer that was in sleep mode, the computer would suddenly wake up, displaying multiple ads related to anti-viral software. The event viewer logs showed remote access and monitoring of her computers by external users; there were strange displays, strange apps not installed by***

*her; poor operation of all computers; devices appearing not to be hers, and homepage changes. Ms. Portilla, went into her computer settings as well as the computer settings of the computer that belonged to her 13 years-old son. As per the computers, they were on proxy. settings. The proxy settings would reset themselves after she tried to change them*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*Ms. Portilla detailed her continued. suffering, indicating that her business had slowed down due to the hacking crimes and that she was being hacked even while using the Court web sites and that her submissions are being tampered.*
**(Exhibit)**

*Upon going to the same library more than two times or so, the word apps on the library computers would start freezing, and would display that "add -ons" "plug- ins" and "extensions" were now a part of the word app. That was an indication that she had to find a different library in a different city. Ms. Portilla was bouncing between libraries and Staple stores, where ever she could find them, throughout New Jersey and New York.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*Ms. Portilla, who is being followed, was now taking buses, trains and taxis and spending her days searching for places all over New Jersey and New York, where pay phones were still available, so that she could call her clients and follow up on her cases. A picture of a rotating New Jersey Transit bus was now permanently affixed to her email mail sign in page. One day upon showing up at a pay phone, that she had used on two prior occasions, the pay phone was no longer there.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*An individual with computer expertise, who provided mercy assistance when she was jammed-up, who verified that she was being hacked, but could not tell who the hackers were, became a victim of cybercrimes.*

*In 2017, Ms. Portilla was forced to expend excessive amount of time for mental Health care while trying to run her business.*
*The hackers use Ms. Portilla' s ·phones to make calls, and answer her phones. Ms. Portilla, upon leaving her phone unattended at times, will return to find multiple outgoing calls on her phone call logs, that are made when she is_ away from her phone. The hackers type messages into her cell phone text box and use her email*

*address to send emails. Numerous calls and text messages are missing from Ms. Portilla's monthly detailed phone bills.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*Upon calling Comcast, Verizon and T-Mobile to get help, the hackers will intercept the calls and answer Ms. Portilla, pretending to be agents of Comcast, Verizon and T-Mobile.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*Documents that are filed on ecourts by Ms. Portilla, at times, are not the ones that last exited her computer after she hits the submit button. Documents that are filed on ecourts sometimes don't even show up as filed. This is a substantial cause· of Ms. Portilla's emotional distress.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*There is also no explanation why copies of the documents that Ms. Portilla sent to the defendants' attorneys on 4/21/22022, have different PDF files sizes from the ones that were submitted to ecourts on 4/21/2022.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

*Ms. Portilla has been locked out of the workers' compensation courts on line site and blocked from accessing the system many times, especially when not at home or work. On one occasion, after preparing a motion and uploading it, the system shut down on her. On logging back in, there were nine copies of the motion and Ms. Portilla did not know which one to pick and file.*

**(Exhibit-Clear Copy of April 2022 Notice of Claim attached)**

**It is Respondent's sincere belief, that a righteous Investigator on a truth finding mission, would not have LEFT OUT what the Respondent really considered to be "evidence of cyber sodomy and virtual rape"**

43. In contrast to Respondent's prior statements, she supplied the OAE with a letter from Dr. Ejiofor8 dated June 28, 2025, regarding Respondent's mental health **(Exhibit 5),** which states:

I have been asked by Ms[.] Portilla to prepare a letter concerning her mental competency.

I have known Ms[.] Portilla for many years. In fact, after she advised me in approximately 2020 that the [WOPD] was refusing to provide her with assistance regarding her concerns that she was being harassed by government agents regarding her whistle-blowing activities, and trying to suggest that she was mentally incompetent, and by dint of my professional expertise I offered to go to the police station with her in her defense. I called the [WOPD] Station line many times for this purpose, but no one either picked up nor returned my calls. Not only is Ms[.] Portilla mentally competent, she is diligent and purposeful in her professional career as a black woman.

I am convinced that Ms [.] Portilla, in fact, made all the observations that she has reported over the years.

**Response**

**Admit that Dr. Ejiofor wrote a letter report as to Respondents mental competence. (Exhibit-Letter Report of Dr. Ejiofor)**

**Denies that there are contrasts. People who are perceived to be mentally ill are allowed to heal and allowed the dignity and respect of stating their current symptoms.**

**Mr. Chopra should not be deciding how the Respondent should feel and what her symptoms should be, especially after he FAILED to interview Ronald Morrison (a critical witness).**

**44.** When asked by the OAE to elaborate upon the source of Dr. Ejiofor's letter and her treatment with him, during her August 11, 2025 interview with the OAE, Respondent explained she began seeing him in approximately 2017 to 2019 but could not recall the last time she saw him for mental health treatment; they are both religious and pray together, and Respondent is constantly in contact with him for work-related reasons and refers all her clients to him **(Exhibit 3, pages 80-92).**

**Response**

**Respondent has not complained of symptoms since year 2022. She is happy and at peace.**

**She did not tell anyone that she needs treatments.**

**She did NOT tell Mr. Chopra or Ms. Gitter that she was anxious, depressed or that she has symptoms of PTSD.**

**As perceived, Dr. Ejiofor became a victim of Cyber Crimes due to his relationship with Ms. Portilla.**

**We keep in touch frequently and we pray. We are praying people.**

**Dr. Ejiofor is also part of a national ministry. In 2023, Respondent and another individual were in attendance with Dr. Ejiofor.**

45. Respondent further minimized her past mental health treatment during her interview with the OAE on August 11, 2025, specifically:

**Response:**
**Denied.**

**Mr. Chopra is the one engaging in minimizations. He has omitted facts that would cause readers NOT to conclude that the FBI is involved.**

**Even lay persons know that when it comes Psychiatry, the focus is on <u>CAUSE</u> and <u>EFFECT</u>.**

**The <u>cause</u> of the Respondent's trauma was cyber terror!**

**Stopping the root <u>cause</u> is the most important factor.**

**The only way to stop the cause is for the State or Federal Government to prosecute the cyber terrorists. The alternative is an act of GOD. Ms. Portilla perceives that FBI agents acting ultra viresly are the cyber terrorists!!!**

Having Ms. Portilla drugged up on psychiatric medications or locked away in a psych ward cannot stop cyber terror and harassment! In fact, one of the harassers, who Ms. Portilla perceived to be an FBI agent, showed up at Overlook Hospital and was parked outside the window of the group therapy room with his brakes light on every day!

Her harassers also followed her to Dr. Ejiofor's office for every therapy session. One day when Ms. Portilla pretended not to see one harasser, he started pressing his horn so that she would look and acknowledge his presence!

Dr. Ejiofor is a man of God. Ms. Portilla grew up in a very religious home. The rest and the prayer were therapeutic. Ms. Portilla and Dr. Ejiofor have not stopped praying. Ms. Portilla still prays.

Dr. Ejiofor is a highly intelligent man. He has a PhD in Engineering. Not many people can accomplish that! Dr. Ejiofor was the one who diagnosed Respondent with the Depression, Anxiety and PTSD. If he is vested with the authority to diagnose, he is also vested with authority under the laws of the State of New Jersey to decide how those conditions should be treated.

The medications, routine therapy and hospitalization did not stop the Cyber terror (the root cause).

Ms. Portilla and Dr. Ejiofor decided that the best course was prayer, since the Government failed to act and were not prosecuting the harassers. The laws of New Jersey allow patients to be involved in their own care. Ms. Portilla made reports to the FBI and to the State Government that have been ignored.

The symptoms outlined in the 2022 Notice of Claim were both old and limited to that time period. Ms. Portilla no longer has any of those symptoms.

This is year 2025. Ms. Portilla's husband, her daughter and her best friend are Nurses. If Ms. Portilla still had symptoms, they would be the first to know it and direct her to get help.

Ms. Portilla has hired a Cyber Security Company. In 2022 the cyber security Company could not find anything wrong with her computers. The company advised her to google her IP address in 2022. When she did, google advised her that her IP address was in VIRGINIA. This is contrary to the *conclusions* that Mr. Chopra tries to present in his certification.

**Ms. Portilla is allowed to exercise her right to sue ALL those who failed to act or who failed to have and enforce policies that allowed her to be traumatized in such an outrageous and degrading manner.**

**As shown by Ronald Morrison's Certification, the Credit Reporting system and the Background Check system are also perceived to be under assault by the cyber terrorists. (Exhibit-Certification of Ronald Morrison 12/2/2025). Prescribing psychiatric medications for Mr. Morrison or hospitalizing him in a psych ward would not stop any of those acts!**

**Dr. Ejiofor's certification that his business cell phone and his surveillance Camera are being given unlawful interference that is perceived to relate to his association to Ms. Portilla validates Ms. Portilla's argument. (Certification of Dr. Ejiofor dated 12/03/2025)**

**To alter and falsify the prescriptions of a Medical provider who has contracts with Medicare and Medicaid and other insurance companies that could result in the DEATH of citizens is an act of extreme persecution. (Certification of Dr. Ejiofor dated 12/03/2025)**

**Note carefully that Mr. Chopra and Ms. Gitter REFUSED to interview Ronald Morrison who clearly is being extremely persecuted related to his assistance to Ms. Portilla. (Exhibit). To declare someone DEAD and block them from purchasing a Vehicle due to his presumed death that affects his livelihood is an act of extreme Persecution. (Certification of Ronald Morrison)**

**Ronald Morrison's certification should put to rest Mr. Chopra's conclusion that Ms. Portilla is not imagining any extreme persecution and instead agree that her harassers are EXTREMISTS.**

**To falsify, tamper and change a legal background check in a secured government system that causes an innocent Citizen to be immediately terminated from employment necessary to pay rent and buy food, is an act of Extreme Persecution. (Certification of Ronald Morrison)**

**Mr. Chopra's use of the statement "[f]inally some one called Medicare and Medicaid on Ejiofor" is outrageous! Is he expressing his belief that the call should have been made long it actually made?**

**Mr. Chopra writes the certification in such a manner that readers would NOT know and understand that it was Ms. Portilla who disclosed that Dr. Ejiofor (her treating doctor), was suddenly accused of Medicare and Medicaid Fraud [after he agreed to write a report to assist her in litigation against Maxim].**

**When Medicare and Medicaid could not find the over half a million dollars that Dr. Ejiofor allegedly stole and allowed him to continue caring for their patients, he was suddenly subjected to numerous complaints against him to his licensing board. This is extreme persecution! Because he is man of GOD, Dr. Ejiofor is still standing!!**

**Ms. Portilla's husband who was also forced to attend therapy, and take psychiatric medications due to the cyber crimes and harassment, validated Ms. Portilla's concerns on two attachments to Respondent's claims against Essex County Prosecutor's Office. (Exhibit, Exhibit). Mr. Chopra does NOT mention that he read any of Mario Portilla's words corroborating the stalking and cyber crimes.**

**Would that not be important to a neutral and detached investigator?**

**Mr. Chopra seemingly attacks Dr. Ejiofor by stating that Dr. Ejiofor merely suggested rest when her husband suggested hospitalization. Dr. Ejiofor knew exactly what the respondent needed. Respondent was completely and severely exhausted from travelling all over New Jersey and New York to find phones to make calls as many of her calls were being blocked.**

**She was exhausted from travelling out of town to find post offices or mail boxes from which to send mail without being observed.**

**Because she knew that her car and cell phone were being tracked, she would sometimes park her car and leave the cell phone inside and walk long distances to find a post office, a pay phone or a Staples store with computers that she had never been to before. At the end of the day her legs and feet would hurt.**

**Sometimes Respondent would spend ALL DAY travelling trying to find a phone to make a single phone call so that her Workers' Compensation cases could settle. Ms. Portilla started using a Courier in 2022. Even her husband and son were assisting.**

**Respondent's husband was also traumatized and taking psychiatric meds from what was being done to him. Upon trying to use her husband's phones to make calls they**

became rigged and difficult to use. Respondent did not want to traumatize her husband any more by telling him about all the HARDSHIPS that she was enduring from the Cyber Crimes.

Respondent's husband does NOT know that she travelled to Washington DC to try and hand deliver a letter of complaint to the Post Master General as the 800 number would not work. Someone had received a certified mail from the respondent opened and the green return receipt was not signed by addressee who lived alone.

Even when she walked into a random place of business to borrow a phone, the business owners' phones would malfunction. They could not understand what was happening to them as their phones were working fine all day until Respondent walked in.

Dr. Ejiofor helped the Respondent through the storm and became a victim of crimes himself. Like Eldridge Hawkins, he does not fear.

Mr. Chopra also had an opportunity to explain why Respondent states that the "FBI has cameras in her bedroom and bathroom; turned off the power at her office; blocked her heat in the winter; entered her home and office; and removed her business records" but acts as if Ms. Portilla was simply rambling on without rhyme or reason.

ALL the things that Respondent outlined in her complaint and notice of claim were being done to her. For example, one day Respondent was CONSTIPATED and sitting on her toilet struggling. After achieving success, Ms. Portilla happened to look at her cell phone that was on the bathroom counter and was SHOCKED to see a pop up AD explaining how to avoid constipation.

The Ad kept popping over numerous days without any logical explanation.

Most rational persons would conclude that someone saw her while she was on the toilet.

And yes, one day while she was in the privacy of her home having sex with her husband in their bed, a computer that had gone to sleep suddenly woke up and the word "F**K" flashed across the screen. That was NOT the only time her bedroom privacy was violated!

Mr. Chopra states on page 30 of his certification that Exhibit 6 is a letter to the OAE, Ombudsman and the Superior Court Clerk on which Donald Trump [was

**included]. Mr. Chopra has engaged in many omissions in his certification and has not attached any document for our review. Thus, we have no way of verifying what he really relied on.**

**The Respondent also tried on several occasions to reach out to Donald Trump as is her right to petition government (when the State of New Jersey had no interest in listening to her). Thus, she wants to explain why one letter to Mr. Trump was important.**

**Ms. Portilla told Mr. Chopra at the Ethics interview that both she and Eldridge Hawkins have been unable to make contact with a client MC via email or phone since April 2025. Ms. Portilla explained that after MC became aware that the Respondent wanted to petition to have the FBI dismantled, MC expressed overwhelming support and encouraged her to *do it* even if other people tried to make it seem as if her efforts were in vain. MC told the Respondent about people who have been hurt and death caused by persons perceived to be FBI Agents.**

**Months prior without being asked, MC volunteered to do a post on Face Book about Respondent's efforts to have the FBI dismantled. MC became aware that she had difficulty accessing her face book account after after deciding to do the post. Ms. Portilla who had not accessed face book in years tried to log in and could not. She was advised that she No longer allowed access to Face Book because had engaged in some type of violations and needed to Appeal Face books decision.**

**Respondent did not Appeal the ban from Facebook, because the only posting that she done on Face Book were educational articles and poems.**

**In April 2025, while taking to MC one night, MC expressed that she wanted the Respondent to tell her Cousin who was an FBI agent from California, about the issues that she was having with perceived FBI agents. Upon, the Cousin joining the call, and telling him all that has occurred, MC disclosed that she had planned to do the post on Face book in support of Ms. Portilla. The Cousin immediately advised MC that posting about the FBI would cause the FBI to retaliate against her.**

**While all the details were not discussed with Mr. Chopra, the fact that an FBI agent admits that FBI agents will retaliate against citizens despite the CONSTITUTIONAL GUARANTEES OF FREE SPEECH, is circumstantial evidence that Respondent's perception that her harassers are perceived FBI Agents is justified.**

**Upon disclosing to Mr. Chopra that Respondent and Mr. Hawkins have been completely unable to make any contact via phone, text or email with MC since April**

**2025, and that if we want to contact MC, we have to go to her house and knock on her door, Mr. Chopra asked, what happens when we send an email to MC?**

**Respondent explained that the emails are marked as sent, but that MC *never* receives them.**

**This is documented nowhere in Mr. Chopra Certification!! WHY NOT? Locking off MC's ability to communicate freely with her attorneys because she dislikes the FBI is extreme persecution.**

**In July 2025 the Respondent received an email from face book that states as follows:**

> **Your account has been permanently disabled You can't use Facebook because your account, or activity on it, didn't follow our Community Standards.**
> **More than 180 days have passed since your account was disabled, so you can no longer request a review.**

**This was extreme persecution from simply attempting to log into Face Book after a communication with MC about a post regarding the FBI.**

**Respondent felt compelled to tell President Trump about MC's deceased fiancé LD who was also our client.**

**Like Ronald Morrison, LD advised us repeatedly that he was being harassed by law enforcement. LD worked as an armed security guard who wanted to become a Police Officer.**

**Because of the harassment he clung to his Gun. He apparently made a mistake and crossed into New York and apparently forgot to remove his weapon from his backpack.**

**While he was New York he was stopped and searched by the Police who seemed to know that he had Gun in his back pack.**

**He was given 7 years in prison in New York.**

**While in prison, LD contacted Eldridge Hawkins and MC and advised them that there was plan to kill him in jail and that law enforcement was behind it.**

**LD begged that we do something to save his life! Mr. Hawkins wrote letters but there was nothing that we could do to protect him. LD was later found dead in his cell in New York. He was only 40 years old.**

**MC who is 20 years younger than the Respondent, was left to care for 6 children by herself. Respondent had to deal with MC's gut wrenching screams at LD's funeral.**

**Like MC, I am a mother. Sending a letter to President Trump telling him about my belief that LD was murdered in his cell by Law enforcement was the least I that could do, so that similarly situated defendants will not meet LD's fate. I did not think that there was anyone in New Jersey to tell this to.**

**President Trump is said to be tough on crimes. Respondent sincerely believes that if President Trump knew what is happening in New Jersey, he would attempt to fix the system.**

**As opined by Eldridge Hawkins, the criminal Justice system in NJ seems to be busted. That is the reason why he has taught me to add the top officials and policy makers as defendants in all law suits against entities so that they will WAKE UP from their slumber and enforce their policies.**

**Respondent suspects that her attempt to add the Essex County Prosecutor and the State Attorney General as defendants to her law suit against Essex County Prosecutor's Office is part of this backlash to deem her incompetent to suppress her speech.**

**As perceived this is sought to be achieved by using *OLD FACTS* and *OLD SYMPTOMS* that have NO bearing on Ms. Portilla's current state of total wellness.**

**Ms. Portilla is a very happy and secure person. As per Eldridge Hawkins, she is the hardest worker that he knows. Ms. Portilla wants her story to become public for the benefit of all. She wants everyone to know all the possibilities of cyber technology.**

**All acts outlined in the April 2022 NOC are true.**

a. Prior to or around the same time as Respondent began seeing Ejiofor, she saw a mental health professional recommended by her husband until such professional retired, and she tried to see a female provider but did not proceed for insurance reasons (Exhibit 3, pages 93-96);

**Response:**

**See Id**

b. Respondent indicated Ejiofor advised she should merely rest when Respondent's husband suggested she admit herself to the hospital for psychiatric treatment (Exhibit 3, pages 143-44);

**Response:**

**See Id**

**When an attorney submits an expert report from a psychiatrist licensed by the State of New Jersey, that report carries the same presumptive credibility as any other professional medical opinion. See Delvecchio v. Township of Bridgewater, 224 N.J. 559 (2016)**

**Federal Courts Applying New Jersey Law consider APNs as Medical Experts Under Rule 702. Cavallo v. Star Enterprise, 100 F.3d 1150 (4th Cir. 1996) . In Cavallo, the court held that nurse practitioners are qualified medical experts under the Federal Rules of Evidence when testifying within their training and licensure. "Nurse practitioners… may testify as medical experts when their opinions fall within the scope of their professional expertise." — *Cavallo*, 100 F.3d at 1159.**

**New Jersey Courts Give Equal Weight to Qualified Experts Regardless of Title Townsend v. Pierre, 221 N.J. 36 (2015). The New Jersey Supreme Court held that expert credibility is based on qualifications, not professional title, and that any licensed expert qualified under N.J.R.E. 702 is entitled to full evidentiary weight.**

**The Statute that governs Advanced Nursing Practice, authorizes APNs to establish their own entities and vests them with the authority to evaluate, medically diagnose, determine causation, provide treatments, which include psychotherapy, and prescribe medication which include schedule II drugs. APNs may determine cause of death NJAC 45:11-49 10 (f), and may attest as to permanent disability NJAC 10:90-4.10(a)(2). See In re J.P., 339 N.J. Super. 443 (App. Div. 2001)**

**New Jersey Administrative code 10:58A-2.10 specifically states that Professionals who are qualified to perform psychiatric evaluations (for applicants to**

**Medicaid participating facilities), include psychiatrists, general physicians, both doctors of medicine (M.D.) and of Osteopathy (D.O.) and APNs. Id.**

**In New Jersey, the authority for APN practice is delineated at NJSA 45:11-45 to 52 and related Board of Nursing Administrative code: 13: 37-7.1-7.11. Dr. Ejiofor has a Masters Degree in Nursing and is an Advanced Practice Nurse who is Board Certified in Psychiatric Mental Health. (Ex 1; Ex7; Ex 8).**

**According to New Jersey Hospital Licensing Standards, APNs are considered to be Qualified Medical Personnel. N.J.A.C 8:43G-12:6. Qualified Medical Personnel means a physician who meets the requirements at N.J.A.C 8:43G-12.3 or an Advance Practice Nurse certified by the New Jersey Board of Nursing or a Physician Assistant licensed by the New Jersey Board of Medical Examiners. NJAC 8:43G-12.6.**

**Dr. Ejiofor an APN, licensed by the State of New Jersey, has already opined that Ms. Portilla is mentally competent.[1] Dr. Ejiofor is a psychiatric Mental Health provider who provides mental health assessments and treatments to numerous patients for which he is compensated by various insurance companies. He has contracts with Medicare and Medicaid and almost all insurance companies.**

**Fundamental due process prohibits arbitrary disregard of qualified expert testimony. Where an attorney's licensed psychiatrist has issued a report affirming competence, the OAE cannot compel an emergency examination absent clear and convincing contrary evidence. To do otherwise would constitute an arbitrary deprivation of liberty and professional reputation.**

**Mr. Chopra reviewed Ms. Portilla's Notice of claim dated 2022 wherein she complaints about her mental trauma and lack of assistance from the Essex County Prosecutors' Office.**

**Ms. Portilla has not complained to anyone of depression anxiety or being traumatized since 2022. It is almost 2026. Thus, there can be no emergency when her mental health provider already stated in July 2025 that she is competent. (Report of Dr. Ejiofor)**

c. After 2017, Respondent voluntarily admitted herself to the hospital for psychiatric treatment for one to two weeks, during which time she "just stayed there and rested" (Exhibit 3, pages 142-46);

---

[1] Dr. Ejiofor is an Advanced Practice Nurse (APN) but is addressed as 'Doctor' because he has a PhD in Engineering.

**Response:**

**See Id**

d . Respondent was prescribed Xanax for anxiety, Ambien and "something else. I don't remember" (Exhibit 3, pages 146-47);

**Response:**

**See Id**

e. After being discharged from psychiatric treatment, Respondent went back to or began seeing Ejiofor who prescribed an anxiety medication and Ambien (Exhibit 3, pages 89-90 and 147); and

**Response:**
**See Id**

f. Respondent works in a psychiatric unit, and she did not think she needed anything after the hospitalization (Exhibit 3, page 89) .

**Response:**
**See Id**

46. In addition, with respect to the timing of the issues Respondent has experienced, Respondent claimed her statement and her Certifications suggest the events are recent, but they are in the past **(Exhibit 3, pages 147-48).** However, she confirmed the eCourts issues remain current **(Exhibit 3, page 148).** Respondent indicated being followed is "on and off' and when she talks about these incidents or takes action, they will follow her again to show she is being watched **(Exhibit 3, pages 148-49).**

**Response:**
**See Id**

47. During her interview with the OAE on August 11, 2025, Respondent noted

Ejiofor was placed under surveillance due to his helping her **(Exhibit 3, pages 71-74).** In addition, the licensing board suddenly received tons of complaints against Ejiofor while he was helping Respondent **(Exhibit 3, pages 71-72).** Finally, somebody called Medicaid or Medicare on Ejiofor **(Exhibit 3, page 72).**

**Response:**
**See Id**

**The word "finally" is disturbing and misleading.**

**Ms. Portilla has made clear that someone called Medicaid and Medicare to punish Ejiofor for assisting her. Just as Dr. Ejiofor is being harassed again. Just like they are harassing Morrison. (Exhibit-Certification of Ronald Morrison, Certification of Dr. Ejiofor December 3, 2025)**

**Just like Comcast SUDDENLY accusing Ms. Portilla's former computer Expert of downloading porn and taking away his Comcast services and forced him out of business.**

48. During her interview with the OAE on August 11, 2025, Respondent stated in 2022, she received a letter from a pest control company. She described the letter as stating, "we can help you with your pest control issue. We will come to the law firm, and while we are taking care of the pests, we will go into your legal books" (Exhibit 3, pages 46-47). Respondent added that she brought the letter to an attorney named Kim Ringler who indicated the letter was concerning but not to worry (Exhibit 3, pages 46-47).

**Response:**
**See Id**
**Truth**
**See response to 45, 47 as circumstantial evidence of harassment.**

49. Respondent previously submitted a letter dated December 9, 2024 to the OAE, Ombudsman and Superior Court Clerk on which President Donald Trump was copied (Exhibit 6). Respondent alleged she been "hooked up to the FBI main frame in VA since approx. 2013, after I blew the whistle against a Federal Special Agent AKA-FBI" (Exhibit 6).

**Response:**

**See Id**

**Ms. Portilla has made it crystal clear in multiple writings including her Amended Complaint against the ECPO that she was advised by her Cyber Security company to google her IP address. When she googled it, as per google her IP Address was in Virginia.**

**That is logical circumstantial Evidence that her harassers as perceived are out of Virginia where the FBI has its head quarters.**

**Ms. Portilla went to the Comcast store in West Orange where it was confirmed that her IP address should NOT be located in Virginia.**

50. During her interview with the OAE on August 11, 2025, Respondent confirmed her belief that her IP address is located in Virginia, which she perceives to be confirmation of the mainframe hookup (Exhibit 3, pages 103, 127, and 131 ). Such discovery occurred after her son observed "Comcast guys coming out of a PSE&G van to make change out of my house without our consent, without our knowledge" (Exhibit 3, page 127).

**Response:**
**Denied as to the confirmation of the mainframe hook.**

**Ms. Portilla has made it crystal clear in multiple writings including her Amended Complaint against the ECPO that she was advised by her Cyber Security company to google her IP address. When she googled it, as per google her IP Address was in Virginia.**

**That is logical circumstantial Evidence that her harassers as perceived are out of Virginia where the FBI has its head quarters.**

**Ms. Portilla went to the Comcast store in West Orange where it was confirmed that her IP address should NOT be located in Virginia.**

51. In Respondent's letter dated December 9, 2024 (Exhibit 6), she further

expressed that the FBI: has cameras in her bedroom and bathroom; turned off the power at her office; blocked her heat in the winter; entered her home and office; and removed her business records (Exhibit 6).

**Response:**
**See Id**
**As perceived.**
**Ms. Portilla communication in her text box**

52. Respondent further described that she began using a courier service instead of the United States Postal Service (USPS) as the FBI interfered with USPS as well (Exhibit 6). During her interview with the OAE, Respondent identified the courier by name and specified that she began using his services in 2023 (Exhibit 3, pages 68-69).

**Response:**
**See Certification of Ronald Morrison.**
**Clarified here that Ms. Portilla started using the Courier in 2022.**

**After Ms. Portilla identified Ronald Morrison by name, Mr. Chopra and Ms. Gitter said they would reach out to him.**

**They FAILED to do so.**

**As such, they failed to find all corroboration and to obtain evidence of extreme acts of persecution against Ms. Portilla's Courier who became a victim of harassment by law enforcement due to his support of her. (Certification of Ronald Morrison)**

53. Respondent explained she went to Walmart to set up a phone for a client and received assistance from an employee. When Respondent returned to the Walmart employee per his instructions, the employee declined to assist Respondent further because the FBI had called the employee and told the employee a lie to change his mind (Exhibit 6). During her interview with the OAE on August 11, 2025, Respondent confirmed this incident and added same occurred within the past four years (Exhibit 3, pages 43-44).

**Response:**
**See Id**
**Based on the Supreme Court, circumstantial evidence may be just as compelling as direct evidence.**
**People in the legal profession rely on circumstantial evidence.**

54. Based on the foregoing, the OAE has concerns that Respondent's extreme persecutory beliefs are interfering with Respondent's ability to prosecute matters on behalf of her clients. Respondent concedes she is unable to support her claims with direct evidence, which brings into question the capacity of Respondent to practice law pursuant to R. 1 :20-12(b ).

**Response:**

**The concerns are invalid.**

**Weaponizing mental-health procedures to punish advocacy is the very definition of arbitrary state power. Compelling a Mental Examination of an Attorney based on Advocacy Opinions Violates Federal Law. Congress has made clear that procedural rules cannot abridge substantive rights. The Office of Attorney Ethics without good cause seeks an Order to compel an emergency mental examination upon Attorney Cecile D. Portilla, Esquire solely because of her expressed opinion. As per the OAE, the Supreme Court referred the matter to the OAE after Ms. Portilla filed two motions advocating for her clients and expressing that the Court and the State of New Jersey were denying her clients access to Courts due perceived cyber crimes on eCourts. Ms. Portilla had expressed in her motion brief that the State was causing her clients to be denied of due process due to acts of unlawful interference on the Court site that were witnessed by plaintiff and another attorney that the State was failing to abate.**

**There is no clear and convincing evidence of incapacity, misconduct, or impairment that would warrant such an invasion of Ms. Portilla's substantive rights.**

The examination is predicated entirely on the content of her speech and Ms. Portilla's advocacy before the Supreme Court and not on professional performance or conduct.

Advocacy opinions expressed by counsel do not place mental condition in controversy. To compel an attorney to undergo psychiatric testing merely for their litigation positions would impermissibly abridge substantive constitutional rights.

New Jersey law also requires that any involuntary mental health examination or commitment—whether of an attorney or any other person—must comply with the same statutory and procedural safeguards outlined in the civil commitment statutes and court rules. While disciplinary authorities may investigate misconduct, they cannot bypass the civil commitment framework when seeking psychiatric evaluation Specifically, N.J.S.A. 30:4-27.1, N.J.S.A. 30:4-27.9(b), N.J.S.A. 30:4-27.15(a), and Rule 4:74-7(f) establish clear standards of dangerousness, due process, and judicial oversight that apply universally.

While disciplinary authorities may investigate misconduct, they cannot bypass the civil commitment framework when seeking psychiatric evaluation. The statutes and rules as to mental examinations are person-neutral: they apply to *any individual* subject to involuntary psychiatric examination or commitment. Subjecting attorneys to involuntary exams without meeting statutory standards risks unconstitutional deprivation of liberty under the due process clause of Article 1 para 1 of the New Jersey Constitution.

**Because involuntary examination is a serious deprivation of liberty, the same constitutional and statutory protections must apply to attorneys.**

**Attempting to impose a lower standard on attorneys would conflict with the Legislature's explicit declaration in N.J.S.A. 30:4-27.1 that involuntary examinations requires balancing liberty with safety under uniform safeguards.**

**Courts treat compelled medical or psychological examinations as searches requiring constitutional justification. When the state demands such an exam without probable cause, individualized suspicion, or procedural safeguards, it violates the Fourth Amendment and substantive due process**

**Courts have consistently emphasized that professional status does not diminish due process rights; attorneys retain the same protections against arbitrary or unsupported psychiatric intervention. The Equal Protection Concerns are compelling. Applying a different standard to attorneys would create an impermissible classification not supported by legislative intent and a denial of Equal protection.**

**Article 1 ¶ 6 of the New Jersey Constitution, provides broad speech protections, often exceeding federal standards. Punishing an attorney's opinion with psychiatric scrutiny violates this guarantee. Conducting a mental examination of an attorney solely because of her expressed opinion is unlawful and unconstitutional.**

**Such an action undermines the independence of the legal profession, chills advocacy, and erodes public confidence in the fairness of disciplinary processes.**

**Courts and disciplinary bodies must reject attempts to weaponize mental examinations as a tool of SUPPRESSION. If attorneys risk psychiatric evaluation for expressing controversial or unpopular opinions, the independence of the bar is compromised.**

55. This certification is submitted in support of the OAE's Emergent Application for a medical examination pursuant to R. 1 :20 - 12(b) so that the OAE can determine whether Respondent lacks the capacity to practice law.

**Response:**
**See Id**
**(See Exhibit -Report of Dr. Ejiofor)**

56 . I submit this certification in the course of my duties as a Disciplinary Investigator for the OAE based on my investigation of the matters at issue and my knowledge of the facts as set forth herein.

**Response:**
**See Id**
**See all previous responses.**

**Ms. Portilla has consistently maintained that she <u>perceives</u> that her harassers are FBI Agents-based on her history with the FBI and based on overwhelming circumstantial evidence. She has never said that she has the IP addresses of any FBI agent or concrete proof.**

**She was told since day one that she would never get proof against any FBI Agent. She was told by her experts and other lawyers to make sure that she have witnesses to all relevant observations before going public. She did!**

**(See All exhibits)**

I certify that the foregoing responses made by me are true. I am aware that if any of the foregoing responses made by me are willfully false, I am subject to punishment.

/s/ Cecile D. Portilla
CECILE D. PORTILLA, ESQUIRE

Dated: December 7, 2025

Exhibits Attached

1. Motion Brief in support of Reconsideration of Petition for Certification with Appendix of Angel Lopez filed May 30, 2025
2. Clean Copy of the Old 2022 Notice of Claim on Which Mr. Chopra relied
3. Certification of Eldridge Hawkins, Esquire dated June 12, 2025
4. Certification of Dr. Ejiofor dated December 3, 2025
5. Certification of Ronald Morrison dated December 2, 2025
6. Order denying recusal allegedly submitted in error to the Supreme Court January 31, 2025
7. Order denying recusal allegedly submitted in error to the Supreme Court January 31, 2025
8. Report of Dr. Ejiofor dated 6/28/2025
9. Witness statement of Cecile D. Portilla in support of Eldridge Hawkins (w/o exhibits) dated September 28, 2025

Eldridge Hawkins
ELDRIDGE HAWKINS, ESQUIRE

Dated December 19, 2025

FILED, Clerk of the Appellate Division, June 12, 2025, AM-000528-24, M-005754-24

| | |
|---|---|
| **Deborah Upchurch**<br>**Plaintiff**<br><br>v<br><br>INSERVCO INSURANCE SERVICES, INCORPORATED (AKA) PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, CITY OF ORANGE, ORANGE POLICE DEPARTMENT, CHRISTOPHER HARTWYK, NANCY FOLKES, SHANELL BOOKER, KIMBERLY ANN WEIDERHOLD, SYLVIA BACAAN, CITY OF ORANGE AGENTS (1-10), INSERVCO AGENTS (1-10) JOHN DOES (1-10), JANE DOES (1-10) ABC CORPORATIONS (1-4) (FICTITIOUS PARTIES identities unknown)<br><br>Defendants | **SUPERIOR COURT OF NEW JERSEY**<br>**APPELLATE DIVISION**<br><br>Sat Below<br>Hon. Jennifer C. Critchley, J.S.C<br>DOCKET NO: ESX-6471-22<br><br>**CIVIL ACTION** |

CERTIFICATION OF ELDRIDGE HAWKINS, ESQ

---

ELDRIDGE HAWKINS LLC,
ATTORNEY AT LAW
60 Evergreen Place, Suite 510
East Orange, New Jersey 07018
Phone (973) 676-5070
Fax (973) 676-7356
Attorney Id: 214731967
Email: [illegible]

CECILE D. PORTILLA, ESQUIRE
7 Glenwood Avenue
East Orange, NJ 07017
Phone (973) 676 5072 Fax 862 520 3433
Fax (973) 669 3268
Phone (973) 419 2325
Attorney Id: 21212005
portillalaw@gmail.com

Eldridge Hawkins of full age with knowledge of the penalties of false swearing hereby certify as follows:

1. I am an attorney at law of the State of New Jersey.
2. I am familiar with the facts of this case and able to make this certification.
3. I advise all that Ms. Portilla utilized office space in my office somewhere around 2014-2015. I recall at the time that she had a problem with her then employer or ex employer, a hospital, in her other professional capacity as a nurse.
4. When she first addressed her complaints to me, I was very wary as she was complaining as if everything going wrong in her life was because of the F.B.I.
5. I spoke to her spouse, Mario Portilla, also a nurse, who confirmed his observations of the strange things happening with his wife and her computers and electronic equipment .(see certification of Mario attached)
6. Be aware that Ms. Portilla advised me that she hired a professional computer services company to maintain and scan her computers who could not find anything wrong with them. She also advised me that she has VPN and a fire wall.
7. I was very concerned about Ms. Portilla because the strange manifestations CAUSED HER MUCH UPSET
8. Additionally, I was concerned that she might be developing some kind of mental condition that needed to be addressed until I started making some of the same observations.
9. There was an experience Ms. Portilla wanted me to have when I had tried to reach one of Ms. Portilla's medical experts. I dialed the number and somewhere during the call there was a message that the call was being recorded.
10. While businesses may have recordings that calls may be recorded, when I asked the doctor if his calls were being recorded he said he was unaware and I advised him that I heard a recording on his line saying the matter was being recorded. I found it peculiar that whatever his expertise, that recording should not be there.

11. As recently as 6/11/2025 I called Ms. Portilla from the court house and a recording came on during our conversation that our call was being recorded. This was a very similar experience to that which I had with her medical expert years ago.
12. Ms. Portilla has also handed me her phone so that I could hear first hand that persons such as other law firms that she was trying to reach had recordings that they were not in service.
13. In her submission to the Supreme Court ,Ms. Portilla complained that somehow someone is rearranging items in the ACMS system to make defendants' submissions look as if they are filed before her's which were not recorded at all in the ACMS. This is NOT an uncommon experience .
14. Ms. Portilla complained to me of items that we filed that purportedly were not seen by the court prior to its decision. I have been complaining of similar experiences.
15. I also attach an 02/03/2025 inquiry that I submitted to JUDGE TARANTINO , in whom I have the greatest respect .(see 02/03/2025 documents attached).
16. The 01/30/2025 documents submitted by the undersigned were not recorded on the ACMS (P.3 OF 6) while those submitted by the adversary on 01/31/2025 were recorded
17. If you look at the ACMS sheet, you will see that my January 30 documents as of JANUARY 31 do not appear at all. This is not the only time something like this has happened.
18. Because of my experiences with the court in ESSEX County,I personally perceive that those behind the strange occurrences are a combination of Essex County clericals OR Court staff and/or the Essex County prosecutors office and/or Attorney General's Office .
19. I say this because I KNOW I HAVE BEEN A VICTIM OF FRAUD when in litigation with ESSEX COUNTY , ESSEX SHERIFF OFFICE , ESSEX PROSECUTORS OFFICE , A.G. .SOMEONE put my name on a consent to vacate a default to which I NOT agree at the time .
20. Please see State Of New Jersey V King Perry Et Als , ESX-L-9267-21.(see ACMS and Docket sbeet attached . Ms. Portilla also referenced these circumstances in her submissions to the New Jersey Supreme Court.

FILED, Clerk of the Appellate Division, June 12, 2025, AM-000528-24, M-005754-24

21.Ms. Portilla brought it to my attention that multiple very strange invalid failures to prosecute notifications were repeatedly sent out on multiple clients. Ms. Portilla brought it to the Court's attention and tried to get it to stop.

22. Upon reviewing the files I agreed. These bizarre repeated failure to prosecute notifications were going out after defense counsels have filed answers or motions to dismiss.

23.I felt compelled to assist Ms. Portilla in drafting a Notice of claim against the STATE OF NEW JERSEY and the three branches of government that were keeping the monies required to get the defendants who were dismissed to be reinstated to our cases. Who could be doing this?

24.Things are happening that Ms. Portilla and I have observed.

25.I feel very pleased that I have had the opportunity to nurture Ms. Portilla in protect the public. I have personally taken on cases multiple times where the clients could not afford counsel to handle their very worthy cases. To my chagrin, my workload started to increase without similar increase in income, because she started doing the same thing with my having been volunteered as the trial attorney .

26.All should know that I personally have been complaining about the complete disrespect that I have developed pertaining to government's actions and non actions .

27..Specifically , I complain that the NEW JERSEY SUPREME COURT is more interested in protecting the Judiciary and their fellow N.J. government partners, the N .J. LEGISLATURE and the Executive branch that they have insisted on defending their UNCONSTITUTIONAL FOLLOWING POLICIES.

28.Rule.1;12-1,2 which violates Morrisey v Brewer, 408,u.s.471 1972
B doctrine of necessity by which THE SUPREME COURT justifies violating the N J Constitution

29.I also submit that in the approximate last 24 months an alleged client came into my office complaining about the FBI and what they were doing to him. He too strangely identified himself as a Whistle Blower against the FBI.

30.He specifically did not want to have a usual file placed in the file cabinet. In the most recent last 6 months or so , he came back into my office. This guy

coming at this time sounded too peculiar. I sincerely believe that he was sent by the FBI. I became convinced that he was not here for the reasons that he said that he did. His complaints mirrored Ms. Portilla's concerns.

31. When I asked if he was sent by the FBI he hung his head. I apologized to Ms. Portilla for not believing everything that she had told me that she suspected that the FBI was doing.
32. I now have reason to believe that Ms. Portilla's disturbing experiences are not only true but quite possibly initiated by the FBI .
33. The debate I had continually with MS. Portilla was that she had no real proof that her suspicions of the cause of these very strange circumstances that we were both experiencing was accurate , although she appeared convinced
34. AFTER the last visit by the client complaining about the FBI , I NOW believe she seems to be correct. I DID GET HER TO STOP making statements without utilizing the word "perceived"
35. Ms Portilla stated in her communication to the Supreme Court that multiple Court notifications {that she perceived to be blocked by others) were not coming through to us.
36. The Matter of Atkinson v County of Hudson is very significant regarding this that are on the docket sheet that others apparently are not seeing.
37. With respect to both the judge and defense counsel allegedly not seeing my filings for default multiple times, it would appear that the docket sheet accurately records what happened , and the undersigned did indeed file for default appropriately , which were not included in the carefully written chronology stated by defense counsel and possibly merely reiterated by the court from defense counsel's statement.
38. What ever the reason both the COURT and DEFENSE counsel missed TRUTH !
39. WHATEVER the truth may be , it is suggested that this OLD lawyer Has experienced many things in life and suggests with CERTAINTY, that Ms. Portilla is not a danger to anybody , is a very competent attorney and seems to be accurate in much of her observations that she reported.
40. The evidence demonstrates that the FBI may very well be behind the multiple interferences with a variety of electronic filings on ecourts etc.

41. At my last court appearance on June 9 ,2025 I complained to Judge Critchley that I keep my own diary and did not have notice via eCourts about that matter nor the trial that the judge told me was scheduled for Monday June 16, 2025.

42. I actually complained on that record of some of the strange events that were occurring to me recently , including a recent recording of my conversation with Ms. Portilla that reminded me of that recording with Ms. Portilla's medical expert years ago.

43. Ms. Portilla's report to the Supreme Court also mentions that someone with administrative access has removed her name from the almost all docket sheets of her clients and replaced her name with mine.

44. The docket sheets attached speak for themselves as to whether she is imagining these things.

45. The matter of Nazario v. Lorenzo is the most obvious that someone accessed the docket sheets and made the change for what ever reason. I agreed to be the trial attorney towards the end of the Nazario v. Lorenzo case.

46. Yet strange enough my name was substituted for Ms. Portilla's at the top of the docket sheet as the attorney of record. {See attached docket sheets of Ms. Portilla's clients wherein those cases were filed under her account by her.}

47. I did not consent to become the attorney of record on Ms. Portilla's clients' cases! Ms. Portilla did not consent to these changes!

I certify that the above statements made by me are true. I am aware that if any of the forgoing statements are wilfully false that I will be subject to punishment.

/s/ Eldridge Hawkins
ELDRIDGE HAWKINS, ESQUIRE

June 12, 2025

ELDRIDGE HAWKINS LLC
ATTORNEY AT LAW
60 Evergreen Place, suite 510
East Orange, NJ 07017
PHONE: (973) 676 5070 FAX: (973) 676 7356
Email:hwklaw@aol.com
Attorney ID: 214731967
Attorney for Plaintiff, Cecile Portilla

CECILE PORTILLA

Plaintiff

v

MAXIM HEALTH CARE SERVICES, INC
DAWN KENNY, LAURA RIDDLE
BARBARA VOLTA, HEAD DOE
JOHN DOE (1-20)

Defendants

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: ESSEX COUNTY

Civil Action

Docket No: ESX-L-6774-14

CERTIFICATION OF
MARIO PORTILLA

Certification of Mario Portilla of full age, bearing witness of malicious activities against Cecile D. Portilla. I am a Registered Nurse and work as a Nurse Clinician at NJMS Rutgers University.

1. I have observed and witnessed tampering, hacking and harassment of Cecile D. Portilla's professional and personal environment.
2. I observed how a special computer security software revealed the presence of duplicate programs mysteriously invading computer files and monitoring computer activity.
3. I observed how Ms. Portilla's personal computers became inaccessible with her passwords and required "administrative" passwords.
4. I observed printer malfunctions on numerous NEW devices/equipment.
5. I have assisted Ms. Portilla in returning several NEW printers to BEST BUY and Staples after these developed unrepairable malfunctions within a few weeks of purchase.
6. I observed fax machine transmission and reception interrupted.
7. I witnessed email access interrupted or denied requiring "administrative password".
8. Ms. Portilla reported to me over many months numerous occurrences of cell phone calls dropped, frequent cell phone volume inexplicably diminished, voice mail answering services not capturing messages.
9. Ms. Portilla brought to my attention and on several occasions (and I witnessed) real time tampering of documents/motions being processed (computer work) for submission to the courts and other attorneys.
10. Ms. Portilla reported to me over many months that there was ongoing tampering of documents included deletion of edits and updates.

11. I observed vertical lines or stripes appearing during printing that made documents unacceptable (occurring with NEW devices and relatively new devices).

12. Ms. Portilla reported to me several occurrences involving the interruption of phone calls to other professionals and businesses that could be accessed using other phone services that were not previously used within the confines of Ms. Portilla's personal practice and those of her professional associates.

13. On Ms. Portilla's behalf I have made many phone calls from my work site at Rutgers Biomedical and Health Sciences to communicate with parties that Ms. Portilla was unable to reach from her work site using her land line and her cell phone.

14. I have witnessed stalking of Ms. Portilla while she was pursuing her professional and personal activities by unknown parties.

15. Ms. Portilla reported to me numerous occurrences of a third party intercepting personal and privileged phone conversations.

16. Ms. Portilla showed me a sample of a tampered legal document that was delivered by the US Post Office services.

17. Ms. Portilla maintained with me an ongoing reporting of the hacking/tampering of computers and cell phones of other professionals participating in business related activities with Ms. Portilla.

18. I witnessed how these malicious tampering activities of professional files have resulted in significant time lost and requiring:

    a. Micromanagement of all documents prior to submission

    b. Excessive time devoted to re-reviewing documents

ESX-L-001684-25 09/16/2025 11:59:52 PM Pg 48 of 50 Trans ID: LCV202525563569

c. Excessive time spent dealing with equipment malfunctions

19. In the course of many months Ms. Portilla reported to me that clients and persons seeking Ms. Portilla's professional services mentioned to her that their cell phones and computers:

a. Computers and cell phones developed sudden glitches

b. Cell phone conversations sound like they are talking in an echo chamber

c. Cell phones will turn on without entering the passcode

20. One client personally know to me complained of all the above mentioned cell phone problems after meeting with Ms. Portilla.

21. My computer work was also impacted:

a. Hospice patient reports would have entire sections deleted

22. My printer develops printing malfunctions when used by Ms. Portilla:

a. New "name brand" ink cartridges fail to print shortly after legal documents are being generated

b. My printer develops jams and malfunctions when used by Ms. Portilla

23. I have met with two of Ms. Portilla's Mental Health Clinicians (Dr. Alena Antohira and Dr. Lee Hindin) to corroborate Ms. Portilla's complaints of harassment, tampering and hacking.

I certify that the above statements made by me are true. I am aware that if any of the foregoing statements are willfully false that I am subject to punishment.

[signature]

Dated: November 26 2017 Mario Portilla

ESX-L-002562-22 12/02/2025 10:11:11 PM Pg 1 of 4 Trans ID: LCV20253333988

CECILE D. PORTILLA, ATTORNEY AT LAW LLC
CECILE D. PORTILLA, ESQUIRE
7 Glenwood Avenue, Suite 400
East Orange, NJ 07017
Phone (973) 419 2325 Fax (973) 669 3268
Attorney Id :021212005
Portillalaw@Gmail.com
CO-COUNSEL FOR RONALD MORRISON

ELDRIDGE HAWKINS LLC, Attorney at Law
ELDRIDGE HAWKINS, ESQUIRE
Attorney ID No. 214731967
60 Evergreen Place, Suite 510
East Orange, New Jersey 07018
Tel: (973) 676-5070 Fax: (973) 676-7356
Email: hwklaw@aol.com

TRIAL ATTORNEY FOR FOR RONALD MORRISON

| | |
|---|---|
| **RONALD MORRISON**<br><br>**Plaintiff**<br><br>**v.**<br><br>**GRAND ESSEX LLC, GREAT BERGEN HOMES LIMITED LIABILITY COMPANY d/b/a GREAT BERGEN HOMES, TOWNSHIP OF IRVINGTON, SASHI SHALOM, SHARI MILLER SHALOM, SAMUEL ADDO, T. CADET, SWEET HOMES PROPERTIES, LLC, HEAD DOES 1-5, HARRY DOES 1-10**<br><br>**(Identities Unknown)**<br><br>**Defendant** | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY<br><br>**ESX-L-002562-22**<br><br>**CIVIL ACTION**<br><br>**CERTIFICATION OF RONALD MORRISON IN FURTHER SUPPORT OF MOTION TO TRANSFER VENUE TO MORRIS COUNTY** |

ESX-L-002562-22 12/02/2025 10:11:11 PM Pg 2 of 4 Trans ID: LCV20253383393

## CERTIFICATION OF RONALD MORRISON

Ronald Morrison of full age with knowledge of the penalties of false swearing certify as follows:

1. I am a client of Cecile D. Portilla and Eldridge Hawkins.
2. I have had discussions with Ms. Portilla and Eldridge Hawkins that I would like my case transferred to Morris County, as Eldridge Hawkins does not believe that we can get the justice necessary in Essex County.
3. I trust Eldridge Hawkins and Ms. Portilla to handle my case.
4. I assist them with courier services and see them frequently.
5. Ms. Portilla advised me that she was a Whistle Blower against the FBI.
6. Ms. Portilla wanted her mail delivered by a Courier because she explained that the green certified mail receipts were not being returned and mail was being received ripped open at times and not getting to their destinations.
7. I advised Ms. Portilla that in 2022 that I went to a car dealership to purchase a car that the credit reporting system identified me in the system as deceased.
8. Because I was Identified as a dead person, I could not get the funding that I wanted to buy the car.
9. Ms. Portilla advised me in August 2025 that she had disclosed this to an Ethics Attorney Alexandra Gitter and Investigator Chopra, whom she stated, would call me to verify statements made by her.
10. I went in person to the office of Attorney Ethics and gave my address to the clerk to make sure that they could reach me as the sim card was strangely removed from my phone and I wanted to make sure that I could be reached.
11. Ms. Portilla explained that the sim card was also removed from her cell phone remotely at one point upon which she advised that she went to the phone company to get help.
12. No one called me from the Office of Attorney Ethics, and no one sent me any mail related to my witness statement.
13. I advised both Mr. Hawkins and Ms. Portilla and sent them photos that I am being harassed by law enforcement persons.

14. I have pictures of vehicles that I recognize as law enforcement employees who are constantly parked in front of my home who seemingly want me to see them or to feel their presence.
15. I have been working for Uber for over 10 years. On 11/25/25, Uber suddenly subjected me to a background test within 10 months of the last one.
16. According to Uber, I failed the background test and was subjected to immediate termination from my uber job.
17. Strangely enough while I failed the background test for Uber, I passed the background test for my firearm, and for LYFT within weeks of the Uber check.
18. I also passed the background check for TWIC and my vehicle registration without issue I rely on my income from Uber to pay my rent and bills.
19. In October 2025, Ms. Portilla advised me to file a Notice of Claim against the City of Irvington and the police after they claimed that they did not receive my application for renewal of my gun permit which I knew to be false.
20. After the receipt of the Notice of Claim, wherein I accused Irvington and the police of discrimination and conspiracy, my gun permit application was quickly processed.
21. I was present in his law offices when Eldridge Hakwins received a call from someone who stated that he was from a bar association.
22. He stated that Judge Venable asked him to call Eldridge Hawkins regarding becoming trustee over his cases. I heard Eldridge Hawkins declined the offer.
23. I want my case transferred to Morris County so that my matter that is now in Essex County may be timely concluded.
24. Please allow the transfer of my case to Morris County as soon as possible because my lawyers are not comfortable in Essex County.

I certify that the foregoing is true to the best of my knowledge and am aware that should any of the foregoing be willfully false, I may be subject to punishment.

Ronald Morrison

December 2, 2025

# J.U. Ejiofor, Ph.D., MSN, APN

A Psychiatric Mental Health Provider

Dear Sir/Madam:

I am the Director of Luminous Cares, LLC – A Psychiatric Mental Health Provider. I am a licensed Mental Health Provider, professional.

I have been asked by Ms Portilla to prepare a letter regarding her mental competency.

I have known Ms Portilla for many years. In fact, after she advised me in approximately 2020 that the West-Orange Police was refusing to provide her with assistance regarding her concerns that she was being harassed by government agents regarding her whistle-blowing activities, and trying to suggest that she was mentally incompetent, and by dint of my professional expertise I offered to go to the police station with her in her defense. I called the West Orange Police Station line many times for this purpose, but no one neither picked up nor returned my calls.

Not only is Ms Portilla mentally competent, she is diligent and purposeful in her professional career as a black woman.

I am convinced that Ms Portilla, in fact, made all the observations that she has reported over the years.

Should you have any questions, please feel free to reach me at 862-930-0740.

Ejiofor

J. U. Ejiofor, CEO
Ph.D., MBA, MSN, PMHNP-BC
6/28/2025

Luminous Cares, LLC

p | 862.233.2133
f | 862.233.2043
e | luminouscares@yahoo.com

134 Evergreen Place
Suite 301
East Orange, NJ 07018

ELDRIDGE HAWKINS LLC, Attorney at Law
Attorney ID No. 214731967
60 Evergreen Place, Suite 510
East Orange, New Jersey 07018
Tel: (973) 676-5070 Fax: (973) 676-7356
Email: hwklaw@aol.com
*Attorney for Plaintiff*

| | |
|---|---|
| **CECILE D. PORTILLA, ESQUIRE**<br>**Plaintiff-Appellant**<br><br>**JOANNA BARBA JONES, in her official capacity as Director of the Office of Attorney Ethics; ALEXANDRA GITTER, individually R. CHOPRA, individually JOHN DOES 1--10,**<br><br>**Defendants-Respondents** | **UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**<br><br>**Case NO. 26-1207**<br><br>**Civil Action**<br><br>**CERTIFICATION OF LATOYA BORUM** |

I, Latoya Borum of full age certify as follows:

1. I am an assistant to Ms. Portilla and familiar with the facts of this case.
2. I met Ms. Portilla through her husband Mario. I have known her since 2023.
3. Ms. Portilla is a very likable person with a beautiful personality.
4. She has assisted me in many ways. I tell her all the time that I appreciate her.
5. Mr. Hawkins calls her "mother."
6. I agreed to start helping her with her office functions in April 2025.

7. She bought me a lap top and a printer so that I can work from home, but I also go into the Office to assist her and Mr. Hawkins.
8. She advised me shortly after that she was a Whistle blower against the FBI.
9. She told me this after she observed me crying because of a very hurtful text message that I received from my son's phone number.
10. She stated that I should be absolutely sure that my son actually wrote the hurtful message before I got angry at him.
11. She told me that her husband and others have received text messages from her phone that she did not send.
12. She told me that her husband received a text message from her phone advising him that she was bringing home men for dinner.
13. Soon after I became aware that I too was being harassed.
14. I went to Ms. Portilla house on two Sundays to assist her and on both occasions DYFS received a call that I had abandoned my four year old daughter.
15. The second false report received by DYFS advised that my four year old was left at home and was walking naked in the hallway.
16. I am a good mother. Whenever I have to leave my four year old, she is always left with my college aged daughter who lives with me.

17. In response to the false reports, a DYFS agent came to my home telling me that I must subject myself to a drug test based on the calls related to my daughter.

18. I do not use drugs.

19. Ms. Portilla told me not to consent to the drug test. She filed a notice of claim against DYFS for Harassment, Violation of Privacy and Denial of Equal protection and other claims.

20. Upon Ms. Portilla calling my house one night after hours, while I was asleep, to inquire into my availability for the next day, someone who does not live in my house hacked my phone and answered my cell phone pretending to me.

21. The next day Ms. Portilla wanted to know why I was not ready to be picked up at the time she was told by the person who had accessed my phone remotely and answered her call.

22. I told her that I was asleep and knew nothing about the conversation that she had with the person who answered my phone and pretended to be me.

23. I later became aware that I had lost the ability to use my Cell phone while away from my home and close to my wi-fi.

24. Xfinity is the carrier for my cell phone. Ms. Portilla drove me to the Xfinity office in West Orange as I could not get any clear answers via phone from X-fixity.

25. Upon going to the X-finity office for answers, I was told that I failed to pay my phone bill for 10 months and was required to pay over $1000.00 to be able to use my cell phone.

26. I was never accused of failing to make my phone payments until I started assisting Ms. Portilla.

27. I looked at my own account and saw that ten payments were in fact made from my account, yet Xfinity for some strange reason cannot see those payments.

28. Ms. Portilla stated that she believes that that is exactly the way documents are being blocked on eCourts so that Judges and Court staff cannot see them.

29. She also told me that after she made her 2022 tax payment on line to the State, no one could see that payment for weeks, causing the State to send multiple threatening letters to her regarding nonpayment.

30. Ms. Portilla said that she was forced to travel to Trenton in person to the Department of Taxation to show that the payment was made.

31. She also told me that her payments to Guaranteed Subpoena are being erased from their computers, and unless she has a receipt to show that the payments were made, they try to make her pay the same bills repeatedly.

32. Because I could not convince Xfinity that the payments were made despite the 10 months of payment being removed from my account. Ms. Portilla bought me a track phone at Target with 400 minutes, so that I would have a reliable way of communicating.

33. She advised that upon the staff at Target trying to add the protection plan to the track phone the system would not recognize the phone.

34. The cashier at Target said that this had never happened to her before and called her manager. The manager could not get the system to recognize the track phone. Target was forced to give her another track phone.

35. Two days later while using the new track phone, I heard a recording that my phone call was being recorded, after which my conversation was interrupted and my call was disconnected.

36. Upon trying to reconnect with the person with whom I was speaking, I heard another recording that my track phone was not in service. When I called the 800 number to find out why my track phone was not working, I was told by the agent that I had used up all 400 minutes!

37. I could not have used more than 60 minutes out of the 400 minutes in two days.

38. Ms. Portilla was forced to buy me a gift credit card that I could use to make monthly payments on the track phone.

I certify that the above statements made by me are true. I am aware that if any of the above statements are willfully false that I am subject to punishment.

/s/ Latoya Borum
LATOYA BORUM

Dated: February 15, 2026